## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF NEW YORK
### Albany Division

MATTHEW AVITABILE; FIREARMS )
POLICY COALITION; and FIREARMS )
POLICY FOUNDATION )
)
Plaintiffs, )
) Civil Action No. __1:16-cv-1447__ (DNH/CFH)
v. )
)
ANDREW M. CUOMO, in his Official )
Capacity as Governor of the State of New )
York, ERIC SCHNEIDERMAN, in his )
Official Capacity as Attorney General of )
New York and LT. COL. GEORGE )
BEACH in his Official Capacity as )
Superintendent of the New York State Police )
)
Defendants. )
_____)

### COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

COME NOW the Plaintiffs, MATTHEW AVITABILE, FIREARMS POLICY COALITION and FIREARMS POLICY FOUNDATION ("Plaintiffs"), by and through his undersigned counsel, and complain of the Defendants as follows:

### I.   PARTIES

1. Plaintiff Matthew Avitabile is a natural person and a citizen of the United States and of the State of New York and resides in Schoharie County, New York, and is a member of Firearms Policy Coalition and the Firearms Policy Foundation.

2. Plaintiff Firearms Policy Coalition ("FPC") is a non-profit public benefit organization that serves its members and the public through direct and grassroots advocacy, legal action, education, and other programs. The purposes of FPC include defending the United States Constitution and the People's rights, privileges and immunities deeply rooted in the Nation's

1

history and tradition, especially the fundamental Second Amendment right to keep and bear arms. FPC believes that N.Y. Penal Law § 265.01 is unconstitutional. FPC has spent funds and resources to research the law's constitutionality and educate the public about the issue. FPC has members in New York whom, but for New York's ban on Tasers and other electronic arms, would keep, carry, and in the appropriate circumstances utilize Tasers and other bearable electronic arms for self-defense.

3. Plaintiff Firearms Policy Foundation ("FPF") is a non-profit public benefit organization that serves to promote civil rights through research, education, and other charitable efforts, with a focus on laws affecting the fundamental Second Amendment right to keep and bear arms. FPF believes that N.Y. Penal Law § 265.01 is unconstitutional. FPF has spent funds and resources to research the law's constitutionality and educate the public about the issue. FPF has members in New York whom, but for New York's ban on Tasers and other electronic arms, would keep, carry, and in the appropriate circumstances utilize Tasers and other bearable electronic arms for self-defense.

4. Defendant Andrew M. Cuomo is the Governor of the State of New York. Defendant Cuomo is sued in his official capacity and is responsible for the administration and enforcement of New York's customs, policies, practices and laws related to the State of New York's ban on stun guns and/or electronic arms. Defendant Cuomo may be served at the New York State Capitol Building, Albany, NY 12224.

5. Defendant Eric Schneiderman is the Attorney General of the State of New York and is sued in his official capacity and is responsible for enforcing the State of New York's customs, policies, practices and laws related to the State of New York's ban on stun guns and/or

electronic arms. Defendant Schneiderman may be served at the Office of Attorney General on the second floor of the Justice Building, Empire State Plaza, Albany, NY 12224.

6. Defendant Lt. Col. George Beach is sued in his official capacity as the Superintendent of the New York State Police. Defendant Beach is responsible for enforcing the State of New York's customs, policies, practices and laws related to the State of New York's ban on stun guns and/or electronic arms. Defendant Beach may be served at the New York State Police, Building 22, 1220 Washington Avenue, Albany, NY, 12226.

## II.   JURISDICTION AND VENUE

7. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1343, 2201, 2202 and 42 U.S.C. § 1983 and § 1988.

8. Venue lies in this Court pursuant to 28 U.S.C. § 1391.

## III.   STATEMENT OF FACTS

### a. The Second Amendment

9. The Second Amendment to the United States Constitution provides: "A well regulated Militia being necessary to the security of a free State, the right of the people to keep and bear Arms shall not be infringed."

10. The Second Amendment guarantees individuals a fundamental right to keep and carry arms for self-defense and defense of others in the event of a violent confrontation. *District of Columbia v. Heller*, 554 U.S. 570 (2008); *McDonald v. Chicago*, 561 U.S. 742 (2010); *Caetano v. Massachusetts,* 577 U.S. __ (2016).

11. Arms are "'weapons of offence, or armour of defence.' 1 Dictionary of the English Language 107 (4th ed.)" They are anything that a man [or woman] wears for his defense, or takes

3

into his hands, or uses in wrath to cast at or strike another.' 1 A New and Complete Law Dictionary (1771)." *District of Columbia v. Heller*, 554 U.S. at 581.

12. The Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding. *Heller,* 554 U.S. at 582; *Caetano*, slip op. at 1 (per curiam).

