**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK
Albany Division**

MATTHEW AVITABILE, et al.      )
                                )
Plaintiffs,              )
                                )   Civil Action No. 1:16-cv-1447 (DNH/CFH)
v.                   )
                                )
ANDREW M. CUOMO et al.    )
                                )
Defendants.           )
_____)

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S
MOTION FOR A PRELIMINARY AND/OR PERMANENT INJUNCTION**

# TABLE OF CONTENTS

*Page*

I.      Introduction ……..............................................................................................1

II.     Plaintiffs have standing to bring this action ...…………………………….......…2

III.    Plaintiffs are entitled to a preliminary injunction ………..………………………..3

IV.     Plaintiffs are likely to succeed on the merits of their claim that New York's
        ban on Tasers and other electronic defensive arms violates
        the Second Amendment .....................................................................................3

        a.      New York bans otherwise law-abiding citizens
                from keeping and bearing Tasers and other electronic arms .................................3

        b.      Tasers are arms under the Second Amendment ......................................................4

        c.      Tasers are neither dangerous nor unusual ……………………………….......8

        d.      That New York allows possession of other arms does not save
                its ban on Tasers and other electronic defensive arms ………………………..15

        e.      The Court need not reach the question whether a narrower restriction
                might be constitutional ………………………………………………………..15

        f.      New York's ban fails any measure of heightened constitutional scrutiny ………16

V.      Plaintiffs continue to suffer irreparable harm in the absence of preliminary
        relief..……………………………………………………………………………22

VI.     The balance of equities tips overwhelmingly in Plaintiffs' favor….....................................23

VII.    An injunction is in the public interest ..............................................................................24

VIII.   The court should enter final judgment for Plaintiffs…... ...................................................24

Conclusion ……..................................................................................................................25

Certificate of Service……………………………………………………………………….26

## I.      Introduction

The Supreme Court in *Heller*, 554 U.S. 570, and *McDonald,* 561 U.S. 742 (2010) held that the Second Amendment protects the fundamental right of law-abiding persons to keep and bear commonly owned arms for self-defense.   In *Heller* and *McDonald*, the arms in question were handguns.[1]   *Heller* held that the Second Amendment protects a fundamental, individual right to possess firearms for self-defense, and it therefore struck down the District's handgun ban as categorically unconstitutional. 554 U.S. at 628-29 (total handgun ban in the home would fail any standards of scrutiny applied to enumerated constitutional rights).

In *McDonald*, the Court confirmed that the right the Second Amendment protects is fundamental and thus applied *Heller's* ruling to the several states via the 14th Amendment's due process clause to strike down Chicago's handgun ban. 561 U.S. at 750.   This case now presents the question whether the New York's ("Defendant" or "New York") may ban the possession and carrying of a Taser electronic control device ("ECD"), a non-lethal arm commonly used by citizens and police in lieu of deadly force to temporarily incapacitate an attacker, or in the case of law enforcement officers, to aid in apprehending a suspect or gaining compliance.   New York outlaws the possession of Tasers and other electronic arms.   *See* N.Y. Penal Law § 265.01.

Plaintiff Avitable is a member of both Firearms Policy Coalition ("FPC") and Firearms Policy Foundation ("FPF").   FPC and FPF are civil rights organizations that operate to protect and advance the rights of their law-abiding members, like Mr. Avitable, and similarly-situated members of the public.   [ECF 1-1, Declaration of Matthew Avitable].   Both FPC and FPF have members who reside in or visit the State of New York. Mr. Avitabile seeks to keep and bear an

---

[1] *Heller* also invalidated D.C.'s requirement that all guns, including legal shotguns and rifles, be kept either disassembled, or unloaded and trigger-locked, when stored in the home.  *Heller*, 554 U.S. at 630.

electronic arm for self-protection in the event of a violent attack. As a direct result of the New York's ban on the possession of electronic arms, he is denied his right to do so. Accordingly, he seeks a preliminary and permanent injunction against enforcement of the New York's ban on electronic arms.

## II.      Plaintiffs have standing to bring this action.

To show standing, Plaintiffs must allege a concrete and particularized injury that is either actual or imminent. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). That injury must be both fairly traceable to the challenged action of the defendant and redressable by the court. *Id*. at 560-61. Plaintiffs plainly meet this standard.

Mr. Avitabile is suffering an immediate and continuing injury because state law denies him the ability to acquire, possess and use a Taser in New York for personal self-defense. There was a similar injury sufficient for standing in *Parker v. District of Columbia*, 478 F.3d 370, 376 (2007), *aff'd sub nom. Hell*er, 554 U.S. 570.

Mr. Avitabile has suffered a concrete and continuing injury as a result of the challenged statute. *See Va. State Bd. Of Pharmacy v. Va. Citizens Consumer Council, Inc.,* 425 U.S. 748, 750-57, 755 n.12 (1976) (consumers had standing to challenge constitutionality of state statute prohibiting pharmacists from advertising prescription drug prices); *NRA v. BATFE,* 700 F.3d 185, 190-91 (5th Cir. 2012) (18-20 year olds had standing to challenge federal ban on purchase of a handgun by persons under 21). *See also Freeman v. Corzine,* 629 F.3d 146 (3rd Cir. 2010) (consumers have standing to challenge prohibition against interstate shipment of wine directly to consumers). *Accord Bridenbaugh v. Freeman-Wilson*, 227 F.3d 848, 849-50 (7th Cir. 2000). Inasmuch as the requested relief herein would redress Mr. Avitabile's injury by allowing him to acquire and use Tasers for self-defense, Plaintiffs have standing to bring this action.

2

### III.     Plaintiffs are entitled to a preliminary injunction.

The court evaluates a request for a preliminary injunction by looking at four factors.  "A plaintiff seeking a preliminary injunction must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Winter v. Natural Res. Def. Council, Inc*., 55 U.S. 7, 19 (2008). Each of these factors support Plaintiffs' motion for a preliminary injunction.

### IV.     Plaintiffs are likely to prevail on the merits of his claim that New York's ban on Tasers and other electronic defensive arms violates the Second Amendment.

Plaintiffs are likely to prevail on the merits of this action because New York bars responsible law-abiding persons from keeping and bearing a class of commonly used arms for self-defense that are not dangerous and unusual.

