UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

MATTHEW AVITABILE, *et al.*

                                        *Plaintiffs*,

                                                              1:16-CV-01447
                    -against-                                  (DNH)(CFH)

ANDREW M. CUOMO, *et al.*,

                                        *Defendants*.
_____


**DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO
PLAINTIFFS' MOTION FOR A PRELIMINARY OR PERMAENT INJUNCTION**


                              ERIC T. SCHNEIDERMAN
                              Attorney General of the State of New York
                              *Attorney for Governor Andrew M. Cuomo,*
                              *Attorney General Eric T. Schneiderman, and*
                              *Superintendent George P. Beach II, Superintendent*
                              *of the New York State Police*
                              The Capitol
                              Albany, NY 12224


MICHAEL G. McCARTIN
Assistant Attorney General
      *Of Counsel*
Bar Roll No. 511158
Telephone: (518) 776-2620

March 7, 2017

# Table of Contents

Preliminary Statement…………………………………………………………………..1

Statement of Facts……………….…………………………………………………...2

Argument…………………………………………………………………………….3

Point I     Plaintiffs cannot meet the "higher standard" needed for a preliminary
injunction that would alter the status quo here because they cannot make
a "clear showing" that they will prevail on the merits, nor can they show
that they face a harm that is "actual and imminent." ……………..………………3

Point II    Plaintiff Avitabile does not have a Second Amendment right to possess
a Taser or a stun gun – even within his own home ………………..………………6

Point III   There is a legitimate question as to whether Tasers or stun guns are even
"bearable arms" under *Heller*, and *Caetano*'s per curium decision did not
definitively answer that open question……………………………………………9

Point IV   There is also a legitimate question as to whether Tasers or stun guns are
"in common use" under *Heller*, and *Caetano*'s per curium decision did
not definitively answer that open question either……………………………..10

Point V    The necessary level of scrutiny to apply to this matter, if any, is "intermediate
scrutiny" and that is met here because the N.Y. Legislature has properly
concluded that Tasers and stun guns present a threat to public safety…………..12

Point VI   Under controlling Second Circuit precedent, because Plaintiff Avitabile
has access to "adequate alternatives" to protect his home, there is, as a
matter of law, no "substantial burden" on his Second Amendment rights………18

Conclusion………………………………………………………………………….19

**Preliminary Statement**

Plaintiffs in this 42 U.S.C. § 1983 action have seized upon a short, five-paragraph per curium decision issued by the U.S. Supreme Court in *Caetano v. Massachusetts*, 136 S.Ct. 1027 (2016), and they attempt to use that ambiguous decision to undue a 40-year ban against Tasers, as well as a 26-year ban against stun guns, prohibitions that the New York State Legislature saw fit to impose decades ago in order to protect New Yorkers from items that it deemed were highly dangerous.  More than that, though, Plaintiffs now also seek to leapfrog to the end of this litigation – and obtain all the injunctive relief that they seek on the merits – asking this Court to lift the ban on these dangerous instruments by means of the issuance of a preliminary and permanent injunction.

But "one of the first principles of constitutional adjudication" is the "basic presumption of the constitutional validity of a duly enacted state or federal law."  *Connecticut ex rel. Blumenthal v. Crotty*, 346 F.3d 84, 102 (2d Cir. 2003) (omits internal quotations and citations). Simply put, with this presumption of constitutionality in place, the per curium decision of the Supreme Court in *Caetano* does not warrant that this Court declare that New York State's bans against Tasers and stun guns are unconstitutional.  Nor does *Caetano* – or any other Supreme Court or Second Circuit decision – warrant the granting of the Plaintiffs' sought-after injunction. For the reasons that follow, Plaintiffs' motion for this extraordinary relief must be denied.  If Plaintiffs want the ban on Tasers and stun guns lifted within New York, they should seek to do it the old-fashioned, democratic way: they should petition their representatives in the New York State Legislature to do so.  That's the proper forum for their purely policy arguments – this Court is not.

## Statement of Facts

Plaintiff Matthew Avitabile and two advocacy groups – *i.e.*, the Firearms Policy Coalition ("FPC") and the Firearms Policy Foundation ("FPF")[1] – have brought this 42 U.S.C. § 1983 action alleging that certain N.Y. Penal Laws that prohibit the possession of Tasers and stun guns violate the Second Amendment of the U.S. Constitution.  Plaintiffs have sued Governor Andrew M. Cuomo, Attorney General Eric T. Schneiderman, and George P. Beach II, the Superintendent of the New York State Police, in addition to the Schoharie County District Attorney, James Sacket.  Amend. Complt., ¶¶ 4-7.  Pursuant to Federal Rule of Civil Procedure 12(b)(6), the Governor and the Attorney General moved to dismiss this action against them since they are not proper parties as they have no direct responsibility for the enforcement of the N.Y. Penal Laws in question.  *See* Dkt. No. 18.[2]  (Plaintiffs have now stipulated to the dismissal of the Governor and the Attorney General from this action.  *See* Dkt. No. 26.)  Additionally, the defendants also moved to dismiss FPC and FPF from this action because, under Second Circuit precedent, they lack standing to bring this lawsuit.  *Id.*  Defendant Sacket has also moved to dismiss this action in its entirety.  *See* Dkt. No. 16.

