# EXHIBIT A

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF NEW YORK**
**Albany Division**

| | |
|---|---|
| MATTHEW AVITABILE, et al.,<br><br>*Plaintiffs*,<br>v.<br><br>ANDREW CUOMO, et al.,<br><br>*Defendants.* | Civil Action No. 1:16-cv-1447 (DNH/CFH) |

**MEMORANDUM OF EVERYTOWN FOR GUN SAFETY AS AMICUS CURIAE**

ILANN M. MAAZEL
EMERY CELLI BRINCKERHOFF & ABADY LLP
600 Fifth Avenue, 10th Floor
New York, NY 10020
(212) 763-5000
*imaazel@ecbalaw.com*

DEEPAK GUPTA
JONATHAN E. TAYLOR
GUPTA WESSLER PLLC
1735 20th Street, NW
Washington, DC 20009
(202) 888-1741
*deepak@guptawessler.com*

MARK ANTHONY FRASSETTO
EVERYTOWN FOR GUN SAFETY
P.O. Box 4184
New York, NY 10163

*Counsel for Amicus Curiae*
*Everytown for Gun Safety*

March 8, 2017

## CORPORATE DISCLOSURE STATEMENT

Everytown for Gun Safety has no parent corporations. It has no stock and hence no publicly held company owns 10% or more of its stock.

# TABLE OF CONTENTS

Corporate Disclosure Statement ........ i

Table of Authorities ........ iii

Introduction and interest of amicus curiae ........ 1

Argument ........ 2

I. The challengers' categorical "common use" theory is illogical, dangerous, and inconsistent with Second Circuit precedent. ........ 2

II. To the extent that this Court decides to reach the merits and finds that the Second Amendment applies, it should not subject the law to strict scrutiny. ........ 8

Conclusion ........ 10

## TABLE OF AUTHORITIES

**Cases**

*Caetano v. Massachusetts*,
136 S. Ct. 1027 (2016) .......... 3

*Dearth v. Lynch*,
781 F.3d 32 (D.C. Cir. 2015). .......... 8

*District of Columbia v. Heller*,
554 U.S. 570 (2008) .......... 1, 2, 5

*Friedman v. City of Highland Park*,
784 F.3d 406 (7th Cir. 2015) .......... 4, 5, 6, 7

*Hollis v. Lynch*,
827 F.3d 436 (5th Cir. 2016) .......... 3

*Jackson v. City & County of San Francisco*,
746 F.3d 953 (9th Cir. 2014) .......... 7

*Kolbe v. Hogan*,
—F.3d—, 2017 WL 679687 (4th Cir. Feb. 21, 2017) (en banc) .......... 8

*Kolbe v. Hogan*,
813 F.3d 160 (4th Cir. 2016) .......... 8

*Kwong v. Bloomberg*,
723 F.3d 160 (2d Cir. 2013) .......... 9

*Mishtaku v. Espada*,
—F. App'x—, 2016 WL 5414978 (2d Cir. Sep. 28, 2016) .......... 9

*National Rifle Associationn v. Bureau of Alcohol, Tobacco, Firearms, and Explosives*,
700 F.3d 185 (5th Cir. 2012) .......... 8

*New York State Rifle & Pistol Association v. Cuomo*,
804 F.3d 242 (2d Cir. 2015) .......... 4, 8

*State v. DeCiccio*,
105 A.3d 165 (Conn. 2014) .......... 9

*State v. Hermann*,
873 N.W.2d 257 (Wis. Ct. App. 2015) .......... 9

*Tyler v. Hillsdale County Sheriff's Department*,
—F.3d—, 2016 WL 4916936 (6th Cir. Sept. 15, 2016) (en banc) .......... 8

*Tyler v. Hillsdale County Sheriff's Department*,
775 F.3d 308 (6th Cir. 2014) .......... 8