13. Under the Second Amendment, the Defendants retains the ability presumptively to regulate the manner of carrying arms and may prohibit certain arms in narrowly defined sensitive places, prohibit the carrying of arms that are not within the scope of Second Amendment's protection such as unusually dangerous arms, and disqualify specific, particularly dangerous individuals from carrying arms. *See Heller,* 554 U.S. at 627.

14. Given the decision in *Heller*, Defendants may not completely ban the keeping and bearing of arms for self-defense that are not unusually dangerous, deny individuals the right to carry arms in non-sensitive places, deprive individuals of the right to keep or carry arms in an arbitrary and capricious manner, or impose regulations on the right to keep and carry arms that are inconsistent with the Second Amendment. *See Caetano v. Massachusetts*, 577 U.S. ___ (2016); *Heller v. District of Columbia,* 801 F.3d 264 (D.C. Cir. 2015); *Palmer v. District of Columbia,* 59 F.Supp.3d 173 (2014).

15. In a recent Fifth Circuit Court of Appeals case, the Fifth Circuit cited approvingly to *Caetano* for the proposition that stun guns are protected arms under the Second Amendment:

> In addressing whether stun guns are in common use, Justice Alito, joined by Justice Thomas, implied that the number of states that allow or bar a particular weapon is important:
>
>> [T]he number of Tasers and stun guns is dwarfed by the number of firearms. This observation may be true, but it is beside the point.... The more relevant statistic is that [200,000] ... stun guns have been sold to private citizens, who it appears may lawfully possess them in 45 States.... While less popular

4

> than handguns, stun guns are widely owned and accepted as a legitimate means of self-defense across the country.

*Caetano*, 136 S.Ct. at 1032–33 (citations and quotation marks omitted). These two justices suggested that the 200,000 absolute number, plus that 45 states have "accepted [stun guns] as a legitimate means of self-defense," was enough to determine that the stun gun is in common use.

*Hollis v. Lynch*, 827 F.3d 436, 449 (5th Cir. 2016).

### b. Tasers

16. Tasers are arms in common use for self-defense by civilians as well as by law enforcement.

17. Tasers are manufactured and sold by Taser International, Inc.

18. A Taser is an electronic control device ("ECD") that uses replaceable cartridges containing inert, compressed nitrogen to fire two small probes that are attached to insulated conductive wires. In the models generally marketed to non-law enforcement persons, the conductive wires are 15 feet (4.5 meter) in length.

19. Taser models generally marketed to law enforcement agencies use conductive wires with lengths up to 25 feet in length.

20. The probes are designed to penetrate the clothing of an attacker and imbed in the attacker's skin. Electrical energy is sent over the wires into the probes. The charge is transmitted between the two probes and is designed to disrupt the sensory and motor functions to inhibit muscular control of an attacker.

21. With a Taser exposure, the attacker is momentarily incapacitated to allow the person attacked to escape and call for law enforcement assistance, or in the case of a law enforcement officer, to allow for the apprehension of the suspect without further risk of injury to the officer or the suspect.

22. The Taser's electronic charge lasts from five to thirty seconds depending on whether the civilian or the law enforcement model is employed.

23. The most commonly employed civilian Taser is a one shot device with a 30 second charge. Once fired the device can still be used as a direct contact stun device in the event of a missed shot or in the event of multiple assailants.

24. Taser International also manufactures Taser devices having the capacity for multiple shots. These multiple shot devices are commonly used by law enforcement personnel in the performance of their duties.

25. Tasers have several advantages over other non-lethal means of self-defense, such as self-defense sprays or contact weapons.

26. First, self-defense sprays must be administered generally within several feet of an assailant while a civilian model Taser can be deployed within 15 feet. The closer distance the assailant must be to a potential victim for the victim to employ a self-defense spray increases the danger to the potential victim. For example, it is generally recognized by law enforcement that an assailant wielding a contact weapon such as a knife or a club can be a lethal threat at distances of 21 feet or closer. *See* Dennis Tueller*, How Close is Too Close*, Police Policies Study Council, available at http://www.theppsc.org/Staff_Views/Tueller/How.Close.htm (originally published in the March 1983 Edition of SWAT Magazine).

27. Second, pepper sprays can often be ineffectual against highly intoxicated or highly agitated assailants. *See generally* Steven M. Edwards, et al., *Evaluation of Pepper Spray*, National Institute of Justice, U.S. Dept. of Justice, Office of Justice Programs, Research in Brief (February 1997), available at https://www.ncjrs.gov/txtfiles/162358.txt. Tasers, on the other hand, when effectively employed will likely stop an attack from an intoxicated or mentally disturbed attacker.

28. Third, for optimum effect, defense sprays should be deployed at the face of the attacker, which is a small target. The Taser is most effective when deployed at other larger parts of the body of the attacker.