### a.  New York bans otherwise law-abiding citizens from keeping and bearing Tasers and other electronic arms.

N.Y. Penal Law § 265.01 provides that "A person is guilty of criminal possession of a weapon in the fourth degree when:(1) He or she possesses any firearm, electronic dart gun, electronic stun gun…" These provisions serve to outlaw the possession and use of Tasers and other electronic arms such as stun guns.

 A Taser is an electroshock arm sold by Taser International, Inc. It fires two small dart-like electrodes via compressed nitrogen gas, which stay connected to the main unit by thin wire conductors, to deliver a low amperage electric current to disrupt voluntary control of muscles.  A person exposed to a Taser deployment experiences stimulation of sensory and motor nerves, resulting in involuntary muscle contractions.   To deter misuse of the devices, Taser maintains a registry of civilian purchasers of Tasers and Taser cartridges. When the civilian model of the

device is deployed the device releases numerous small ID tags containing information that allows police to trace the purchaser of the device.

Tasers were introduced as non-lethal weapons for police to use to subdue fleeing, belligerent, or potentially dangerous persons, who would have otherwise potentially been subjected to lethal weapons such as firearms or other more control techniques more likely to cause physical injury. A 2009 Police Executive Research Forum study said that officer injuries dropped by 76 percent when a Taser is used.  Taser's web site maintains a count of persons saved from death or serious bodily harm by deployment of a Taser.  Taser claims almost two-hundred thousand lives saved.  *See* https://www.taser.com/lives-saved.  The United States Department of Justice has found that Taser use by police reduce serious injuries to both suspects and officers. Geoffrey P. Alpert, *Police Use of Force, Tasers and Other Less-Lethal Weapons*, NIJ RESEARCH IN BRIEF, (May 2011), at 14, available at https://www.ncjrs.gov/pdffiles1/nij/232215.pdf.  *See also* Mark Kroll, Jeffrey D. Ho (eds.), *Taser® Conducted Electrical Weapons: Physiology, Pathology, and Law* (2009), Chapter 24, 287-289.

> **b.    Tasers are arms under the Second Amendment.**

The Second Amendment to the United States Constitution protects the "right to keep and bear *arms*," not the right to keep and bear *firearms*.  U.S. Const., amend. II (emphasis added).  The Supreme Court and the courts of other states have treated the right as extending beyond firearms. The Supreme Court recently made this clear in unanimously reversing the holding of the Massachusetts Supreme Judicial Court in *Caetano v. Massachusetts*, 577 U.S. ___, slip op. (March 21, 2016).  The Massachusetts court had held that stun guns were not protected arms because they were not in common use when the Second Amendment was enacted. *Caetano*, slip op. at 1. In addition, the Massachusetts court said stun guns were not protected because the record was lacking in evidence that stun guns were readily adapted to military use. *Caetono*, slip op. at 2.  The

4

Supreme Court said, however, that it "has held that 'the Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding.' *District of Columbia v. Heller*, 554 U.S. 570, 582 (2008)."  Slip op. at 1.  The *Caetano* opinion also rejected the "proposition 'that only those weapons useful in warfare are protected.'" *Id.* slip op. at 2, citing 554 U.S. at 624-25.

In fact, the Court in *Heller* stated,

> The 18th-century meaning [of arm"] is no different from the meaning today. The 1773 edition of Samuel Johnson's dictionary defined "arms" as "weapons of offence, or armour of defence." 1 Dictionary of the English Language 107 (4th ed.) (hereinafter Johnson). Timothy Cunningham's important 1771 legal dictionary defined "arms" as "any thing that a man wears for his defence, or takes into his hands, or useth in wrath to cast at or strike another." 1 A New and Complete Law Dictionary (1771); see also N. Webster, American Dictionary of the English Language (1828) (reprinted 1989) (hereinafter Webster) (similar).

> The term was applied, then as now, to weapons that were not specifically designed for military use and were not employed in a military capacity. For instance, Cunningham's legal dictionary gave as an example of usage: "Servants and labourers shall use bows and arrows on *Sundays*, &c. and not bear other arms."

*Heller*, 554 U.S. at 581.

So just like the handgun in *Heller*, a Taser or a stun gun is designed to be borne "for . . . defence, or . . . to cast at or strike another." *Id.*  New York, however, criminalizes an entire class of "arms" falling squarely within the plain wording used by the Framers.  Plainly, Tasers "constitute bearable arms" for purposes of Second Amendment analysis.  In *People v. Yanna*, 297 Mich. App. 137, 140, 824 N.W.2d 241, 243 (Mich. Ct. App. 2012) the court struck down Michigan's statute criminalizing possession of portable electronic weapons, stating that following *Heller*, the Second Amendment "protect[s] a citizen's right to possess and carry Tasers or stun guns for self-defense, and the state may not completely prohibit their use by private citizens."

In a similar case, *State v. DeCiccio*, 315 Conn. 79, 108-150, 105 A.3d 165, 185-210 (Conn. 2014), the Connecticut Supreme Court read *Heller* to invalidate a Connecticut statute on Second Amendment grounds criminalizing the transport of dirk knives and police batons in a motor vehicle. Various other state courts have found weapons other than firearms protected under the Second Amendment.  *See State v. Griffin*, 2011 WL 2083893, *7 n.62 (Del. Super. Ct., May 16, 2011) (holding that "arms" encompasses "all instruments that constitute bearable arms" and therefore a "knife, even if a 'steak' knife, appears to be a 'bearable arm' that could be utilized for offensive or defensive purposes," and is protected under both the Second Amendment and the Delaware Constitution); *City of Akron v. Rasdan*, 663 N.E.2d 947, 951-52 (Ohio Ct. App. 1995) (treating a restriction on knife possession as implicating the "right to keep and bear arms" under the Ohio Constitution, though concluding that the restriction is constitutional because "[t]he city of Akron properly considered this fundamental right by including in [the knife restriction] an exception from criminal liability when a person is 'engaged in a lawful business, calling, employment, or occupation' and the circumstances justify 'a prudent man in possessing such a weapon for the defense of his person or family'"); *State v. Delgado*, 692 P.2d 610, 610-14 (Or. 1984) (holding that the "right to keep and bear arms" under the Oregon Constitution extends to switch blade knives because they could be used for defensive purposes). Although various cases differ on just which weapons can constitute "arms," after *Heller* and *Caetano* it is not plausible to read "arms" as limited to guns.