Plaintiffs challenge New York's laws which ban and criminalize the possession of "electronic dart guns" (commonly known as Tasers) and "electronic stun guns."  *See* N.Y. Penal Law §§ 265.01; 265.00(15-a) (defining "electronic dart gun"); and 265.00(15-c) (defining "electric stun gun"); Amend. Complt., ¶¶ 40-43, Prayer for Relief.  The Taser ban was enacted as a crime-fighting measure in 1976 because Tasers had been used in "holdups and robberies" within the State.  *See* Declaration of Michael G. McCartin, Exhibit A, p. 4 (the Bill Jacket for

[1] Upon information and belief, Plaintiffs FPC and the FPF are non-profit organizations based in Roseland, California.  *See, e.g.*, http://rct.doj.ca.gov/Verification/Web/Details.aspx?result=2a02f984-6a74-4ebb-b271-d3c2d8c1c2b3.   Neither appears to be registered in New York to solicit donations.  The only New York member they identify is Mr. Avitabile.
[2] Defendant George P. Beach II, the Superintendent of the New York State Police, simultaneously answered the Amended Complaint.

2

Senate Bill 7151-A/Assembly Bill 9187-A). Also, law enforcement and public officials determined that Tasers were dangerous if used against police officers and members of the general public. *See, e.g., id.*, pp. 7-8, 19-20. Similarly, the ban against stun guns was enacted in 1990 as another public safety measure. It was supported by law enforcement and public officials at least in part because stun guns were "show[ing] up" in "domestic disputes." *Id.*, Exhibit B, pp. 7, 10-11 (the Bill Jacket for Senate 5301/Assembly 5398-A).

 Plaintiffs' Second Amendment challenge to these public safety statutes is both facial and as-applied. Amend. Complt. ¶ 60. And now Plaintiffs seek a preliminary and/or permanent injunction that would entirely lift New York State's ban against Tasers and stun guns. But the Court should deny this drastic relief.

## Argument

### Point I

**Plaintiffs cannot meet the "higher standard" needed for a preliminary injunction that would alter the status quo here because they cannot make a "clear showing" that they will prevail on the merits, nor can they show that they face a harm that is "actual and imminent."**

Injunctive relief is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 22 (2008). Generally, a party seeking a preliminary injunction must establish (1) "irreparable harm"; (2) "either (a) a likelihood of success on the merits, or (b) sufficiently serious questions going to the merits of its claims to make them fair ground for litigation, plus a balance of the hardships tipping decidedly in favor of the moving party"; and (3) "that a preliminary injunction is in the public interest." *New York v. Actavis PLC*, 787 F.3d 638, 650 (2d Cir. 2015) (internal quotation marks omitted).

3

Yet, importantly here, the Second Circuit has held movants to a heightened standard where: (i) an injunction is "mandatory," or (ii) the injunction "will provide the movant with substantially all the relief sought and that relief cannot be undone even if the defendant prevails at a trial on the merits." *Tom Doherty Assocs., Inc. v. Saban Entm't, Inc*., 60 F.3d 27, 33-34 (2d Cir. 1995). When either condition is met, the movant must show a "clear" or "substantial" likelihood of success on the merits, in addition to showing that the preliminary injunction is in the public interest. *New York v. Actavis PLC*, 787 F.3d at 650. Furthermore, the Second Circuit has also made clear that where, as here, the preliminary relief sought would "stay[] governmental action taken in the public interest pursuant to a statutory scheme…, plaintiffs must establish a 'clear' or 'substantial' likelihood of success on the merits on their claim." *Lopez Torres v. N.Y. State Bd. of Elections*, 462 F.3d 161, 183 (2d Cir. 2006), rev'd on other grounds, 552 U.S. 196 (2008).[3]

In fact, a "higher standard" must also be met when, as would happen here, "an injunction will alter, rather than maintain, the status quo." *Tom Doherty*, 60 F.3d 27 at 33; *see also Fann v. Graham*, 2016 WL 3633388, at *1 (N.D.N.Y. June 29, 2016) (applying heightened standard for mandatory preliminary injunctive relief that would alter status quo). For these types of circumstances, an injunction should issue "only upon a clear showing that the moving party is entitled to the relief requested, or where extreme or very serious damage will result from a denial of preliminary relief." *Abdul Wali v. Coughlin*, 754 F.2d 1015, 1025 (2d Cir. 1985) (internal quotations and citations omitted). *See also Reeder v. DSS Bell*, 2015 U.S. Dist. LEXIS 164651, *5-*6 (N.D.N.Y. Dec. 9, 2015) (same). Furthermore, "[t]he court's task when granting a preliminary injunction is generally to restore, and preserve, the status quo ante, *i.e*., the situation

---

[3] This "heightened standard" is also required here because Plaintiffs "seek to enjoin enforcement of and, ultimately, void a statute that was already in effect at the time the Complaint was filed." *Pankos Diner Corp. v. Nassau Cnty. Legislature*, 321 F. Supp. 2d 520, 523 (S.D.N.Y. 2003).

that existed between the parties immediately prior to the events that precipitated the dispute."
*Chobani, LLC v. Dannon Co., Inc*., 157 F. Supp. 3d 190, 201 (N.D.N.Y. 2016) (quoting *Asa v. Pictometry Intern. Corp*., 757 F. Supp. 2d 238, 243 (W.D.N.Y. 2010)).