*United States v. Booker*,
644 F.3d 12 (1st Cir. 2010) .......... 8

*United States v. Chester*,
628 F.3d 673 (4th Cir. 2010) .......... 8

*United States v. Chovan*,
735 F.3d 1127 (9th Cir. 2013) .......... 8

*United States v. Marzzarella*,
614 F.3d 85, 97 (3d Cir. 2010) .......... 8

*United States v. Reese*,
627 F.3d 792 (10th Cir. 2010) .......... 8

*United States v. Williams*,
616 F.3d 685 (7th Cir. 2010) .......... 8

**Statutes**

1837 Ala. Acts 7, No. 11 .......... 9

Mass. Gen. Laws ch. 194, §§ 1–2 (1850) .......... 9

1890 Okla. Sess. Laws 475–76, ch. 25 §§ 18–19 .......... 9

1906 Va. Acts 9, ch. 11 .......... 9

1907 Ala. Acts 80, No. 55 .......... 9

1912 N.J. Laws 365 .......... 9

1923 Cal. Stat. 695, ch. 339, § 1 .......... 9

1925 N.J. Laws 185 .......... 9

1931 N.Y. Laws 1033 .......... 9

1931 Tenn. Priv. Acts 1089 .......... 9

Pub. L. No. 275, § 14, codified at 47 Stat. 650 (1932) .......... 9

Pub. L. No. 85-623, codified at 72 Stat. 562 (1958) .......... 10

1959 N.M. Laws 245 .......... 10

N.Y. Penal Law § 265.01 .......... 2

**Other authorities**

Joseph Blocher & Darrell A.H. Miller, *Lethality, Public Carry, and Adequate Alternatives*, 53 Harv. J. on Legis. 279 (2016) .......... 5, 7

Cody J. Jacobs, *End the Popularity Contest*, 84 Tenn. L. Rev. 231 (2015) .......... 4, 5, 6, 7

William J. Krouse, *Gun Control Legislation*, Congressional Research Service (Nov. 14, 2012) .......... 3

## INTRODUCTION AND INTEREST OF AMICUS CURIAE

Everytown for Gun Safety is the nation's largest gun-violence-prevention organization, with supporters in every state—including over 1,800 current and former mayors of cities across the country and a network of more than 1,000 survivors of gun violence who are leaders in campaigns to support common-sense gun laws in their communities. Everytown has drawn on its expertise to file briefs in numerous Second Amendment cases, including those involving stun-gun laws. *See, e.g.*, *Wrenn v. District of Columbia*, No. 16-7025 (D.C. Cir.); *Peruta v. San Diego*, No. 10-56971 (9th Cir.); *Kolbe v. Hogan*, No. 14-1945 (4th Cir.); *Peña v. Lindley*, No. 15-15449 (9th Cir.); *Wright v. District of Columbia*, No. 16-1556 (D.D.C.). Although Everytown takes no position on stun-gun legislation of the sort involved in this case, it has a strong interest in ensuring that Second Amendment jurisprudence is informed by a proper understanding of both doctrine and history.

Everytown files this memorandum to make two doctrinal points in response to arguments advanced by the challengers—arguments that, if accepted, could have profound effects on Second Amendment cases more broadly. *First*, the challengers contend that the law is "plainly facially unconstitutional" under *District of Columbia v. Heller*, 554 U.S. 570 (2008), because, with "275,000 Tasers in the hands of citizens," it prohibits "persons from keeping and bearing a class of commonly used arms." Memo. 17, 14, 1, 3. But no federal court has held that governments are categorically precluded from prohibiting any arm deemed in "common use" based on such a sales threshold. In fact, the Seventh Circuit has expressly rejected a *less extreme* theory of common use as circular and contrary to federalism, and the D.C. Circuit (among others) has implicitly done the same. If the challengers' theory were the law, moreover, it would create perverse incentives for gun manufacturers, threatening public safety. *Second*, the

challengers ask for strict scrutiny should the Court reject their broad theory, and further argue that the law "fails any measure of heightened scrutiny." Memo. 16. But if the Court decides to reach the merits and concludes that the Second Amendment applies, intermediate scrutiny is the correct standard.

## ARGUMENT

### I. The challengers' categorical "common use" theory is illogical, dangerous, and inconsistent with Second Circuit precedent.

**A.** The challengers want this Court to hold that New York's law, N.Y. Penal Law § 265.01, is *necessarily* unconstitutional under the Second Amendment because the law (in their view) prohibits "persons from keeping and bearing a class of commonly used arms for self-defense." Memo. 3; *see id.* at 17 (arguing that the law is "plainly facially unconstitutional"); *id.* at 18 (advocating a "categorical analysis"). On this theory of what constitutes an "unusual" weapon, as soon as *any* type of weapon achieves a certain minimal nationwide sales or manufacturing threshold—and what the magic number is, the challengers do not say—then the Second Amendment confers an absolute right to acquire it in every state.