29. Fourth, defense sprays can end up being blown back at the victim if used in a windy environment, resulting in incapacitating the victim rather than the attacker. This is not an issue with a Taser device.

30. Likewise, Tasers have advantages over the variety of contact weapons as well such as police type batons or knives. Allowing an attacker to close to contact distance creates a high degree of danger to a potential victim.

31. Contact weapons can also be more difficult for persons of lesser strength to deploy, compared to a Taser.

32. Moreover, use of any contact weapon, such as a knife or club, carries a high degree of risk of death or serious bodily harm to the assailant, whereas risk of death or serious bodily harm from a Taser is minimal.

33. On a related note, given that use of a knife or club qualifies as the use of deadly force, an individual using a knife or club to defend against a criminal attack, has a high legal standard to meet to sustain a claim self-defense.

34. Tasers have been widely used by law enforcement agencies throughout the United States and the world. More than 18,000 law enforcement agencies use the devices.

35. Studies have shown Tasers to reduce injuries to both law enforcement officers and to suspects. The United States Department of Justice found that Tasers result in fewer injuries to suspects and officers than all other means of subduing suspects.

36. In the event of deployment of a civilian Taser the device releases some 24 small confetti like tags called AFIDs which are packed into the firing mechanism. When the Taser cartridge is engaged, the AFIDs fly out of the Taser and scatter around the area where the device was utilized.

37. The term AFID stands for Anti Felon Identification. Taser utilizes AFIDs to deter criminal misuse of its product. Taser can trace the purchaser of the device from data contained on an AFID.

38. Tasers and other electronic weapons are in common use for self-defense. The Michigan Court of Appeals found that "Hundreds of thousands of Tasers and stun guns have been sold to private citizens," *People v. Yanna*, 297 Mich. App. 137, 144, 824 N.W. 2d 241, 245 (2012). Concurring in the *per curiam* reversal of the Massachusetts Supreme Judicial Court's upholding of a ban on stun guns, Justice Alito stated, "While less popular than handguns, stun guns are widely owned and accepted as a legitimate means of self-defense across the country." *Caetano v. Massachusetts*, 577 U.S. __, ___ (March 21, 2016) (Alito, J., concurring).

   c. **State of New York Law.**

39. N.Y. Penal Law § 265.00 15-a states as follows: "'Electronic dart gun' means any device designed primarily as a weapon, the purpose of which is to momentarily stun, knock out or paralyze a person by passing an electrical shock to such person by means of a dart or projectile."

40. N.Y. Penal Law § 265.00 15-c. states as follows: "'Electronic stun gun' means any device designed primarily as a weapon, the purpose of which is to stun, cause mental disorientation, knock out or paralyze a person by passing a high voltage electrical shock to such person."

41. N.Y. Penal Law § 265.01 provides that "A person is guilty of criminal possession of a weapon in the fourth degree when:(1) He or she possesses any firearm, electronic dart gun, electronic stun gun…"

42. Thus, New York outlaws the private possession by Plaintiffs of a Taser or stun gun within the state.

### d. Plaintiff Matthew Avitabile.

43. Plaintiff desires to purchase a stun gun or Taser for self-defense and other lawful purposes in his home.

44. Plaintiff is aware that there are significant and adverse legal, financial, social and psychological ramifications of using deadly force to defend against a home invasion or personal attack.  He is aware that even where use of deadly force is justified, a victim forced to use deadly force may be taken into police custody, arrested and prosecuted.  He is aware that he would likely have to go to the expense of hiring an attorney to protect his rights in the criminal justice system.  He is aware that he would be at the mercy of police, prosecutors and jurors who will have weeks or months to second guess a decision to use deadly force made in seconds in the face of a threatened attack.

45. Plaintiff is aware that even where use of deadly force is justified, a victim may be sued by the perpetrator if the perpetrator survives, or by the perpetrator's family, if the perpetrator does not survive.  The victim may have to go to the expense of hiring an attorney to defend the civil proceeding and will be at the mercy of a jury second guessing in the comfort of a jury room the decision to use deadly force made in a second in the face of an attack.

46. Plaintiff is aware that persons forced to use deadly force in their defense will likely suffer one or more types of psychological distress.  *See generally,* Alexis Artwohl, *Deadly Force*

*Encounters, What Cops Need to Know to Mentally and Physically Prepare for and Survive a Gun Fight* (1997), pp. 79-242 (hereinafter "Artwohl").

47. He is aware that persons forced to use deadly force in their defense will likely suffer from the withdrawal and isolation of friends and families, especially if their use of force results in the death of the perpetrator.

48. He is aware that persons forced to use deadly force in their defense will likely suffer from one or more manifestations of Post Violent Event Trauma ("PVET"). Manifestations of PVET can include sleep disturbance including sleeplessness or nightmares, substance abuse, depression or malaise, appetite disturbance, social withdrawal or social ostracism, aggression or avoidance syndrome and flashbacks. *See* Artwohl.