In a recent Fifth Circuit Court of Appeals case, the Fifth Circuit cited approvingly to *Caetano* for the proposition that stun guns are protected arms under the Second Amendment:

> In addressing whether stun guns are in common use, Justice Alito, joined by Justice Thomas, implied that the number of states that allow or bar a particular weapon is important:

> [T]he number of Tasers and stun guns is dwarfed by the number of firearms. This observation may be true, but it is beside the point.... The more relevant statistic is that [200,000] ... stun guns have been sold to private citizens, who it appears may lawfully possess them in 45 States.... While less popular than handguns, stun guns are widely owned and accepted as a legitimate means of self-defense across the country.

> *Caetano*, 136 S.Ct. at 1032–33 (citations and quotation marks omitted). These two justices suggested that the 200,000 absolute number, plus that 45 states have "accepted [stun guns] as a legitimate means of self-defense," was enough to determine that the stun gun is in common use.

*Hollis v. Lynch*, 827 F.3d 436, 449 (5th Cir. 2016).

Tasers were of course not in common use at the time of the Second Amendment's enactment because they did not even exist until modern times. But the Supreme Court "do[es] not interpret constitutional rights that way." *Heller*, 554 U.S. at 582. *Caetano,* slip op. at 1.   Although Tasers did not exist in 1789, other portable self-defense weapons less lethal than firearms, such as knives and billy clubs, were in common use at the founding. *See State v. DeCiccio*, 315 Conn. at 117-118, 105 A.3d at 190-191.  And, like the modern handgun at issue in *Heller*, a Taser may be kept in a location (such as a purse) "that is readily accessible in an emergency," and that may be utilized by "those without the upper-body strength to lift and aim" a heavier weapon. *Heller*, 554 U.S. at 629. Tasers thus share many of the features that make handguns so popular as self-defense arms, but with one important exception relevant to this case, they are not a lethal weapon.[2]  The conclusion that Taser's are arms under the Second Amendment is thus manifest.

---

[2] A significant advantage of a Taser, as opposed to a knife or billy club, is that the Taser is designed to be a standoff weapon to be used before an assailant can come within arm's reach of a victim. The chance of death or serious bodily harm to a victim is substantially increased if the attacker can close to contact distance.  The assailant could have a contact weapon such as a knife or club, or the assailant may be bigger and stronger than the intended victim such that he may easily overpower him or her.  A Taser could be deployed beyond the wingspan of the victim and assailant alike. The importance of distance in keeping one safe is aptly illustrated by the standard training of police officers.  Police officers are regularly trained that escalation to deadly force is appropriate when a suspect armed with a knife or club exhibiting signs of an attack closes within seven yards

### c.    Tasers are neither dangerous nor unusual.

For an arm to be prohibited under the Second Amendment, it must be both dangerous and unusual. *Heller,* 554 U.S. at 627. Tasers are neither. It is difficult to comprehend how a Taser, a weapon designed not to kill or maim and is "almost never fatal," (Volokh, *Nonlethal Self-Defense, (Almost Entirely), Nonlethal Weapons, and the Right to Keep and Bear Arms and Defend Life*, 62 Stan. L. Rev. 199, 204 (2009)), if ever, could be banned in accord with *Heller* as a "dangerous and unusual weapon" when *Heller* plainly protects a very deadly weapon: handguns. As Justice Breyer pointed out in dissent, handguns, are employed in "well over 60,000 deaths and injuries in the United States each year," *McDonald v. City of Chicago*, 561 U.S. at 924, but are nevertheless the "quintessential self-defense weapon" for Second Amendment purposes. *Heller*, 554 U.S. at 629.

Tasers used in law enforcement are credited with reducing injuries to suspects and officers. *See* John M. McDonald et al., *The Effect of Less-Lethal Weapons on Injuries in Police Use-of-Force Events*, Am. J. Public Health 2268 (December 2009); Taylor, *Comparing Safety Outcomes in Police Use-of-Force Cases for Law Enforcement Agencies that Have Deployed Conducted Energy Devices and a Matched Comparison Group that Have Not: A Quasi-Experimental Evaluation,* NIJ Monograph. *See also State v. DeCiccio*, 315 Conn. at 121, 105 A.3d at 193 (the more limited lethality of dirk knives compared to firearms provides strong support for the conclusion that dirk knives also are entitled to protected status under the Second Amendment).

Absolutely no basis exists to presume that Tasers in the hands of law-abiding citizens would be any more dangerous than in the hands of law enforcement. Indeed, citizens would have

---

of the officer. *See* Dennis Tueller, *How Close is Too Close,* SWAT Magazine (March 1983). *See also* Ron Martinelli, *The 21 Foot Rule:  Forensic Fact or Police Myth*, Law Officer (Feb. 12, 2016) available at http://lawofficer.com/2016/02/21footrule/.

far fewer uses for Tasers than do police.  For law enforcement, Tasers are principally employed for two reasons: one, to gain compliance from uncooperative or resisting suspects; second, for defense of the officer.  Only for this second reason would a citizen have legal justification to employ a Taser or other electronic defense tool.  Just as in the case of a law enforcement application, the chance of serious injury to the attacker would be minimal and certainly far less likely than if the victim responded with personal weapons (hands, feet, elbows or knees), a contact weapon such as a club or a knife, or a firearm.

Even self-defense sprays, such as pepper spray or Mace®, present their own risks.  There have been cases of subjects dying after being pepper sprayed by law enforcement officers; generally, these subjects have respiratory issues such as asthma, serious heart problems, or substantial amounts of stimulative drugs in their systems.  *See* Charles S. Petty, *Deaths in Police Confrontations When Oleoresin Capsicum is Used* (Feb. 2004), available at https://www.ncjrs.gov/pdffiles1/nij/grants/204029.pdf.  Unlike Tasers, any of the above arms also pose a risk to the innocent victims of an attack.  Engaging in a fist fight with an attacker carries substantial risk of serious injury or death.  Likewise, use of a contact weapon requires that the attacker and victim be within touching distance of one another.  And although a firearm is best employed as a standoff weapon, using a firearm for self-defense poses five significant dangers among a multitude of risks to the victim and other innocents not presented by use of Tasers.