As this very Court recently held, even when a court assumes that the "alleged violation of a constitutional right generally satisfies a plaintiff's burden to demonstrate irreparable harm", the moving party must still establish "that without the preliminary injunction, he will suffer an injury that is neither *remote nor speculative, but actual and imminent* …"  *Ulmer v. Dibble*, 2016 U.S. Dist. LEXIS 141648, *3-*4 (N.D.N.Y. Oct. 12, 2016) (omits internal quotations and citations) (emphasis added) (Hurd, J.); *see also Williams v. Conway*, 2017 WL 696808, at *24 (N.D.N.Y. Feb. 22, 2017) (requiring strong showing of irreparable harm for preliminary injunction seeking mandatory act) (citing *Schneiderman v. Actavis PLC*, 787 F.3d 638 (2d Cir. 2015)).

Here, Plaintiff Avitabile cannot show that he is under any type of "actual and imminent" threat that his home will be invaded and that he will suffer harm if he does not have access to a Taser or a stun gun.  Thus, at best, the harm that he alleges is clearly "remote" and "speculative." Consequently, Plaintiff Avitabile cannot meet his heavy burden here of showing that statutes that are decades old are unconstitutional.  Quite simply, a mandatory injunction that alters the status quo regarding governmental action that was taken in the public interest pursuant to a statutory scheme should not be issued under the type of speculative circumstances that are presented in this case.  *See Grand River Enter. Six Nations, Ltd. v. Pryor*, 481 F.3d 60, 66 (2d Cir. 2007) ("[p]laintiffs must demonstrate that absent a preliminary injunction they will suffer an injury that is neither remote nor speculative, but actual and imminent") (internal quotation marks omitted); *see also Weinstein v. Krumpter*, 120 F. Supp. 3d 289, 297 (E.D.N.Y. 2015) (holding in a Second Amendment case that "[t]he court must not adopt a 'categorical' or 'general' rule or presume that the plaintiff will suffer irreparable harm ...").

5

## Point II

**Plaintiff Avitabile does not have a Second Amendment right to possess a
Taser or a stun gun – even within his own home.**

The Second Amendment provides that "[a] well regulated Militia, being necessary to the
security of a free State, the right of the people to keep and bear Arms, shall not be infringed."
U.S. Const., Amend. II.  In *District of Columbia v. Heller*, 554 U.S. 570 (2008), the Supreme
Court concluded that the Second Amendment codifies a pre-existing "individual right to possess
and carry weapons in case of confrontation."  *Id*., 554 U.S. at 592.  Once it made that
determination, the Supreme Court struck down the District of Columbia's prohibition on the
possession of firearms in the home because, quite importantly, the law banned "*the
quintessential self-defense weapon*" – the *handgun* – and it did so in the place that Americans
hold most dear – within their own homes.  *Id*. at 628-29 (emphasis added*).  See also Kolbe v.
Hogan*, 2017 U.S. App. LEXIS 2930, *38 (4th Cir. Feb. 21, 2017).  But the high court still noted
that the Second Amendment does not ensure a right to possess "any weapon whatsoever":

> Like most rights, the right secured by the Second Amendment is not unlimited.
> From Blackstone through the 19th-century cases, commentators and courts
> routinely explained that the right was not a right to keep and carry ***any weapon
> whatsoever*** in any manner whatsoever and for whatever purpose.

*Id*., at 626 (emphasis added).  The Second Amendment right includes an "important limitation"
relating to the type of weapon that is protected.  *Id.*, at 626–27.  It is also clear that the
government can regulate and even ban certain types of weapons, including but not limited to
short barreled shotguns and machine guns*.  See, e.g., United States v. Miller*, 307 U.S. 174
(1939); *Heller*, 554 U.S. at 626-27.  Thus, the Second Circuit has held, "*Heller* was never meant
to clarify the entire field of Second Amendment jurisprudence."  *Kachalsky v. County of
Westchester*, 701 F.3d 81, 89 (2d Cir. 2012) (upholding New York State's concealed weapon
licensing requirements) (omits internal quotations).  Indeed, within the Second Circuit, district

6

courts have recently stated that "'the contours of [the Second Amendment right to bear arms] are as of yet underdeveloped and ill-defined.'" *Hudson v. County of Dutchess*, 2015 U.S. Dist. LEXIS 154632, *42 (S.D.N.Y. Nov. 14, 2015) (quoting *Doutel v. City of Norwalk*, 2013 U.S. Dist. LEXIS 93436, 2013 WL 3353977, at *23 (D. Conn. July 3, 2013)).

And this is true even though two years after *Heller*, the Supreme Court further addressed a Second Amendment case and held there that the Second Amendment's protections apply fully to the states through the Fourteenth Amendment. *McDonald v. City of Chicago*, 130 S. Ct. 3020, 3026, 3042 (2010). Importantly, though, while *McDonald* struck down a Chicago law that banned handguns in the home, *id*. at 3050, it also reaffirmed *Heller*'s assurances that Second Amendment rights are far from absolute and that many longstanding handgun regulations are "presumptively lawful." *Heller*, 554 U.S. at 627 n.26; *see McDonald*, 130 S. Ct. at 3047. Furthermore, the Court explicitly noted that the doctrine of "incorporation does not imperil every law regulating firearms." *McDonald*, 130 S. Ct. at 3047. This has caused the Second Circuit to recognize that "*McDonald* did not expand upon *Heller*'s analysis and simply reiterated *Heller*'s assurances regarding the viability of many gun-control provisions." *N.Y. State Rifle & Pistol Ass'n v. Cuomo*, 804 F.3d 242, 254 (2d Cir. 2015), cert. denied sub nom. *Shew v. Malloy*, 136 S. Ct. 2486 (2016)).