The challengers locate this "common use" theory in *Heller*, which invalidated a law that "amount[ed] to a prohibition of an entire class of 'arms' that is overwhelmingly chosen by American society for [self-defense]." 554 U.S. at 628; *see* Memo. 18 ("Given that *Heller* applied a categorical analysis to invalidate D.C.'s gun ban, this Court should similarly apply that analysis to strike down New York's Taser ban."). *Heller* held that "[u]nder any of the standards of scrutiny that we have applied to enumerated constitutional rights, banning from the home the most preferred firearm in the nation to 'keep' and use for protection of one's home and family, would fail constitutional muster." 554 U.S. at 628–29 (quotations, citation omitted). The challengers ask this Court to stretch this holding far beyond the context of that case—which

concerned a law prohibiting a class of 114 million arms, *see* William J. Krouse, *Gun Control Legislation*, Congressional Research Service, at 8 (Nov. 14, 2012), *at* http://bit.ly/1bNw2Br—to compel the invalidation of a law prohibiting a weapon that is hundreds of times less common.

The challengers support this sweeping position by relying heavily on the Supreme Court's five-paragraph per curiam opinion in *Caetano v. Massachusetts*, 136 S. Ct. 1027 (2016), which vacated and remanded a decision by the Massachusetts Supreme Judicial Court that had upheld a conviction under that state's stun-gun prohibition. But the Supreme Court did not strike down Massachusetts' law, nor did it expand *Heller* in the slightest. Instead, it simply remanded the case and held that "the explanation the Massachusetts court offered for upholding the law"—"that the Second Amendment does not extend to stun guns" because they are a "modern invention" and are not used in the military—"is inconsistent with *Heller*'s clear statement[s]." *Id.* at 1027–28. The plaintiffs also attempt to stretch *Caetano*'s holding, pointing to a recent Fifth Circuit case that, they contend, "cited approvingly to *Caetano* for the proposition that stun guns are protected arms under the Second Amendment." Memo. 6–7 (citing *Hollis v. Lynch*, 827 F.3d 436, 449 (5th Cir. 2016)). But for that proposition, the court in *Hollis* relied not on the Court's opinion in *Caetano*, but on the concurrence of only two Justices. Only Justice Alito (joined by Justice Thomas) would have adopted the broad categorical argument the challengers urge here. *See Caetano*, 136 S. Ct. at 1032–33 (2016) (Alito, J., concurring) (expressing the view that, because "[h]undreds of thousands of Tasers and stun guns have been sold to private citizens," a "categorical ban of such weapons therefore violates the Second Amendment"). No other Justice expressed agreement with this view, and it is not the law in any circuit.

It is certainly not the law in the Second Circuit. Two years ago, in a challenge to New York and Connecticut laws prohibiting a class of semiautomatic firearms defined as "assault

weapons," as well as a class of large-capacity magazines, the Second Circuit rejected the argument that the laws must be struck down on the theory that they amounted to a "complete prohibition" on weapons that were "commonly owned by many law-abiding Americans." *New York State Rifle & Pistol Ass'n v. Cuomo*, 804 F.3d 242, 258 (2d Cir. 2015). The Court accepted that the weapons were "'in common use' as that term was used in *Heller*," noting that "nearly four million units of a single assault weapon, the popular AR–15, have been manufactured between 1986 and March 2013," and that "nearly 50 million such magazines—or nearly two large-capacity magazines for each gun capable of accepting one—were approved for import by 2000." *Id.* at 255. "This much is clear," the court concluded: "Americans own millions of the firearms that the challenged legislation prohibits." *Id.* But even working under the assumption that these weapons were "typically possessed by law-abiding citizens for lawful purposes," *id.* at 257, the Second Circuit rejected a categorical approach, applied intermediate scrutiny, and found that the statutes "nonetheless largely pass constitutional muster." *Id.* at 260, 257.