49. Plaintiff is aware of the potential legal, economic and psychological ramifications of even the justified use of deadly force to defend himself or his home against a violent criminal attack.

50. Plaintiff would prefer to minimize the likelihood that he would have to resort to deadly force in the event he was forced to defend himself or his home from a violent criminal attack.

51. In appropriate circumstances, Plaintiff would prefer to utilize a Taser for defense of himself, his family and his home due to its proven effectiveness and its proven record of minimizing injury to suspects and/or assailants.

52. Plaintiff Avitabile desires to place an order with Taser International for a Taser Pulse model. However, Plaintiff fears prosecution for possessing and carrying a Taser, so he has refrained from violating New York's ban on Tasers and stun guns. See Exhibit "1."

53. But for New York's law, Plaintiff would acquire, possess, carry and where appropriate use a Taser or stun gun to protect himself and his home.

### e. Plaintiff Firearms Policy Coalition.

54. Plaintiff FPC has members in New York whom desire to purchase a stun gun or Taser for self-defense and other lawful purposes in their home.

55. FPC is a non-profit public benefit organization that serves its members and the public through direct and grassroots advocacy, legal action, education, and other programs. The purposes of FPC include defending the United States Constitution and the People's rights, privileges and immunities deeply rooted in the Nation's history and tradition, especially the fundamental Second Amendment right to keep and bear arms. FPC believes that N.Y. Penal Law § 265.01 is unconstitutional. FPC has spent funds and resources to research the law's constitutionality and educate the public about the issue. FPC has members in New York whom, but for New York's ban on Tasers and other electronic arms, would keep, carry, and in the appropriate circumstances utilize Tasers and other bearable electronic arms for self-defense.

### f. Plaintiff Firearms Policy Foundation.

56. Plaintiff FPF has members in New York whom desire to purchase a stun gun or Taser for self-defense and other lawful purposes in their home.

57. Plaintiff FPF is a non-profit public benefit organization that serves to promote civil rights through research, education, and other charitable efforts, with a focus on laws affecting the fundamental Second Amendment right to keep and bear arms. FPF believes that N.Y. Penal Law § 265.01 is unconstitutional. FPF has spent funds and resources to research the law's constitutionality and educate the public about the issue. FPF has members in New York whom,

but for New York's ban on Tasers and other electronic arms, would keep, carry, and in the appropriate circumstances utilize Tasers and other bearable electronic arms for self-defense.

## COUNT I

### U.S. CONST., AMEND. II, 42 U.S.C. § 1983 AGAINST ALL DEFENDANTS

58. The Defendants prohibit Plaintiffs from acquiring, possessing and using a defensive arm in common use, i.e., a Taser. As such it violates Plaintiffs' Second Amendment rights.

59. Defendants' laws, customs, practices and policies generally banning the acquisition, possession, carrying and use of Tasers and other electronic arms violates the Second Amendment to the United States Constitution, facially and as applied against the Plaintiffs in this action, damaging Plaintiffs in violation of 42 U.S.C. § 1983. Plaintiffs are therefore entitled to preliminary and permanent injunctive relief against such laws, customs, policies, and practices.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs request that judgment be entered in his favor and against Defendants as follows:

1. An order preliminarily and permanently enjoining Defendants, their officers, agents, servants, employees, and all persons in active concert or participation with them who receive actual notice of the injunction, from enforcing N.Y. Penal Law § 265.01 to ban the acquisition, possession, carrying or use of Tasers and other electronic arms;

2. An order declaring that N.Y. Penal Law § 265.01 is unconstitutional and violates the Second Amendment to the United States Constitution;

3. An order declaring N.Y. Penal Law § 265.01 unenforceable;

4. Costs of suit, including attorney fees and costs pursuant to 42 U.S.C. §1988;

5. Damages to be determined at trial;

6. Such other Declaratory relief consistent with the injunction as appropriate; and

7. Such other further relief as the Court deems just and appropriate.

Dated:  December 3rd, 2016.

>Respectfully submitted,

>**MATTHEW AVITABILE, FIREARMS POLICY COALITION AND FIREARMS POLICY FOUNDATION**

>/s/ Stephen D. Stamboulieh
>Counsel for Plaintiffs

*/s/ Stephen D. Stamboulieh*
Stephen D. Stamboulieh
Stamboulieh Law, PLLC
P.O. Box 4008
Madison, MS  39130
(601) 852-3440
stephen@sdslaw.us
MS Bar No. 102784
NDNY Bar Roll# 520373


Alan Alexander Beck
Law Office of Alan Beck
4780 Governor Drive
San Diego, CA  92122
(619) 905-9105
Alan.alexander.beck@gmail.com
*Pro Hac Vice Paperwork Forthcoming