First, simply accessing the firearm under the stress of imminent attack itself carries a risk of a self-inflicted injury, an occurrence that has happened to far too many law-enforcement

officers; indeed, often even without the stress of a violent confrontation.[3]   The risk of a self-inflicted Taser exposure is far less serious, than a self-inflicted gunshot wound.

Second, using a firearm in self-defense requires care to avoid placing innocent persons at risk.   When police shoot, they sometimes miss their target with more rounds than they hit.   For example, a Rand Corporation study of the New York City Police Department performance from 1998 to 2006 indicated that New York police involved in gun fights had hit rates on suspects of only 18 percent.   That rose to 30 percent when the suspect was not shooting back.[4]   One would hope that police on average are better trained with their firearms than the average citizen.   Risk of hitting an innocent person is far lower with a Taser than with a firearm.   The civilian Taser models have ranges of only 15 yards.   A handgun round could be deadly hundreds of yards away, although in an urban environment such as New York it is likely that the bullet would hit something or

---

[3] *See e.g.,* Martin Smith, , *Gun Injuries Soar As Police 'Experts' Blast Themselves And Colleagues By Mistake,* DAILY MAIL (March 16, 2008), available at http://www.dailymail.co.uk/news/article-535071/Gun-injuries-soar-police-experts-blast-colleagues-mistake.html;   Patrick   Tolbert, *University of Texas Officer Shot When Gun Goes Off While Holstered*, KXAN (May 17, 2016), available at http://kxan.com/2016/05/17/officer-hurt-in-accidental-shooting-on-on-university-of-texas-campus/;   *Police   Chief   Accidentally   Shoots   Himself   For   The   Second   Time,* COUNTERCURRENT   NEWS   (January   2,   2015),   available   at http://countercurrentnews.com/2015/01/police-chief-accidentally-discharges-for-the-second-time/;   Meredith Jogensen, *Lancaster Officer Accidentally Shoots Self,* WGAL (February 9, 2016), available   at   http://www.wgal.com/news/breaking-lancaster-officer-accidentally-shoots-self/37895650; Cory Shaffer, *CMHA Police Officer Accidentally Shot In The Leg At Tri-C Gun Range,*   CLEVELAND.COM   (May   5,   2016),   available   at http://www.cleveland.com/metro/index.ssf/2016/05/cmha_police_officer_accidental_1.html.

[4] Nate Rawlings, *Ready Fire, Aim:  The Science Behind Police Shooting Bystanders*, TIME MAGAZINE (September 13, 2013), available at http://nation.time.com/2013/09/16/ready-fire-aim-the-science-behind-police-shooting-bystanders/.   *See also*, Scott Glover, Matt Laid, *Accidental Gunshots   Vex   LAPD*,   LA   Times   (August   17,   2006),   available   at http://articles.latimes.com/2006/aug/17/local/me-guns17.

someone well before traveling even 50 yards.[5]  A missed Taser shot is thus demonstrably less likely to hit an innocent person than a missed gun shot and if it does, a Taser strike is much less likely to cause significant injury.

Third, there is always the potential of having the firearm taken away and used on the victim. Again, the experience of police officers tells us weapons retention is a serious issue in use of a firearm for self-defense.[6]  The ramifications to the victim of a Taser being wrestled away from a victim are obviously substantially less serious than if the victim has his or her firearm taken away.

Fourth, the aftermath of using a firearm or other means of deadly force is likely to have serious adverse psychological ramifications to the victim.  The emotional injuries suffered by persons undergoing a deadly force encounter are well known in police training literature.[7] In the immediate aftermath of the event, several physical reactions are common, including trembling, sweating, chills, nausea, diarrhea, dizziness, hyperventilation, jumpiness and extreme thirst.[8] Although disconcerting, these physical issues are likely to pass within 24 hours.  Various emotional

---

[5] A typical 9 mm handgun round as carried by New York's police officers leaves the gun muzzle at approximately 1200 feet per second.  At 250 yards, the round is still traveling approximately 830 feet per second having lost only 1/3 of its velocity, and will have dropped less than six feet. *See http://gundata.org/ballistic-calculator/* (input data:  124 grain Speer Gold Dot hollow point with no atmospheric correction).

[6] *See* Associated Press, *Cases of Officers Killed by Their Own Guns Likely Will Not Change R.I. Policies* (May 2, 2005), available at https://www.policeone.com/close-quarters-combat/articles/100228-Cases-of-Officers-Killed-by-Their-Own-Guns-Likely-Will-Not-Change-R-I-Policies/;  Robert Wilde, *57 Police Officers Fatally Shot by "Unarmed" Suspects Since 2000,* BREITBART.COM (August 30, 2014), available at http://www.breitbart.com/california/2014/08/30/57-police-officers-were-fatally-shot-by-unarmed-suspects/.

[7] *See* Alexis Artwolh, Loren Christensen, *Deadly Force Encounters, What Cops Need to Know to Mentally and Physically Prepare for and Survive a Gunfight* (1997).

[8] *Id.,* at 180.

states often accompany these physical reactions, including, a wide range of emotions such as bouts of crying, elation, anger, paranoia, despondency, emotional numbness, alienation, confusion, difficulty concentrating and impaired memory.[9]  These symptoms can persist for several days.[10] Additional manifestations of emotional harm, however, may persist for months and develop into post-traumatic stress disorder ("PTSD").  Whether or not PTSD develops, sleeplessness, appetite disturbance, nightmares, relationship issues, social isolation, poor job performance, depression, anxiety, hypervigilance, and increased risk taking behavior are all potential issues that may arise from taking another human life no matter how justified the use of deadly force may have been.[11] If the victim can end the threat without resort to deadly force, for example, by use of an intermediate weapon such as a Taser, it stands to reason that he or she is more likely to avoid these long term traumatic effects.