It is into this legal context that Plaintiffs step, asserting that a per curium decision of the Supreme Court in *Caetano* has done more than it really has, that is, that it has supposedly held that all State and local bans on Tasers and stun guns violate the Second Amendment. *See, e.g.*, Plaintiffs' MOL, pp. 4-5, 6-7 (citing *Caetano* for the proposition that "stun guns are protected arms under the Second Amendment" and stating that after *Caetano* "it is not plausible to read

'arms' as limited to guns").  But that simply is not true.[4]

Indeed, a State court within New York got it exactly right when it properly interpreted

*Caetano*'s quite limited holding this way:

> [I]n *Caetano*, the Supreme Court did not hold … that a Massachusetts statute
> banning the possession of stun guns violated the Second Amendment.  Rather, the
> Supreme Court held that the reasons offered by the Supreme Judicial Court of
> Massachusetts in upholding the statute contradicted the Supreme Court's opinion
> in *Heller*.  The judgment of the Supreme Judicial Court of Massachusetts was
> then vacated and the case was remanded for further proceedings.

*People v. Buchholz*, 53 Misc. 3d 563, 566-567 (N.Y. City Crim. Ct. 2016).  Again, this New

York State court is entirely correct, since *Caetano* stands for no more than a high court's

summary rebuke of a poorly-reasoned lower court decision, one that improperly applied well-

known Supreme Court precedent.[5]  Plaintiff's summary reliance upon *Caetano* certainly does not

establish the "clear showing" necessary for the summary injunction they seek.  And because that

is so, Plaintiffs' demand for a preliminary injunction should be denied and this case should

proceed through discovery.

The issue whether Plaintiffs have a right to own a Taser or a stun gun – despite the

reasoned judgment of New York's Legislature to the contrary – should be decided, at the very

least, by this Court at summary judgment after a full airing of the facts and after a full briefing of

the law.  As the Second Circuit recognized in *Kachalsky*, "[i]n the context of firearm regulation,

the legislature is far better equipped than the judiciary to make sensitive public policy judgments

(within constitutional limits) concerning the dangers in carrying firearms and the manner to

---

[4] Plaintiffs also cite to the Fifth Circuit's decision in *Hollis v. Lynch*, 827 F.3d 436, 449 (5th Cir. 2016) which in turn
cited to Justice Alito's concurrence in *Caetano*, among other cases, to find that there is a "wide variety in
methodological approaches" for "the common use inquiry."  *Id.*, at 449.  But *Hollis'* citation to *Caetano* stands for
no more than that.
[5] Notably, *Caetano* did not even concern a Taser; it merely related to a stun gun.  *Caetano*, 136 S.Ct. at 1027.
Furthermore, while the parties and amici curiae all framed the issue as whether the Massachusetts statute violates the
Second Amendment, the Supreme Court did not address that issue directly, but merely rejected the lower court's
reasoning for its decision.

combat those risks." *Kachalsky*, 701 F.3d at 97.  *See also Kolbe*, 2017 U.S. App. LEXIS 2930,

*57 ("enacting the [gun ban at issue] is precisely the type of judgment that legislatures are

allowed to make without second-guessing by a court").  That is true here, too.

## Point III

**There is a legitimate question as to whether Tasers or stun guns are even "bearable arms" under *Heller*, and *Caetano*'s per curium decision did not definitively answer that open question.**

Plaintiffs cite to *Heller*'s definition of "bearable arms" as being any "[w]eapo[n] of

offense" or "thing that a man wears for his defense, or takes into his hands," that is "carr[ied] …

for the purpose of offensive or defensive action."  *Heller*, 554 U.S., at 581, 584.  However, just

as the State of Washington's high court held in *City of Seattle v. Evans*, 184 Wn.2d 856, 869

(Wash. 2015) that "not all knives are 'arms'" (such as paring knives), not everything called a

"gun" (such as a "electronic dart gun" or an "electronic stun gun") is necessarily an "arm" either.

As Washington State's high court observed:

> If a kitchen knife is a protected arm, what about a rolling pin, which might be effectively wielded for protection or attack?  Or a frying pan?  Or a heavy candlestick?  "Admittedly, any hard object can be used as a weapon, but it would be absurd to give every knife, pitchfork, rake, brick or other object conceivably employable for personal defense constitutional protection as 'arms.'"

*Id.*, 184 Wn.2d at 872 (quoting *City of Seattle v. Montana*, 129 Wn.2d 583, 591 n.2 (Wash.

1996)).  Indeed, a District of Columbia court has noted that "the discourse in *Heller* is focused

exclusively on 'arms' or 'weapons,' meaning *firearms* when read in context."  *Wooden v. United*

*States*, 6 A.3d 833, 839 (D.C. 2010) (emphasis added).

*Firearms* are clearly protected by the Second Amendment as "bearable arms", but Tasers

and stun guns are not *clearly* protected as "bearable arms."  And the five-paragraph per curium

decision in *Caetano* did not definitively answer that open question.  It merely remanded the case

back to the Massachusetts court to reconsider the whole matter in a way that was consistent with

9

Supreme Court precedent.