**B.** Even if this Court were free to contravene Second Circuit precedent, it should reject the challengers' theory because it is unworkable, illogical, and would lead to absurd results, as the Seventh Circuit has explained. *See Friedman v. City of Highland Park*, 784 F.3d 406 (7th Cir. 2015), *cert. denied*, 136 S. Ct. 447 (2015). To begin, it is anything but clear what common use means. "[W]hat line separates 'common' from 'uncommon' ownership is something [*Heller*] did not say." *Id.* at 409 (finding "uncertainty" as to whether assault weapons are "commonly owned" based on the sales totals discussed above); *see generally* Cody J. Jacobs, *End the Popularity Contest*, 84 Tenn. L. Rev. 231 (2015), *at* http://bit.ly/1gVsyGZ. Like *Heller*, the challengers are silent on what numerical threshold must be reached before a weapon achieves "common use" sufficient to trigger a constitutional mandate that the weapon be made available throughout the

country. But they necessarily believe that the number is no more than a few hundred thousand sales over the course of a quarter century—or less than a tenth of a percent of the American population (and total gun stock). This raises a few questions: What number is too small in their eyes? Fifty thousand? Ten thousand? Less? Is their proposed test regional or national? Does it look to ownership numbers, sales numbers, or manufacturing numbers? If a survey revealed that half a million people own firearms without serial numbers, would the federal serialization requirement suddenly become unconstitutional because unmarked firearms are in common use? If not, why not? And what would become of the federal prohibition on the manufacture of machine guns (whose constitutionality *Heller* endorsed, *see* 554 U.S. at 627) if some small slice of the American population owned a few hundred thousand M–16s?[1] The challengers offer no answers to any of these questions.

More fundamentally, "relying on how common a weapon is at the time of litigation [is] circular." *Friedman*, 784 F.3d at 409. As Judge Easterbrook observed in rejecting the same theory of common use rejected by the D.C. Circuit in *Heller II*, "it would be absurd to say that the reason why a particular weapon can be banned is that there is a statute banning it, so that it isn't commonly owned. A law's existence can't be the source of its own constitutional validity." *Id.; see also* Joseph Blocher & Darrell A.H. Miller, *Lethality, Public Carry, and Adequate Alternatives*, 53 Harv. J. on Legis. 279, 288–89 (2016) (discussing the "central circularity" that plagues common use: "what is common depends largely on what is, and has been, subject to regulation").

[1] According to the Bureau of Alcohol, Tobacco, Firearms and Explosives, civilians in the United States legally own nearly 176,000 automatic firearms. http://www.nfatca.org/pubs/MG_Count_FOIA_2016.pdf.

Consider just some of the absurd results that the challengers' market-share "common use" test would produce. By focusing on total sales and manufacturing figures, the test would give the firearms industry "the ability to unilaterally make new [highly dangerous] firearms protected simply by manufacturing and heavily marketing them" before the government has had the chance to assess their danger and determine whether to regulate them. Jacobs, *End the Popularity Contest*, at 265. The result would be that, once gun manufacturers ensure that a particular type of weapon has attained whatever market penetration is enough to make it "common," that weapon would then become constitutionally sacrosanct. *Id.* If that were the rule, it would "put[] a great deal of power"—*constitutional* power—"into the hands of gun manufacturers." *Id.* at 267.

By doing so, it would create perverse incentives for manufacturers to overproduce the very types of firearms that most warrant regulatory attention, and to flood the market with firearms possessing new—and potentially dangerous—technology before regulators could assess their safety. That would undoubtedly "hinder efforts to require consumer safety features on guns." *Id.* Given the emergence of new firearm technology (like 3-D-printed gun components undetectable using traditional methods), and given the inevitability of future technological developments, the challengers' common-use theory, if endorsed by this Court, would pose serious threats to public safety. *Id.*

And that is to say nothing of the federalism consequences of adopting a test that looks to nationwide manufacturing and sales totals. Under that test, whenever a new, potentially dangerous firearm feature became available, state and local governments would either have to prohibit it immediately, and in unison, or else forfeit their ability to do so going forward. If some states chose to gather more information before regulating, or if their citizens simply had a

different position on gun policy, those legislative policy judgments would have constitutional effect far beyond those states' borders.

Legislators' decisions in some parts of the country, however, should not make laws in other parts any "more or less open to challenge under the Second Amendment." *Friedman*, 784 F.3d at 408. If they did, that "would imply that no jurisdiction other than the United States as a whole can regulate firearms. But that's not what *Heller* concluded." *Id.* at 412. Because our Constitution "establishes a federal republic where local differences are cherished as elements of liberty," federalism is "no less part of the Constitution than is the Second Amendment." *Id.* The Supreme Court's decision in *Heller* (as applied to the states in *McDonald v. City of Chicago*, 561 U.S. 742 (2010)) "does not foreclose all possibility of experimentation" by state and local governments, *Friedman*, 784 F.3d at 412, but rather permits them to do what they have long done in the realm of firearm legislation: "experiment with solutions to admittedly serious problems," *Jackson v. City & Cnty. of San Francisco*, 746 F.3d 953, 970 (9th Cir. 2014); *see also McDonald*, 561 U.S. at 784 (noting that "[s]tate and local experimentation with reasonable firearms regulations will continue under the Second Amendment"). The challengers' test would eviscerate their ability to do so.