Fifth, in the split second of a violent confrontation, there is always the risk of the victim applying excessive force with the attendant criminal and civil legal ramifications.  Availability of a Taser or other electronic defense tool in appropriate situations to crime victims would minimize the potential of the victim employing excessive force in his or her defense with the attendant risk of criminal or civil liability.  The law of self-defense is a careful balancing of harms, especially as it contemplates the use of deadly force in self-defense.  To justify the use of force for self-defense, five interrelated elements must generally be present:  innocence, imminence, avoidance, reasonableness and proportionality.  *See generally* Andrew Branca, *Law of Self-Defense* (2013);

---

[9] *Id.,* at 180-81.

[10] *Id.,* at 181.

[11] *Id.,* at 182-85.

Paul H. Robinson, *A Right To Bear Firearms But Not To Use Them? Defensive Force Rules and The Increasing Effectiveness Of Non-Lethal Weapons,* 89 B.U.L. REV. 251 (2009).

A person using deadly force must be an *innocent* party, i.e., he did not start the fight or initiate the attack. The person acting in self-defense must have been in *imminent* jeopardy of harm, i.e., the risk of harm exists right now.  The person must have used *reasonable* efforts to *avoid* the conflict. For example, in some jurisdictions such as Maryland, the victim has a duty to retreat to the extent she *reasonably* can prior to using force.  And the person acting in self-defense must not have used more force than reasonably necessary to stop the threat, i.e., her use of force must have been *proportional* to the threat or force used or threatened against her.  The criminal and civil justice systems often take years to judge actions taken in self-defense in seconds.  The potential for a judge or jury in a safe environment months or years later to second guess actions taken by an innocent victim when gripped by fear of death or serious bodily harm is substantial.  Innocent persons have gone to jail or been bankrupted from the cost of defending themselves from criminal and civil liability. This is one reason for the popularity of non-lethal arms.

Thus, far from being dangerous, Tasers in the hands of citizens, just as in the hands of police, reduce injuries to both criminal attackers and to their victims.  Moreover, Tasers have the added advantage of helping to protect the emotional health of potential victims of crime as well as helping to protect them from serious criminal and civil liability.  Far from being the type of dangerous (and unusual) weapon which *Heller* contemplated may be banned, *see* 554 U.S. at 627, a Taser presents substantially less risk to all parties than other common weapons, including firearms, knives, pepper spray, and personal weapons.  The conclusion that Tasers are not so dangerous as can be banned under the Second Amendment is thus manifest.

13

Nor are Tasers or other electronic arms such as stun guns unusual. The Supreme Court has already rejected the view that Tasers are unusual because they are a modern invention. *Caetano*, slip op. at 2. Use of electronic control weapons is widespread in the United States. Tasers and stun guns are legal in most states, *see People v. Yanna*, 297 Mich. App. at 144, 824 N.W.2d at 245, and "[h]undreds of thousands of (them) have been sold to private citizens, with many more in use by law enforcement officers." *Id.*[12] *See also* Volokh, *Nonlethal Self-Defense*, 62 STAN. L. REV. at 200, 244 (listing New York as one of the few jurisdictions that outlaw the possession of Tasers and stun guns by law-abiding citizens). With some 18,000 law enforcement agencies using the device, and some 275,000 Tasers in the hands of citizens, the device can hardly be considered unusual.[13]

In any event, *Heller* used the term "unusual" in the conjunctive with "dangerous." 554 U.S. at 627. This makes perfect sense. All weapons are "dangerous" to some degree, the reference to "dangerous . . . weapons" must mean weapons that are more dangerous than the norm — logically meaning weapons that are unusually dangerous. Thus, to uphold Defendant's ban on possession and carry of Tasers (or stun guns for that matter) this court would have to find that the devices are both dangerous and unusual. Whatever else might fall under that description, Tasers and stun guns are not unusually dangerous weapons. They are significantly less deadly than firearms, which are constitutionally protected and allowed in New York. They are less dangerous even than knives, clubs, baseball bats, or bare hands and fists. *See Caldwell v. Moore*, 968 F.2d

---

[12] Besides New York, Tasers and stun guns currently are restricted only in New Jersey, Hawaii, Rhodes Island, Massachusetts, and in several municipalities. *See* Taser web site, *https://buy.taser.com/taser-state-requirements/.*

[13] Good data appears not to exist for the number of stun guns sold in the United States as opposed to Tasers. Given their modest cost compared to a Taser, however, it is reasonable to conclude that the number of stun guns is many times the number of Tasers.

595, 602 (6th Cir. 1992) ("It is not unreasonable for the jail officials to conclude that the use of a stun gun is less dangerous for all involved than a hand to hand confrontation").  Tasers are not unusually dangerous.

### d.   That New York allows possession of other arms does not justify its ban on Tasers and other electronic defensive arms.

*Heller* speaks mostly about guns because the plaintiff in *Heller* challenged an absolute ban on handguns.  The Court in *Heller* concluded that the Second Amendment codifies a preexisting "individual right to possess and carry *weapons* in case of confrontation."  *Id.* at 592 (emphasis added).  And in *Caetano,* the unanimous Court made clear that the Second Amendment extends to all bearable arms which plainly encompasses Tasers and other electronic defense tools.  Slip op. at 1.  Because New York's ban significantly burdens citizens' rights to keep and bear the arms they seek to use for self-defense, it violates the Second Amendment.  *People v. Yanna*, 824 N.W.2d at 246 (holding that stun guns constitute protected arms and overturning Michigan's complete ban as violating the Second Amendment).

### e.   This Court need not reach the question whether a narrower restriction might be constitutional.

While Plaintiffs believe the right to keep and bear electronic weapons extends outside the home, this Court need not reach that question in this case.  New York's statutory scheme is a categorical ban on all possession of Tasers and stun guns and as such is unconstitutional.  Whether a ban on carrying Tasers and stun guns in public would be constitutional, must await the enactment of such a law.