At a minimum, more briefing on this issue should be had at the merits stage after the *facts* related to Tasers and stun guns are fully aired before the Court.  As this Court recently noted, "[p]reliminary injunction requests are frequently denied if the affidavits [in support of the motion] are too vague or conclusory to demonstrate a clear right to relief under Rule 65." *Ulmer*, 2016 U.S. Dist. LEXIS 141648, *4 (omits internal quotations).  Plaintiffs have offered no meaningful evidence at all to allow this Court to definitively conclude that Tasers and stun guns are "bearable arms."  Preliminary relief should not be granted under these circumstances.  *See Weinstein*, 120 F. Supp. 3d at (holding in a Second Amendment case that "a bare assertion of a constitutional injury, without evidence 'convincingly show[ing]' the existence of noncompensable damages, is insufficient to automatically trigger a finding of irreparable harm…").

## Point IV

**There is also a legitimate question as to whether Tasers or stun guns are "in common use" under *Heller*, and *Caetano*'s per curium decision did not definitively answer that open question either.**

"The Second Amendment protects only 'the sorts of weapons' that are (1) 'in common use' and (2) 'typically possessed by law-abiding citizens for lawful purposes.'"  *N.Y. State*, 804 F.3d at 254-255.  In *N.Y. State Rifle*, the court reviewed gun-control legislation by the New York and Connecticut legislatures prohibiting the possession of certain semi-automatic assault weapons and large-capacity magazines.  *Id.*, at 247.  In addressing the issue of whether those weapons were "in common use," the court examined statistics advanced by the parties that asserted there were between *four million* and *seven million* such assault weapons in general use by the public across the Nation.  *Id.*, at 255.  Looking to these high numbers, the Second Circuit concluded, "[t]his much is clear: Americans own millions of the firearms that the challenged

10

legislation prohibits." *Id.* Based upon this fact, that is, that *millions* of such firearms were held across the country, the Second Circuit assumed for the sake of argument that those weapons were indeed "in common use." *Id.*, at 257 ("In the absence of clearer guidance from the Supreme Court or stronger evidence in the record, we …. assume for the sake of argument that these 'commonly used' weapons and magazines are also "typically possessed by law-abiding citizens for lawful purposes."). Not so here, though.

At most, Justice Samuel Alito's concurrence in *Caetano* cited to *People v. Yanna*, 297 Mich. App. 137, 144 (2012), and noted that statistics showed that "[h]undreds of thousands of Tasers and stun guns have been sold to private citizens" in 45 States (although his citation seems to indicate that it may include some sales to law enforcement as well). *Caetano*, 136 S.Ct. at 1032. "*Hundreds of thousands*" is markedly different from the "*millions*" of firearms that were at issue in *N.Y. State Rifle*. Thus, there is an open question as to whether Tasers and stun guns are "in common use" under the Supreme Court's decision in *Heller* (and the Second Circuit's decision in *N.Y. State Rifle*) and *Caetano*'s five paragraph per curium decision did not even address this open question at all, much less seek to answer it.

This is especially important in light of cases like *Friedman v. City of Highland Park*, 784 F.3d 406 (7th Cir. 2015), which determined that AR-15s were not in common use because only "9 % of the nation's firearms owners have assault weapons," *id.*, at 409, and *Hollis v. Lynch*, 827 F.3d 436 (5th Cir. 2016), which found that a machinegun was an unusual weapon because one ATF statistic indicated that there were only "175,977 pre-1986 civilian-owned machineguns in existence," *id.*, at 449. Even *generously* assuming that 500,000 Tasers and stun guns (combined) are held by civilians for protected purposes in the United States, and certainly there is not clear evidence showing the same, that would still mean that if each such device was owned by a separate person, below 0.02% of the population have them. Yet, here, even the Plaintiffs admit

11

that "[g]ood data appears not to exist for the number of stun guns sold in the United States". Dkt. No. 22-1, p. 14 n 13.

Under these circumstances, Plaintiffs certainly have not established a clear or substantial likelihood of success on the merits on this portion of the Second Amendment analysis either.  It would be wise for the Court to find out the true numbers of Tasers and stun guns that are actually in civilian use today, and how and why they are used, before it reaches a conclusion on the "in common use" issue, and discovery is required for that determination to be made.  *See, e.g., Maloney v. Singas*, 106 F. Supp. 3d 300, 314 (E.D.N.Y. 2015) (denying summary judgment because neither party had "shown an absence of disputed issues of material fact with respect to the critical threshold question of whether chuka sticks are or are not protected by the Second Amendment" since the number of them in existence was uncertain; further stating that "the parties should be prepared to offer a more robust factual record through the use of statistics and/or expert testimony").

### Point V

**The necessary level of scrutiny to apply to this matter, if any, is "intermediate scrutiny" and that is met here because the N.Y. Legislature has properly concluded that Tasers and stun guns present a threat to public safety.**

As the Second Circuit held just a few months ago, courts within this Circuit need only apply intermediate scrutiny even to those laws found to implicate the Second Amendment. *Mishtaku v. Espada*, 2016 U.S. App. LEXIS 17734, *1-*2 (2d Cir. Sept. 28, 2016) (quoting *N.Y. State Rifle*, 804 F.3d at 260-61).  *See also United States v. Decastro*, 682 F.3d 160, 166 (2d Cir. 2012) ("Given *Heller*'s emphasis on the weight of the burden imposed by the D.C. gun laws, we do not read the case to mandate that any marginal, incremental *or even appreciable restraint* on the right to keep and bear arms be subject to heightened scrutiny.") (emphasis added); *Maloney*

*v. Singas*, 106 F. Supp. 3d at 311 ("a majority of courts have applied intermediate scrutiny to general challenges under the Second Amendment, even when reviewing statutes or laws that may restrict the possession of [weapons] in the home") (internal quotations omitted); *United States v. Laurent*, 861 F. Supp. 2d 71, 101 (E.D.N.Y. 2011) ("most courts of appeals have found that regulations which substantially burden the right to keep and to bear arms for the purpose of self-defense should receive intermediate scrutiny").