At the same time, the challengers' test also has the potential to underprotect the Second Amendment right by "creat[ing] an incentive for governments that are interested in restricting access to firearms to ban new weapons completely before they can become popular," even if those weapons would be "extremely effective for self-defense." Jacobs, *End the Popularity Contest*, at 265. But, as scholars have remarked, "[i]f heavy regulation can prevent a weapon from becoming a constitutionally protected 'Arm,' then the Second Amendment right seems hollow indeed." Blocher & Miller, *Lethality*, at 288.

The rights enumerated in our Constitution protect individual liberty by restraining the power of popularly elected legislators. Yet the challengers' constitutional theory would give policymakers (as well as private industry and lobbying groups like the NRA) unprecedented power to define the scope of the Second Amendment right—either by broadening it or by narrowing it. That cannot be the law.

To see why, suppose that in 2004 Congress had renewed the federal prohibition on large-capacity magazines and assault weapons that had been enacted ten years earlier, rather than let it lapse. Had Congress made that policy decision, those weapons would not be in common use today, and thus would not be protected on the challengers' market-share theory. The answer should not be any different because Congress instead decided to let the law lapse. A single twenty-first-century legislative decision should not dictate whether a different legislative judgment made a decade later comports with the Second Amendment. Yet that is the upshot of the challengers' common-use theory. It should be rejected.

## II. To the extent that this Court decides to reach the merits and finds that the Second Amendment applies, it should not subject the law to strict scrutiny.

The challengers' second argument is no less novel: they want this Court to apply strict scrutiny in assessing whether the challenged law is constitutional. But only two circuit decisions have applied strict scrutiny in the eight-plus years since *Heller*, and both were promptly vacated and taken en banc. *See Kolbe v. Hogan*, 813 F.3d 160 (4th Cir. 2016) (facial challenge to state assault-weapon prohibition), *reh'g en banc granted*, 636 F. App'x 880 (Mar. 6, 2016), *decided en banc*, —F.3d—, 2017 WL 679687 at *10 (4th Cir. Feb. 21, 2017) (the law "is subject to —and readily survives—the intermediate scrutiny standard of review"); *Tyler v. Hillsdale Cnty. Sheriff's Dep't*, 775 F.3d 308 (6th Cir. 2014) (as-applied challenge to federal law prohibiting plaintiff from possessing any firearm for life), *reh'g en banc granted* (Apr. 21, 2015), *decided en*

*banc*,

—F.3d—, 2016 WL 4916936 at *10 (6th Cir. Sept. 15, 2016) (en banc) ("conclud[ing] that intermediate scrutiny is the appropriate standard").

On the other side of the ledger, scores of circuit decisions have applied intermediate scrutiny to laws that burden protected Second Amendment conduct based on a historical understanding of the right.[2] The Second Circuit, for its part, has consistently subjected such laws to intermediate scrutiny. *See New York State Rifle & Pistol Ass'n*, 904 F.3d at 260 (assault-weapon and large-capacity-magazine prohibitions); *Kwong v. Bloomberg*, 723 F.3d 160, 168 (2d Cir. 2013) (handgun licensing fees); *Mishtaku v. Espada*, —F. App'x—, 2016 WL 5414978 at *1 (2d Cir. Sep. 28, 2016) (handgun licensing requirements).

If this Court reaches the merits and concludes that the Second Amendment applies, it should follow the lead of the Second Circuit (and every other circuit) and subject the law to intermediate scrutiny. Indeed, even cases *favorable* to the challengers have applied intermediate scrutiny to similar prohibitions. *See State v. DeCiccio*, 105 A.3d 165, 204–06 (Conn. 2014) (holding that intermediate scrutiny is the correct standard to apply to prohibition on dirk knives and police batons, in light of the availability of many "other options for possessing protected weapons in the home," and noting that "courts throughout the country have nearly universally applied some form of intermediate scrutiny" in Second Amendment cases); *State v. Hermann*,