Thus, this case does not raise the question whether New York could limit the ability to carry a Taser in public.  It is noteworthy, however, that the Second Amendment "guarantee[s] the individual right to possess and carry weapons in case of confrontation." *Heller*, 554 U.S. at 592

(emphasis added). "Individual self-defense is 'the central component' of the Second Amendment"
itself. *McDonald*, 561 U.S. at 767, quoting *Heller*, 554 U.S. at 599. Although the "need" for self-
defense may be "most acute" inside the home, *Heller*, 554 U.S. at 628, it cannot be that the right
itself simply evaporates at the threshold. Confrontations are not limited to the home. As Judge
Posner pointed out:

> A woman who is being stalked or has obtained a protective order against a violent
> ex-husband is more vulnerable to being attacked while walking to or from her home
> than when inside. She has a stronger self-defense claim to be allowed to [bear arms]
> in public than the resident of a fancy apartment building (complete with doorman)
> has a claim to sleep with a loaded gun under her mattress.

*Moore v. Madigan*, 702 F.3d 933, 937 (7th Cir. 2012).   *Accord Palmer v. District of Columbia*,
59 F.Supp.3d 173 (District's absolute prohibition on carrying a handgun for personal protection
violates Second Amendment).   And the stun gun used by the defendant in *Caetano* was used in
public, not in the defendant's home.   *Caetano*, slip op. at 1 (concurring opinion of Alito, J.).   If
there was no right to carry the arm outside the home, the case could have been disposed on that
basis.

       To be clear, Plaintiffs are *not* seeking an unfettered right to bear electronic arms free from
any regulation or oversight. Plaintiffs only challenge New York's absolute ban on possession and
use of a class of arms typically used by law abiding citizens for self-defense.  *See Heller,* 554 U.S.
at 628.

       **f.    New York's ban fails any measure of heightened constitutional scrutiny.**

       *Heller* interprets the Second Amendment as "elevat[ing] above all other interests the right
of law-abiding, responsible citizens to use arms in defense of hearth and home," *Heller*, 554 U.S.
at 635, "where the need for defense of self, family, and property is most acute." Inasmuch as New

York outlaws possession of Tasers by responsible, law abiding citizens for all purposes, including for home defense, New York's ban on Tasers is plainly facially unconstitutional.

As discussed above, this case presents the question whether the Second Amendment permits New York to outlaw the mere possession of a Taser or stun gun, not whether Taser or stun gun ownership and use may be regulated considering compelling state interests. Because the statutory scheme in question prohibits a class of arms entirely, the approach taken by New York would afford the Plaintiffs no Second Amendment protection even for possession of the device in the home.  For this reason, the statute in question cannot survive anything more than "rational-basis scrutiny," if that. *Heller*, 554 U.S. at 628 n.27. The ban is not narrowly tailored to achieving any legitimate governmental interest.  The ban sweeps broadly to prevent law-abiding persons from using the devices in any circumstances for legal self-defense.  There is no close means ends fit to the ban.  So, it can neither survive strict scrutiny nor intermediate scrutiny. Because Tasers are arms protected under the Second Amendment, the likelihood of Plaintiffs succeeding on the merits is clear.

New York obviously has an important interest in controlling crime and violence.  But this interest is insufficient to justify the ban on Tasers and stun guns.  Though stun guns or Tasers could conceivably be used for crimes as well as for legitimate self-defense, that is true of any arm. Private arms ownership always poses some risk, but our nation's founders agreed that people are entitled to keep and bear arms despite the risk that some will misuse them.  If that is true for deadly weapons like handguns, it is especially true for weapons that are nonlethal, including Tasers and stun guns.  And given a lack of evidence of criminal misuse of electronic arms in the vast majority of the United States where they are legal, any suggestion of the need to ban them for prevention of violence would at best be based on speculation.  This is especially the case with the civilian model

17

of Tasers which are specifically designed to curb misuse by the emission of the anti-felon identification tags ("AFIDs") upon activation of the device.  These tags allow police to trace the identify the purchaser of the device.

In *Heller*, the Supreme Court struck down the District's handgun ban on the basis of a textual and historical analysis demonstrating that the ban infringed the Second Amendment right to keep arms. 554 U.S. at 628–29 (holding that the D.C. handgun ban would "fail constitutional muster" under "any of the standards of scrutiny we have applied to enumerated constitutional rights").  Given that *Heller* applied a categorical analysis to invalidate D.C.'s gun ban, this Court should similarly apply that analysis to strike down New York's Taser ban.

This Circuit has held that heightened scrutiny will apply when a law substantially burdens the Second Amendment right.  "We hold that heightened scrutiny is appropriate only as to those regulations that substantially burden the Second Amendment. Because § 922(a)(3) only minimally affects the ability to acquire a firearm, it is not subject to any form of heightened scrutiny." *United States v. DeCastro* 682 F.3d 160, 165 (2d Cir. 2012).  Here, New York completely bans an entire class of arms. This substantially burdens the Second Amendment right because it removes the most effective form of less than lethal self-defense from Plaintiff's use.  Thus, some form of heightened scrutiny should apply.

This has been the holding of both the Southern District Court and more recently the Eastern District in that heightened scrutiny should apply to complete bans on arms. This was the holding of the Eastern district in considering a challenge to New York's ban on nun-chuck sticks.

> As the Southern District of New York recently found, a majority of courts have applied "intermediate scrutiny to general challenges under the Second Amendment, even when reviewing statutes or laws that may restrict the possession of [weapons] in the home." *See New York State Rifle & Pistol Ass'n v. City of New York,* No. 13 CV 2115, 86 F.Supp.3d 249, 259, 2015 WL 500172, at *7 (S.D.N.Y. Feb. 5, 2015), *appeal filed,* No. 15–638 (applying intermediate scrutiny to New York City law

restricting the transportation of handguns covered by residence licenses beyond the premises of the licensed residence); *see also Kachalsky,* 701 F.3d at 93 (applying intermediate scrutiny to New York licensing scheme for carrying concealed handguns in public); *United States v. Reese,* 627 F.3d 792, 800 (10th Cir.2010), *cert. denied,* 563 U.S. 990, 131 S.Ct. 2476, 179 L.Ed.2d 1214 (2011) (applying intermediate scrutiny to federal statute prohibiting an individual's possession of gun—even in the home—when subject to a protective order as opposed to a criminal conviction); *United States v. Skoien,* 614 F.3d 638, 641–42 (7th Cir.2010) (*en banc* ) (applying intermediate scrutiny to federal statute prohibiting the possession of firearms by any person convicted of a misdemeanor domestic violence crime); *United States v. Chester,* 628 F.3d 673, 677 (4th Cir.2010) (same as *Skoien* ); *Marzzarella,* 614 F.3d at 97 (applying intermediate scrutiny to law limiting possession of firearms with obliterated serial numbers because the law did not "severely limit the possession of firearms")

*Maloney v. Singas*, 106 F. Supp. 3d 300, 311 (E.D.N.Y. 2015), *reconsideration denied,*

03CV786PKCAYS, 2016 WL 3211472 (E.D.N.Y. Apr. 15, 2016).