Furthermore, the Second Circuit has even held that "[n]o 'substantial burden' exists – and hence heightened scrutiny is not triggered – if *adequate alternatives* remain for law-abiding citizens to acquire a firearm for self-defense." *N.Y. State Rifle*, 804 F.3d at 259 (emphasis added). There is no dispute here that Plaintiff Avitabile could conceivably obtain a handgun, a rifle, shotgun, self-defense spray or other means to defend his home; thus, under this rationale of *N.Y. State Rifle*, a heightened scrutiny is certainly not required just because Plaintiff Avitabile *may purposefully choose* not to avail himself of these "adequate alternatives." *See Kolbe*, 2017 U.S. App. LEXIS 2930, *35, *51-*52.

And since strict scrutiny does not apply to the ban of Tasers and stun guns, and intermediate scrutiny does, that means that "New York's law need only be substantially related to the state's important public safety interest" and a "perfect fit between the means and the governmental objective is not required." *Kachalsky*, 701 F.3d at 98. Thus, under this intermediate scrutiny test, "a regulation that burdens a plaintiff's Second Amendment rights passes constitutional muster if it is substantially related to the achievement of an important governmental interest." *Kwong v. Bloomberg*, 723 F.3d 160, 168 (2d Cir. 2013). On this point, it is beyond cavil that "New York has substantial, indeed compelling, governmental interests in public safety and crime prevention." *Id*. (omits internal quotations).

13

And, as the legislative history reveals, public safety and crime prevention were at the heart of the New York Legislature's policy reasons for adopting the ban on Tasers and stun guns. For instance, the 1976 Bill Jacket for the Taser ban stated: "These devices have already been used in holdups and robberies."  McCartin Decl., Exhibit A, p. 5.  Also, the Superintendent of the New York State Police wrote as follows in favor of the bill's enactment:

> [S]uch weapons employed unsuspectingly on a police officer would not only leave the police officer at the mercy of the perpetrator but also would leave him vulnerable to the loss of his service weapon.

 *Id*., at 8.  Finally, the then-Mayor of New York City, Abraham D. Beame, wrote to the then-Governor of New York State, Hugh Carey, urging him to sign the bill into law because Tasers were, as he asserted, "obviously a menace to many, particularly those with heart conditions." *Id*., at 19.  These words appear to have not only been accurate but also percipient.

For example, there are numerous instances in which Taser use was linked to the death of the individual struck with the Taser probes.  The following is a small sample of cases over the past several years that discuss these types of fatalities:

- *Armstrong v. Village of Pinehurst*, 810 F.3d 892, 897-98 (4th Cir. 2016) (mentally ill patient died after being subjected to five Taser deployments lasting approximately 2 minutes).

- *Mitchell v. City of Warren*, 803 F.3d 223, 226 (6th Cir. 2015) ("One metal dart hit just inches above Robert's heart, the other just inches below.  Mitchell fell to the ground. … The medical team tried to resuscitate him but could not.").

- *Bachtel v. TASER Int'l, Inc*., 747 F.3d 965, 967 (8th Cir. 2014) ("A Moberly police officer shot Stanley Harlan in the chest with an electronic control device (ECD) after a traffic stop just past midnight on August 28, 2008.  Harlan died within two hours[.]").

- *Williams v. City of Cleveland*, 736 F.3d 684, 686 (5th Cir. 2013) ("The evaluating physician listed the cause of death as '[t]oxic effects of cocaine in association with shocks with Taser during police chase.'").

14

- *Fontenot v. Taser Int'l, Inc*., 736 F.3d 318, 321 (4th Cir. 2013) ("Darryl Wayne Turner, age seventeen, died from cardiac arrest after a confrontation with police in which he was struck in the chest by electrical current emitted from a device commonly known as a 'taser,' manufactured by TASER International, Inc.").

- *Piskura v. Taser Int'l,* 2013 U.S. Dist. LEXIS 46332, *7-*8 (S.D. Ohio Mar. 29, 2013) ("Dr. Zipes, a preeminent scholar in the field of electrophysiology (a subspecialty of cardiology that 'focuses on the electrical impulses that regulate heart rhythm') had the necessary training, knowledge, experience, and education to assist the trier of fact in understanding the evidence and in resolving the causation issue in this case, *i.e.* whether Piskura died of cardiac arrest as a result of being tased in the chest").

- *Russell ex rel. Russell v. Wright*, 916 F. Supp. 2d 629, 634 (W.D. Va. 2013) ("[Officer] Wright then triggered his device using a single five second cycle, striking Russell directly in the chest.  ... Upon being struck, Russell's body stiffened and he fell to the ground … and [he] is heard making loud, guttural breathing sounds for at least the next 48 seconds. …  The rescue workers managed to restart his heart, but Russell had gone without oxygen for over eight minutes, causing severe brain damage.  He fell into a coma and died six months later.").