[2] A Westlaw search for "*Heller*" and "Second Amendment" and "intermediate scrutiny" yields 77 federal circuit decisions, minus the two (now-vacated) decisions that mentioned intermediate scrutiny only to reject it in favor of strict scrutiny. *See, e.g. United States v. Booker*, 644 F.3d 12, 25 (1st Cir. 2010); *United States v. Marzzarella*, 614 F.3d 85, 97 (3d Cir. 2010); *United States v. Chester*, 628 F.3d 673, 683 (4th Cir. 2010); *National Rifle Ass'n v. Bureau of Alcohol, Tobacco, Firearms, and Explosives*, 700 F.3d 185, 206 (5th Cir. 2012); *United States v. Williams*, 616 F.3d 685, 692 (7th Cir. 2010); *United States v. Chovan*, 735 F.3d 1127, 1139 (9th Cir. 2013); *United States v. Reese*, 627 F.3d 792, 802 (10th Cir. 2010); *Dearth v. Lynch*, 781 F.3d 32, 44 (D.C. Cir. 2015).

873 N.W.2d 257, 260 (Wis. Ct. App. 2015) (applying intermediate scrutiny in as-applied challenge to switchblade prohibition). There is no reason for this Court to take a different approach here.

The appropriateness of intermediate scrutiny in this case is underscored by more than a century's worth of history. Weapons far less deadly than firearms have long been regulated in different ways and for a variety of reasons. For instance, laws prohibiting the sale or possession of a weapon known as a "slung shot" (a small weighted ball attached to a rope) were enacted in fourteen states and the District of Columbia between 1850 and 1931. Mass. Gen. Laws ch. 194, §§ 1–2 (1850); 1890 Okla. Sess. Laws 475–76, ch. 25 §§ 18–19; 1907 Ala. Acts 80, No. 55; 1931 N.Y. Laws 1033; Pub. L. No. 275, § 14, codified at 47 Stat. 650 (1932). The same is true for brass knuckles. 1906 Va. Acts 9, ch. 11; 1923 Cal. Stat. 695, ch. 339, § 1. Ten states and the District of Columbia prohibited billy clubs and weapons called "sandbags" between 1889 and 1932, while at least fifteen states prohibited various types of knives between 1837 and 1959. 1912 N.J. Laws 365; 1925 N.J. Laws 185; 1837 Ala. Acts 7, No. 11; 1931 Tenn. Priv. Acts 1089; 1959 N.M. Laws 245. Even Congress, in 1958, passed a law prohibiting the sale or manufacture of switchblades in interstate commerce, carrying a punishment of up to five years in prison. Pub. L. No. 85-623, codified at 72 Stat. 562. As these laws illustrate, the people's elected representatives have long had leeway in assessing the dangerousness of weapons and determining whether (and how) to regulate them. This leeway is consistent with intermediate scrutiny.

**CONCLUSION**

The Court should reject the plaintiffs' request to "appl[y] a categorical analysis" to New York's law, and should instead apply intermediate scrutiny.

Respectfully submitted,

*/s/ Ilann M. Maazel*
ILANN M. MAAZEL
EMERY CELLI BRINCKERHOFF & ABADY LLP
600 Fifth Avenue, 10th Floor
New York, NY 10020
(212) 763-5000
*imaazel@ecbalaw.com*

DEEPAK GUPTA
JONATHAN E. TAYLOR
GUPTA WESSLER PLLC
1735 20th Street, NW
Washington, DC 20009
(202) 888-1741
*deepak@guptawessler.com*

MARK ANTHONY FRASSETTO
EVERYTOWN FOR GUN SAFETY
P.O. Box 4184
New York, NY 10163

March 8, 2017

*Counsel for Amicus Curiae*
*Everytown for Gun Safety*

**CERTIFICATE OF COMPLIANCE**

I hereby certify that this memorandum complies with the type-volume limitation of Local Rule 7.1(a)(1) because it contains fewer than 25 pages, exclusive of the portions excluded by Federal Rule of Appellate Procedure 32(f).

*/s/ Ilann M. Maazel*
Ilann M. Maazel

**CERTIFICATE OF SERVICE**

I hereby certify that on March 8, 2017, I electronically filed the foregoing with the Clerk of the Court of the United States District Court for the Northern District of New York by using the CM/ECF system. All participants are registered CM/ECF users, and will be served by the CM/ECF system.

*/s/ Ilann M. Maazel*
Ilann M. Maazel