Based on this Court's precedent some form of heightened scrutiny must apply to New York's complete ban on electric guns. However, unlike the aforementioned case, either strict scrutiny or a categorical approach should apply. Unlike in *Maloney* which deals with a ban on a type of club, here, New York bans an entire class of arms and leaves no similar arm available to use. Thus, unlike the aforementioned case where a rifleman might use another form of rifle to defend himself with, New York completely strips the right to arms away from those that wish to use less than lethal electric arms for self-defense. Thus, strict rather than intermediate scrutiny should apply.

Even if this Court concludes that the law is not *categorically* unconstitutional, the law is nonetheless subject to strict scrutiny, which requires New York to justify the ban as necessary to advance the most compelling of government interests. Strict scrutiny applies because New York's law effectively amounts to a total ban on the exercise of the Second Amendment right to keep and bear a distinct class of arms by typical, law-abiding citizens. As the Supreme Court has explained, "strict judicial scrutiny [is] required" whenever a law "impinges upon a fundamental right

19

explicitly or implicitly protected by the Constitution." *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 17 (1973). And the right to bear arms is not only specifically enumerated in the constitutional text; it was also counted "among those fundamental rights necessary to our system of ordered liberty" by "those who drafted and ratified the Bill of Rights." *McDonald*, 561 U.S. at 768, 778.

Indeed, the D.C. Circuit held in *Heller II* that "a regulation that imposes a substantial burden upon the core right of self-defense protected by the Second Amendment" must be subjected to strict scrutiny. 670 F.3d at 1257. *See also id.* at 1266. As shown above, New York's law – by denying citizens an entire class of non-lethal arms for self-defense – substantially burdens the core of the Second Amendment. But even if this Court concludes that only intermediate scrutiny applies, New York's law still fails constitutional muster. As the Supreme Court recently reaffirmed, intermediate scrutiny demands that restrictions of constitutionally protected conduct be "narrowly tailored," *McCullen v. Coakley*, 134 S. Ct. 2518, 2535 (2014), *see also id.* at 2542, 2548 (Scalia, J., concurring), and possess a "close fit between ends and means," *id.* at 2534 (majority opinion). Here, that close fit is absent.

New York's ban on electronic arms fails any means-ends fit test as a matter of law, since the "means" New York has chosen extinguishes the right to keep and bear a distinct class of arms for ordinary law-abiding citizens. It applies without exception to the very "law-abiding, responsible citizens" the Second Amendment was designed to protect. *Heller*, 554 U.S. at 635. New York cannot adopt a restriction that completely prohibits the core conduct protected by the Second Amendment no matter what its reasons, because that would empty that constitutional protection of all meaningful content. "[T]he enshrinement of constitutional rights necessarily takes certain policy choices off the table," *Id.* at 636, and surely the choice to completely prohibit the

core conduct that the right was enshrined to protect is one of them.  New York's ban on electronic cannot stand.

New York's ban fails constitutional muster as a matter of law for another reason as well. New York's ban has nothing to do with public safety, because no basis exists to conclude that New York or the United States has any problem with the criminal misuse of Tasers or stun guns. To survive intermediate scrutiny, a restriction must be "substantially related to the achievement" of the government's objective. *United States v. Virginia*, 518 U.S. 515, 533 (1996). "The burden of justification is demanding and it rests entirely on the State." *Id.*  Here, New York simply cannot meet that burden as there is no evidence that New York's ban on electronic arms advances public safety.

Even if New York could show that its Taser ban would advance public safety (and, as explained above, it cannot), New York's ban would still have to be struck down because it fails intermediate scrutiny's narrow tailoring requirement. That requirement "demand[s] a close fit between means and ends," and it forbids the government from "burden[ing] substantially more [protected conduct] than is necessary to further the government's legitimate interests." *McCullen*, 134 S. Ct. at 2534–35. Although intermediate scrutiny does not require the government to adopt the least restrictive means that will advance its interests, "the government must demonstrate that alternative measures that burden substantially less [protected conduct] would fail to achieve the government's interests." *Id*. at 2540.  And this it cannot do.

Whatever legitimate public safety interest New York may have concerning Tasers could easily be met by enacting appropriate regulatory measures similar to that existing with respect to other classes of legal arms.  The Commonwealth of Virginia prohibits possession of electronic arms on school grounds, Va. Code 18.2-308.1, and by felons outside the home, Va. Code 18.2-

308.2.  These are examples of more narrowly tailored regulations New York could have adopted with respect to electronic weapons to address potential adverse effects their existence might occasion, but choose for whatever reason not to do so. "In short, [New York can] not [show] that it seriously undertook to address the problem with less intrusive tools readily available to it," *see McCullen*, 134 S. Ct. at 2539, but instead "has too readily foregone options that could serve its interests just as well" without unduly burdening Second Amendment rights, *id.* at 2537.

For all of the above reasons, Plaintiffs are likely to prevail on the merits of this action.

### V.   Plaintiffs will continue to suffer irreparable harm in the absence of preliminary relief.

Having demonstrated that Plaintiffs are likely to prevail on the merits, we turn to whether Plaintiffs will suffer irreparable harm unless an injunction issues. *See Winter v. NRDC*, 555 U.S. 7, 22 (2008). The irreparable harm inquiry requires the court to assume Plaintiffs have demonstrated a likelihood of success on the merits and then to ask "whether that violation, if true, inflicts irremediable injury." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 303 (D.C. Cir. 2006).  Plainly here Plaintiffs are suffering irreparable injury.