- *Marquez v. City of Phoenix*, 693 F.3d 1167, 1171 (9th Cir. 2012) (after multiple uses of a Taser against him, "[d]espite resuscitation efforts, Ronald went into cardiac arrest and died").

- *Rosa v. TASER Int'l, Inc.*, 684 F.3d 941, 944 (9th Cir. Cal. 2012) ("We are called upon to decide whether, in August 2004, a manufacturer of electronic control devices, commonly referred to as 'tasers,' was under a duty to warn that repeated exposure to its products could lead to fatal levels of metabolic acidosis.").

- *Rich v. Taser Int'l, Inc.*, 2012 U.S. Dist. LEXIS 44584, *3-*4 (D. Nev. Mar. 30, 2012) ("Officer Lazoff discharged his TASER Model X26 Electronic Control Device ('ECD') three times into Dr. Rich's chest … Paramedics arrive[d] shortly thereafter to transport Dr. Rich to Spring Valley Hospital where he was pronounced dead.").

- *McKenney v. Harrison*, 635 F.3d 354, 357-358 (8th Cir. 2011) ("[Officer] Pollreis deployed her Taser as Barnes was passing her but before he reached the window.  The Taser's two probes lodged in Barnes's back, but Barnes continued through the window. … Barnes died from his injuries four days later.").

15

Despite Plaintiffs' insistence that Taser's are a non-lethal means of self-defense, that is plainly not always true.  In fact, Taser itself warns of the risks of serious injury and death associated with use of its products.  *See Williams v. City of Cleveland*, 736 F.3d at 687 ("Taser's product warnings explicitly and repeatedly warned of the risks of serious injury and death ...").

What is clear, though, is that when the New York Senate voted on the Taser ban, the vote was 58 to 0; and when the New York State Assembly voted on that same ban, the vote was 140 to 0.  McCartin Decl., Exhibit A, pp. 2-3.  As was noted above, the Second Circuit recognized in *Kachalsky* that "[i]n the context of firearm regulation, the legislature is far better equipped than the judiciary to make sensitive public policy judgments (within constitutional limits) concerning the dangers in carrying firearms and the manner to combat those risks." *Kachalsky*, 701 F.3d at 97.  The unanimous Legislature's vote here should not be gainsaid based upon the flimsy record that Plaintiffs have produced to this Court, which is merely a sparse six-paragraph declaration from Plaintiff Avitabile.

And while Plaintiffs' memorandum of law is jam-packed with a slew of *policy* reasons why Tasers and stun guns should be allowed for self-defense purposes within the homes of New Yorkers, it is for the New York Legislature to determine which policy reasons are more persuasive when it enacts legislation.  Indeed, "[t]he central role of representative democracy is no less part of the Constitution than is the Second Amendment: when there is no definitive constitutional rule, matters are left to the legislative process." *Friedman*, 784 F.3d at 412.[6]  *See also Kolbe*, 2017 U.S. App. LEXIS 2930, *57 ("[i]t is the legislature's job, not ours, to weigh

---

[6] The Bill Jacket to the 1976 Taser legislation makes quite clear that Governor Carey had before him opposition from Taser Systems Inc. itself, as well as opposition that made some of the same policy arguments in favor of Tasers that Plaintiffs make here.  *See* McCartin Decl., Exhibit A, pp. 15-16.  For instance, the New York Association of the Bar urged Governor Carey not to sign the legislation into law by asserting the following: "Recognizing the fact that large numbers of people in New York City possess illegal weapons, not with intent to commit crimes, but because of understandable fear, it would be at least a relative improvement if they would arm themselves with 'stun guns' as opposed to the firearms so many now possess." *Id.*, p. 21.  Obviously, though, this policy consideration was rejected when Governor Carey signed the bill into law.

conflicting evidence and make policy judgments") (omits internal quotations and citations).

That is, quite frankly, the *key* consideration here.  As noted at the outset of this brief, if Plaintiffs

want the ban on Tasers and stun guns lifted, they should seek to do so through their

representatives in the New York State Legislature.  That is the proper place to make the purely

policy arguments that Plaintiffs advance in their memorandum of law.  This Court is not the

proper place for those policy arguments.

So in light of the crime-prevention legislative history behind the Taser ban,[7] and in light

of the potential for serious harm or even death associated with these instruments, it is quite

certain that New York's ban on Tasers and stun guns is "substantially related to the state's

important public safety interest."  *Kachalsky*, 701 F.3d at 98.  Thus, it clearly passes

constitutional muster.  As the Supreme Court noted in *Heller*, there is an "historical tradition of

prohibiting the carrying of 'dangerous and unusual weapons.'"  *Heller*, 554 U.S. at 627.  *See also*

*Kolbe*, 2017 U.S. App. LEXIS 2930, at *35-*36.  The Legislature of New York has simply acted

within this time-worn historical tradition in order to protect its citizens from weapons that it

considers to be "dangerous."   And this determination certainly has a sound basis in law.  *See,*

*e.g., United States v. Agron*, 921 F.2d 25 (2d Cir. 1990) (the stun gun that defendant possessed

during the commission of underlying drug offense caused a physical impairment consonant with

serious bodily injury, so his sentence was properly enhanced under the United States Sentencing

Guidelines' "dangerous weapon" provision); *United States v. Wallace*, 800 F.2d 1509, 1513 (9th

Cir. 1986) (a stun gun is a "dangerous weapon" under Federal Aviation Act of 1958, § 902(l), 49

U.S.C. § 1472 (L)), cert. denied, 481 U.S. 1019 (1987); *Gordon v. Runyon*, 1994 U.S. Dist.