Where the Defendant's actions violate the Plaintiffs' constitutional rights, the requirement of "irreparable injury" is satisfied. As the D.C. Circuit has explained, "[s]uits for declaratory and injunctive relief against the threatened invasion of a constitutional right do not ordinarily require proof of any injury other than the threatened constitutional deprivation itself." *Gordon v. Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013) (brackets omitted) (quoting *Davis v. District of Columbia*, 158 F.3d 1342, 1346 (D.C. Cir. 1998)). Thus, "although a plaintiff seeking equitable relief must show a threat of substantial and immediate irreparable injury, a prospective violation of a constitutional right constitutes irreparable injury for these purposes." *Id.* (brackets omitted) (quoting *Davis*, 158 F.3d at 1346).

The principle that the violation of a constitutional right by itself constitutes irreparable harm derives from the Supreme Court's decision in *Elrod v. Burns* that "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." 427 U.S. 347, 373 (1976). As the Seventh Circuit has explained in the context of a Second Amendment challenge:

> The loss of a First Amendment right is frequently presumed to cause irreparable harm based on the intangible nature of the benefits flowing from the exercise of those rights; and the fear that, if those rights are not jealously safeguarded, persons will be deterred, even if imperceptibly, from exercising those rights in the future.

*Ezell v. City of Chicago*, 651 F.3d 684, 699 (7th Cir. 2011) (internal quotation marks omitted). The Second Amendment also protects "intangible and unquantifiable interests." *Id*. Indeed, its "central component is the right to possess [arms] for protection," and violations of that right plainly "cannot be compensated by damages." *Id*. Thus, for violations of Second Amendment rights, as for violations of First Amendment rights, "irreparable harm is presumed." *Id*.

For these reasons, law-abiding citizens like Mr. Avitabile suffer irreparable harm each day they suffer an ongoing deprivation of their constitutional right to keep and bear a Taser for self-defense. The allegation of the violation, without more, satisfies the irreparable injury requirement. Even if Mr. Avitabile were required to establish a likelihood that New York's Taser ban will "chill" his exercise of constitutionally protected conduct, *see Chaplaincy of Full Gospel*, 454 F.3d at 299, he has satisfied this requirement by declaring that, but for New York's laws, he would obtain and carry Tasers for self-defense. *See* Declaration of Matthew Avitabile [ECF 1-1].

**VI.      The balance of equities tips overwhelmingly in Plaintiffs' favor.**

The equities weigh strongly in Plaintiffs' favor. Mr. Avitabile continues to suffer an ongoing violation of his constitutional rights, and this ongoing violation constitutes irreparable injury. Any interests invoked by New York are entirely speculative. Mr. Avitabile only seeks an

injunction to allow him to keep and bear electronic arms of his choice for purposes of self-defense. FPC and FPF seek to enjoin the ban so their members can utilize electronic arms for self-defense. Furthermore, to repeat the point, Plaintiffs do not seek an unfettered right to keep and bear electronic arms free from any regulation or oversight. Plaintiffs challenge only the absolute ban on electronic weapons.

### VII.    An injunction is in the public interest.

For similar reasons, an injunction is also in the public interest.  In *Jackson Women's Health Org. v. Currier*, 760 F.3d 448, 458 (5th Cir. 2014), *cert. denied,* 136 S. Ct. 2536 (2016), the Fifth Circuit cited  to *Awad v. Ziriax*, 670 F.3d 1111, 1132 (10th Cir.2012) for the proposition that "it is always in the public interest to prevent the violation of a party's constitutional rights."  Because enforcement of this unconstitutional law is by definition contrary to the public interest, the entry of a preliminary injunction serves the public interest as a matter of law.

Although Fed. R. Civ. P. 65(c) requires that a bond or other security be provided as a condition of issuing preliminary injunctions, this requirement may be dispensed with when there is no risk of financial harm. *Federal Prescription Serv. v. American Pharmaceutical Ass'n*, 636 F.2d 755, 759 (D.C. Cir. 1980); *Doctor's Assocs. v. Stuart*, 85 F.3d 975, 985 (2d Cir. 1996). Even courts that view Rule 65(c) as mandatory are open to the idea of the bond being set at zero. *See Hoechst Diafoil Co. v. Nan Ya Plastics Corp*., 174 F.3d 411, 421 n.3 (4th Cir. 1999). Given the nature of this case, the Court should dispense with the bond requirement.

### VIII.   The court should enter final judgment for Plaintiffs.

The Federal Rules of Civil Procedure permit this court to "advance the trial on the merits and consolidate it with the hearing" for a preliminary injunction. Fed. R. Civ. P. 65(a)(2). "[W]hen the eventual outcome on the merits is plain at the preliminary injunction stage, the judge should,

after due notice to the parties, merge the stages and enter a final judgment." *Morris v. District of Columbia*, 38 F. Supp. 3d 57, 62 n.1 (D.D.C. 2014) (quoting *Curtis 1000, Inc. v. Suess*, 24 F.3d 941, 945 (7th Cir. 1994)).

In conclusion, Plaintiffs have shown they are likely to prevail on the merits of this action. They have shown they suffer irremediable harm from the Taser ban.  They have shown the balance of equities weighs in their favor.  And they have shown that the public interest favors the grant of an injunction.

### Conclusion

For the foregoing reasons, the Court should preliminarily and permanently enjoin New York from enforcing its ban on the right of its citizens to keep and bear electronic arms such as Tasers.

Respectfully submitted,

/s/ *Stephen D. Stamboulieh*
Counsel for Plaintiffs


/s/ *Stephen D. Stamboulieh*
Stephen D. Stamboulieh
Stamboulieh Law, PLLC
P.O. Box 4008
Madison, MS  39130
(601) 852-3440
stephen@sdslaw.us
MS Bar No. 102784
NDNY Bar Roll# 520383

Alan Alexander Beck
Law Office of Alan Beck
4780 Governor Drive
San Diego, CA  92122
(619) 905-9105
Alan.alexander.beck@gmail.com
*Admitted pro hac vice

**<u>Certificate of Service</u>**

  I, Stephen D. Stamboulieh, hereby certify that I have caused to be filed a true and correct copy of the foregoing document or pleading via the Court's CM/ECF system which sent a notice and copy of the foregoing to all counsel of record.

Dated: February <u>13th</u>, 2017.

         <u>/s/ *Stephen D. Stamboulieh*</u>
         Counsel for Plaintiffs