LEXIS 4959 (E.D. Pa. 1994) ("case law suggests that stun guns are inherently dangerous"); *see*

---

[7] As noted above, the 1990 legislative history related to stun guns is similar to that of Tasers.  For example, the legislative history referred to an Albany man who assaulted two females with a stun gun.  McCartin Decl., Exhibit B, pp. 10-11.

*also Armstrong v. Village of Pinehurst*, 810 F.3d at 902 ("Deploying a taser is a serious use of force.  The weapon is designed to 'caus[e] . . . excruciating pain,' and application can burn a subject's flesh.").  As such, Plaintiffs simply cannot establish that they have a likelihood of success on the merits of this action.

Additionally, the legislative history and this case law also shows that "a balance of the hardships" does not tip "decidedly in favor of the moving party", as is required, nor that "a preliminary injunction is in the public interest."  *Actavis PLC*, 787 F.3d at 650 (internal quotation marks omitted).  Indeed, according to the New York State Legislature, quite the opposite is true. This Court should defer to that judgment, certainly based upon the paltry record that Plaintiffs have placed before the Court at this preliminary injunction stage.

### Point VI

**Under controlling Second Circuit precedent, because Plaintiff Avitabile has access to "adequate alternatives" to protect his home, there is, as a matter of law, no "substantial burden" on his Second Amendment rights.**

In *Decastro*, the Second Circuit clearly held that a "law that regulates the availability of firearms is *not a substantial burden on the right to keep and bear arms if **adequate alternatives** remain for law-abiding citizens to acquire a firearm for self-defense*."  *United States v. Decastro*, 682 F.3d at 168 (emphasis added).  Again, that rule of law is directly applicable here because Plaintiff Avitabile has "adequate alternatives" at his disposal – handguns, rifles, and shotguns – all of which can be lawfully purchased by him to protect his home.  And if Plaintiff Avitabile still wants a "less lethal" form of defense, he can also use items like pepper spray.  Under the rule of law set forth by the Second Circuit in *Decastro*, these "adequate alternatives" necessarily mean that Plaintiff Avitabile's Second Amendment rights have not been substantially burdened. In fact, there is absolutely no ***evidence*** – that is, no sworn declaration – before the Court at this early stage of the litigation that Plaintiff Avitabile would not be ready, willing and able to use at

18

least one of these alternative forms of self-defense, if the absolute need arose.  Here, Plaintiff Avitabile's sparse six-paragraph declaration does not even attempt to assert as much; rather, its only ostensible purpose is to stave off a standing challenge.  *See* Dkt. No. 12-1; *Ulmer*, 2016 U.S. Dist. LEXIS 141648, *4 ("[p]reliminary injunction requests are frequently denied if the affidavits [in support of the motion] are too vague or conclusory to demonstrate a clear right to relief under Rule 65") (omits internal quotations).

Finally, despite Plaintiff Avitabile's argument to the contrary, he would have no appreciable right to possess a Taser or stun gun outside of his home.  In fact, the law to the contrary, especially within the Second Circuit, is quite clear on this point.  *See Kachalsky*, 701 F.3d at 94-95 ("There is a longstanding tradition of states regulating firearm possession and use in public because of the dangers posed to public safety."); *United States v. Laurent*, 861 F. Supp. 2d at 100 (holding that the Second Amendment "does not prohibit government regulation of firearms outside of the home or limitations on ownership of certain firearms; nor does it prevent the government from limiting the use of firearms for specific purposes or by specific people"). *See also Peruta v. Cnty. of San Diego*, 824 F.3d 919, 924 (9th Cir. 2016) (en banc) ("the Second Amendment does not preserve or protect a right of a member of the general public to carry concealed firearms in public").

## Conclusion

Based upon the above, Plaintiffs' motion for a preliminary injunction must be denied by the Court.

Dated: Albany, New York
       March 7, 2017

                                    ERIC T. SCHNEIDERMAN
                                    Attorney General of the State of New York
                                    *Attorney for Governor Andrew M. Cuomo,*
                                    *Attorney General Eric T. Schneiderman, and*
                                    *Superintendent George P. Beach II, Superintendent*
                                    *of the New York State Police*
                                    The Capitol
                                    Albany, NY 12224

                                    s/*Michael McCartin*
                                    Michael G. McCartin
                                    Assistant Attorney General
                                           *Of Counsel*
                                    Bar Roll No. 511158
                                    (518) 776-2620
                                    michael.mccartin@ag.ny.gov

TO:    Alan Alexander Beck, Esq.
       *Attorney for Plaintiffs*
       Alan A Beck Law Firm
       2692 Harcourt Drive
       San Diego, CA 92122

       Stephen D. Stamboulieh, Esq.
       *Attorney for Plaintiffs*
       Stamboulieh Law, PLLC
       P.O. Box 4008
       Madison, MS 39130

       Gregg T. Johnson, Esq.
       *Attorney for Defendant James Sacket*
       LEMIRE, JOHNSON & HIGGINS, LLC
       2534 Route 9 – P.O. Box 2485
       Malta, New York  12020