**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF NEW YORK**
**Albany Division**

| | |
|---|---|
| MATTHEW AVITABILE | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| | ) |
| v. | ) Civil Action No. 1:16-cv-1447 (DNH/CFH) |
| | ) |
| LT. COL. GEORGE BEACH, in his | ) |
| Official capacity as Superintendent of the | ) |
| New York State Police | ) |
| | ) |
| Defendant. | ) |
| _____ | ) |

MEMORANDUM OF AUTHORITIES IN SUPPORT OF PLAINTIFF'S

MOTION FOR SUMMARY JUDGMENT

/s Stephen D. Stamboulieh
Stamboulieh Law, PLLC
P.O. Box 4008
Madison, MS  39130
(601) 852-3440
stephen@sdslaw.us
MS Bar No. 102784
NDNY Bar Roll# 520383
*Counsel for Plaintiff, Matthew Avitabile*

Alan Alexander Beck
Law Office of Alan Beck
4780 Governor Drive
San Diego, CA  92122
(619) 905-9105
Alan.alexander.beck@gmail.com
*Admitted pro hac vice

Dated: August 27, 2018

# TABLE OF CONTENTS

*Page*

I.  Legal Standard…...................................................................................1

II.  Introduction …........................…......................................…1

III.  Electric Arms are Presumptively Protected by the Second Amendment…...…...2

  a.  Electric Arms are in Common Use …………………………………....…3

  b.  Typical Possession …………………………………………………………4

  c.  Pepper Spray is Not an Adequate Alternative to Electric Arms……………6

  d.  New York's Restrictions on Pepper Spray Make It Ineffective…………..…9

  e.  Electric Arms are Less Dangerous than Firearms…………………………....11

IV.  This Court Should Find New York's Electric Ban Categorically Unconstitutional……………………………………………………………...…15

  a.  Strict Scrutiny Should Apply…………………………………………...…18

  b.  Under Intermediate Scrutiny New York's Electric Arm Ban is Unconstitutional……………………………………………...…22

V.  Conclusion………………………………………………………..…25

Certificate of Service…………………………………………………………26

# TABLE OF AUTHORITIES

## Cases

*Avitabile v. Beach*, 277 F. Supp. 3d 326 (N.D.N.Y. 2017)........................................................... 19

*Baran, et al. v. City of Baltimore, et al.*; 1:17-cv-00253 (D. Md. March 3, 2017)....................... 16

*Bateman v. Perdue* 881 F.Supp.2d 709 (2012 ............................................................................. 20

*Bd. of Trs. of State Univ. of N.Y. v. Fox*, 492 U.S. 469 (1989).................................................... 24

*Binderup v. Att'y Gen.*, 836 F.3d 336 (3d Cir. 2016) ................................................................. 24

*Caldwell v Moore*, 968 F.2d 595 (6th Cir. 1992)........................................................................... 5

*Caetano v. Massachusetts*, 136 S. Ct. 1027 (2016)……………...………………….5 ,14, 15, 25

*Crystal Wright v. District of Columbia*, No. 1:16-cv-01556-JEB (D.D.C. Sept. 26, 2016) ......... 15

*De Contreras v. City of Rialto*, 894 F.Supp.2d 1238 (C.D.Cal., September 25, 2012) ............... 14

*District of Columbia v. Heller*, 554 U.S. 570 (2008)............................................................. *passim*

*Duncan v. Becerra*, No. 17-56081, 2018 U.S. App. LEXIS 19690 (9th Cir. July 17, 2018)

    (unpublished)................................................................................................................................ 23

*Ezell v. City of Chicago* ("Ezell II"), 846 F.3d 888 (7th Cir. 2017) ............................................. 21

*Ezell v. City of Chicago*, 651 F.3d 684 (7th Cir. 2011) ................................................................ 21

*Fletcher v. Haas*, 851 F. Supp. 2d 287 (D. Mass. 2012) ............................................................. 23

*Ford v. City of New Orleans*, No. 2:16-cv16433-MVL-KWR (E.D. La. Dec. 14, 2016) ........... 15

*Fotoudis v. City of Honolulu* 54 F. Supp. 3d 1136 (D. Haw. 2014) ............................................ 23

*Hatfield v. Sessions,* No. 3:16-cv-00383-JPG-RJD, 2018 U.S. Dist. LEXIS 70431 (S.D. Ill. Apr.

    26, 2018).................................................................................................................................... 21

*Heller v. District of Columbia*, 419 U.S. App. D.C. 287, 801 F.3d 264 (2015)..................... 24,25

*Hulbert v. Pantelides*, No. 1:16-cv-04121-JFM (D. Md. March 3, 2017)................................... 15

*Ill. Ass'n of Firearms Retailers v. City of Chicago*, 961 F. Supp. 2d 928 (N.D. Ill. 2014) ......... 21

*Johnson v. California*, 543 U.S. 499 (2005) ................................................................................. 24

*Keyes v. Sessions,* 282 F. Supp. 3d 858 (M.D. Pa. 2017) ............................................................ 24

*Maloney v. Singas*, 106 F. Supp. 3d 300 (E.D.N.Y. 2015)............................................................ 3

*McDonald v. Chicago*, 561 U.S. 742 (2010) ................................................................ 2, 5, 15, 25

*Moore v. Madigan*, 702 F.3d 933 (7th Cir. 2012)........................................................................ 17

*Morris v. United States Army Corps of Eng'rs,* 60 F. Supp. 3d 1120 (D. Idaho 2014) ............... 17

*Murphy v. Robert Guerrero*, et al., 1:14-CV-00026, 2016 WL 5508998, (D.N. Mar. Is. Sept. 28, 2016) ........................................................................................................... 23

*N.Y. State Rifle & Pistol Ass'n v. City of N.Y.*, 883 F.3d 45 (2d Cir. 2018) ............................... 18

*N.Y. State Rifle & Pistol Ass'n v. Cuomo*, 804 F.3d 242 (2d Cir. 2015) ............................... *passim*

*New Jersey Second Amendment Society v. Porrino*, No. 3:16-cv-04906-DEA (D.N.J. April 25, 2017) ........................................................................................................... 15

*Osterweil v. Bartlett*, 706 F.3d 139  (2d Cir. 2013) ..................................................................... 22

*Palmer v. District of Columbia*, 59 F. Supp. 3d 173 (D.D.C. 2014) .......................................... 17

*People v. Aguilar*, 2 N.E.3d 321 (Ill. 2013) ............................................................................... 17

*People v. Yanna*, 824 N.W.2d 241 (Mich. Ct. App. 2012) ............................................... 5, 15, 16

*Ramirez v. Commonwealth* No. SJC-12340, 2018 Mass. LEXIS 237 (Apr. 17, 2018) ........ 2, 5, 16

*Richmond v. Peraino*, 128 F. Supp. 3d 415 (D. Mass. 2015) ..................................................... 17

*Roberts vs. Ballard; et al.* (1:18-cv-00125), Hawaii District Court ............................................. 2

*Schenck v. Pro-Choice Network of Western New York,* 519 U.S. 357, 117 S.Ct. 855, 137 L.Ed.2d 1 ........................................................................................................... 20

*State v. DeCiccio*, 315 Conn. 79, 105 A.3d 165 (Conn. 2014) ................................................... 23

*State v. Herrmann,* 2015 WI App 97, 366 Wis. 2d 312, 873 N.W.2d 257 ................................. 23

*State v. Montalvo*, 077331, 2017 WL 2471030 (N.J. June 8, 2017) ........................................... 17

*Taylor v. City of Baton Rouge,* 39 F. Supp. 3d 807 (M.D. La. 2014) ......................................... 20

*THE PEOPLE OF THE STATE OF ILLINOIS, Appellant, v. JULIO CHAIREZ, Appellee.*, 2018 IL 121417, 2018 WL 652814 ........................................................................................................... 23

*Thomas v. Review Bd. of Ind. Employment Sec. Div.*, 450 U.S. 707 (1981) ............................... 20

*Tyler v. Hillsdale Cnty. Sheriff's Dep't,* 837 F.3d 678 (6th Cir. 2016) .................................. 23, 24

*United States v. Carter,* 669 F.3d 411 (2012) ............................................................................. 20

*United States v. Jimenez*, 895 F.3d 228 (2d Cir. 2018) .............................................................. 18

*Veasey v. Wilkins*, 2015 U.S. Dist. LEXIS 53894, 2015 WL 1884832 ..................................... 17

*Viacom Int'l, Inc. v. YouTube, Inc.*, 676 F.3d 19 (2d Cir. 2012) ................................................. 1

*Wesson v. Town of Salisbury*, 13 F. Supp. 3d 171 (D. Mass. 2014) ........................................... 17

*Wrenn v. District of Columbia*, 864 F.3d 650 (D.C. Cir. 2017) ................................................. 17

*Young v. Hawaii*, No. 12-17808, 2018 U.S. App. LEXIS 20525 (9th Cir. July 24, 2018) ........... 17

**Statutes**

18 U.S.C. § 922(g)(1) ................................................................... 24

18 U.S.C. § 924(g)(4) ................................................................... 24

N.Y. Comp. Codes R. & Regs. Tit. 10 § 54.1–54.3 ........................... 9

N.Y. Penal Law § 265.01 ......................................................... 1, 19

N.Y. Penal Law § 265.20(a)(14), (15) ............................................ 9

## Other Authorities

1 Blackstone's Commentaries 145-146, n.42 (1803) ........................ 20

Volokh, *Nonlethal Self-Defense, (Almost Entirely), Nonlethal Weapons, and the Right to Keep and Bear Arms and Defend Life*, 62 STAN. L. REV. 199, 204 (2009). .................................... 5

## Rules

Fed. R. Civ. P. 56(a) ...................................................................... 1

I.      Legal Standard

"Summary judgment is proper only when, construing the evidence in the light most favorable to the non-movant, 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Viacom Int'l, Inc. v. YouTube, Inc*., 676 F.3d 19, 30 (2d Cir. 2012) (additional citation omitted). *See* Fed. R. Civ. P. 56(a).

II.     Introduction

Plaintiff, Mr. Mathew Avitabile moves for summary judgement in his challenge to the State of New York's ban on the possession of electric arms. Plaintiff wished to purchase a "stun gun or Taser for self-defense and other lawful purposes in his home" and would "acquire, possess, carry and where appropriate use a Taser or stun gun to protect himself and his home."  *See* Amended Complaint, Docket #12, ¶¶ 44, 54.  Plaintiff stated that he would "purchase and own, and in appropriate circumstances, carry a stun gun or a Taser … [but] fear[s] prosecution for owning and carrying a stun gun or a Taser." *See* Declaration of Matthew Avitabile, Docket # 12-1, ¶ 5.

N.Y. Penal Law § 265.01 provides in part that, "[a] person is guilty of criminal possession of a weapon in the fourth degree when:(1) He or she possesses any firearm, electronic dart gun, electronic stun gun…" This provision serves to outlaw the possession and use of Tasers and other electronic arms such as stun guns even within home.

Mr. Avitabile has never been convicted of a crime, either misdemeanor or felony, and has never been convicted of a crime of domestic violence.  *See* Deposition of Matthew Avitabile, Exhibit "1", 10:16-25.  He has never been deemed by a mental health professional to have a mental illness.  *Id*. at 11:15-19.  He currently does not own a handgun but does own a shotgun and bolt-action rifles. *Id*. at 13:2-22.  He testified that he would possess a Taser if it were legal in New York.  *Id*. at 17:7-9.  He further testified that he would carry a Taser "in accordance with state law,

1

wherever [he] could carry it" as well as his home. *Id*. at 17:15-24. He testified that "the last thing [he'd] like to do is use lethal force" when defending himself should the need arise and that the Taser appears to be the most effective form of non-lethal defense. *Id*. at 20:9-13.

III.     Electric Arms Are Presumptively Protected by the Second Amendment

Forty-seven (47) states currently allow electric arms possession. Post-*District of Columbia v. Heller*, 554 U.S. 570 (2008) and *McDonald v. Chicago,* 561 U.S. 742 (2010) New York's ban cannot withstand constitutional muster. Three (3) states already have had their electric arm bans enjoined by court order[1]. This is because as established by the record and the legal arguments made below, electric arms are "in common use today" for the "lawful purpose" of self-defense. Thus, they are protected by the Second Amendment. Further, under any of the tests this Court may apply, New York's ban cannot survive constitutional muster.

In *N.Y. State Rifle & Pistol Ass'n v. Cuomo*, 804 F.3d 242, 254 (2d Cir. 2015) the Second Circuit laid out the two-step analysis for determining the constitutionality of firearm restrictions:

> First, we consider whether the restriction burdens conduct protected by the Second Amendment. If the challenged restriction does not implicate conduct within the scope of the Second Amendment, our analysis ends and the legislation stands. Otherwise, we move to the second step of our inquiry, in which we must determine and apply the appropriate level of scrutiny. *Id*.

With respect to step one, a court determines whether the Second Amendment applies by determining whether the weapon at issue is "(1) 'in common use' and (2) 'typically possessed by

---

[1] The other states that still ban electric arms are Rhode Island and Hawaii. Shortly after the Massachusetts Supreme Court struck the State of Massachusetts ban in *Ramirez v. Commonwealth* No. SJC-12340, 2018 Mass. LEXIS 237 (Apr. 17, 2018) a bill was put before the Rhode Island legislature to legalize electric arms. *See* https://www.wpri.com/news/local-news/west-bay/ri-rep-reintroduces-bill-allowing-stun-gun-ownership/1129244566 (last visited 8/12/2018). In Hawaii, litigation has commenced challenging its ban on electric arms. *See Roberts vs. Ballard; et al.* (1:18-cv-00125), Hawaii District Court. A complete list of the electric arms litigation is included later in the brief.

law-abiding citizens for lawful purposes.'" *Id*. at 254–55.  Significantly, in *NYSRPA*, the Second

Circuit explained that:

> *Heller* emphasizes that the "Second Amendment extends, prima facie, to all
> instruments that constitute bearable arms." *Heller*, 554 U.S. at 582, 128 S.Ct. 2783.
> In other words, it identifies a presumption in favor of Second Amendment
> protection, which the State bears the initial burden of rebutting. *Id.* at 257 n.73.

> In ruling on the constitutionality of a ban on a non-semiautomatic Remington 7615 the

*NYSRPA* panel found that "[b]ecause the State . . . has failed to make any argument that [a non-

semiautomatic pump action rifle] is dangerous, unusual, or otherwise not within the ambit of

Second Amendment protection, the presumption that the Amendment applies remains unrebutted."

*Id*.

Thus, Circuit precedent holds that all bearable arms are presumed to be protected by the

Second Amendment.  As electric arms are bearable arms, the burden is on the government to

demonstrate they fall outside of Second Amendment protection. This is something that Defendant

will be unable to do because electric arms are "in common use today" for the "lawful purpose" of

self-defense. *Maloney v. Singas*, 106 F. Supp. 3d 300, 312 (E.D.N.Y. 2015).

a.   Electric Arms are in Common use

Mr. Avitabile has engaged in extensive discovery to demonstrate electric arms are in

common use.  His is the first case in the nation to do this. All other cases have relied on the publicly

available number provided by Axon for their product, the Taser.  However, Tasers are a brand of

electric arm and there are millions of electric arms sold by other companies owned by people

throughout the country.

To develop a more robust record on how many electric arms are in possession of private

citizens, sales data was solicited from several electric arms companies which has been submitted

to Defendant's counsel under the current protective order.  He has established, and Defendant has

3

agreed to stipulate that there are 300,000 Tasers and 4,478,330 stun guns currently owned by private civilians in the United States of America. However, this is not a complete number as many of the electric arms companies contacted were unwilling to provide their private sales data. The actual number is likely many millions more than this. However, combining the numbers yields at least 4,778,330 electric arms owned by private citizens and that number is easily enough to establish electric arms are in common use for the lawful purpose of self-defense per this Circuit's precedent. In *N.Y. State Rifle & Pistol Ass'n v. Cuomo*, 804 F.3d 242 (2d Cir. 2015) the Court found AR-15s are in common use and stated:

> [p]laintiffs argue that the weapons at issue are owned in large numbers by law-abiding Americans. They present statistics showing that nearly four million units of a single assault weapon, the popular AR-15, have been manufactured between 1986 and March 2013… Even accepting the most conservative estimates cited by the parties and by amici, the assault weapons and large-capacity magazines at issue are "in common use" as that term was used in *Heller*. The D.C. Circuit reached the same conclusion in its well-reasoned decision in *Heller II*, which upheld the constitutionality of a District of Columbia gun-control act substantially similar to those at issue here. *Id* at 255.

Considering the fact more electric arms are owned by private citizens than AR-15s, this Court is bound by Circuit precedent to find electric arms are in common use.[2]

   b.   Typical Possession

   The next step is determining whether electric arms are typically possessed by law-abiding citizens for lawful purposes. As the Second Circuit observed in *N.Y. State Rifle & Pistol Ass'n v. Cuomo* "[i]n the absence of clearer guidance from the Supreme Court or stronger evidence in the record, we follow the approach taken by the District Courts and by the D.C. Circuit in *Heller II*

---

[2] Plaintiff notes that firearm sales information is collected by the National Shooting Sport Foundation (the trade lobby for the firearms industry), so a complete sales number was easily obtainable by the litigants in *N.Y. State Rifle & Pistol Ass'n v. Cuomo*. Electric arms do not have an equivalent trade group which is why undersigned had to rely on sales data from individual companies and was unable to compile a complete list.

and assume for the sake of argument that these "commonly used" weapons and magazines are also "typically possessed by law-abiding citizens for lawful purposes (footnotes omitted)". *Id* at 257. This Court should do the same here. Unlike firearms, electric arms only purpose is self-defense. Unlike in *N.Y. State Rifle & Pistol Ass'n v. Cuomo*, there can be no argument that these arms are owned for other lawful purposes such as hunting and target practice. *See Id.* at 256. Self-defense is the only reason to own them. Justice Alito agreed with this position in his concurrence in *Caetano v. Massachusetts*, 136 S. Ct. 1027 (2016). "While less popular than handguns[3], stun guns are widely owned and accepted as a legitimate means of self-defense across the country. Massachusetts' categorical ban of such weapons therefore violates the Second Amendment". *Id* at 1033 (Alito, J., concurring). *See also* Volokh, *Nonlethal Self-Defense, (Almost Entirely), Nonlethal Weapons, and the Right to Keep and Bear Arms and Defend Life*, 62 STAN. L. REV. 199, 204 (2009). The State Courts of Michigan and Massachusetts agree that electric arms are typically used for self-defense *See People v. Yanna*, 824 N.W.2d 241, 243 (Mich. Ct. App. 2012); *see also Ramirez v. Commonwealth* No. SJC-12340, 2018 Mass. LEXIS 237 (Apr. 17, 2018). Electric arms are less dangerous than knives, clubs, baseball bats and even going "hands on" with an attacker. *See Caldwell v Moore*, 968 F.2d 595, 602 (6th Cir. 1992) ("It is not unreasonable for the jail officials to conclude that the use of a stun gun is less dangerous for all involved than a hand to hand confrontation"). Ultimately, Circuit precedent places the burden on the Defendant to demonstrate that electric arms are not typically possessed for self-defense and this is something that they have not done. This Court should find that electric arms are protected by the Second

---

[3] As Justice Breyer pointed out in his dissent, handguns are employed in "well over 60,000 deaths and injuries in the United States each year," *McDonald v. City of Chicago*, 561 U.S. at 924, but are nevertheless the "quintessential self-defense weapon" for Second Amendment purposes. *Heller*, 554 U.S. at 629.

Amendment.

    c.   <u>Pepper Spray is Not an Adequate Alternative to Electric Arms</u>

The State of New York will likely once again argue that its ban on electric arms should be deemed constitutional because state law allows for the possession of firearms and pepper spray. *See* Defendants' Memorandum of Law in Opposition to Plaintiff's Motion for a Preliminary or Permanent Injunction at 18. ("…Plaintiff Avitabile has "adequate alternatives" at his disposal – handguns, rifles, and shotguns – all of which can be lawfully purchased by him to protect his home. And if Plaintiff Avitabile still wants a "less lethal" form of defense, he can also use items like pepper spray. Under the rule of law set forth by the Second Circuit in *Decastro*, these "adequate alternatives" necessarily mean that Plaintiff Avitabile's Second Amendment rights have not been substantially burdened.")

Firearms are not an adequate alternative to less lethal electric arms. That is because Mr. Avitabile would like to avoid using lethal force unless necessary. Outside of the obvious moral and ethical issues associated with taking human life, there are many self-defense situations where Mr. Avitabile would open himself to criminal and civil liability if he were to use a firearm. Mr. Avitabile is the mayor of Middleburgh which is a small town in upstate New York. Imagine if he were confronted by a large, angry but unarmed constituent threatening him with bodily harm. If the only arm available were a firearm, Mr. Avitabile would be confronted with the dilemma of suffering bodily injury or resorting to deadly force. If Mr. Avitabile were armed with a Taser, he could most likely diffuse the situation without criminal liability on his part and without either party suffering injury. For this reason, firearms are a not an adequate alternative to electric arms.

Pepper spray is also not an adequate alternative to electric arms. Pepper spray is less effective at subduing a person than a Taser. Pepper spray operates via pain compliance. Pepper

spray is an inflammatory agent. It inflames the mucous membranes in the eyes, nose, throat and lungs. *See* https://www.redhotpepperspray.com/blogs/news/51568707-effects-of-pepper-spray (last visited 8/10/2018). It causes closing of the eyes, difficulty breathing, runny nose, and coughing. However, a motivated person accustomed to pain or on drugs can shrug off the effects of pepper spray. On the other hand, a Taser causes a neuro muscular response that cannot be so easily resisted. Exposing someone to a Taser is a near guarantee that the attacker will be subdued. The same cannot be said with New York's watered-down pepper spray. Ironically, as discussed below, pepper spray can also be more dangerous for all parties involved.

Pepper spray is typically found as an aerosol spray and all forms of pepper spray disperse Oleoresin Capsicum (the active ingredient in pepper spray) through the air. This means that bystanders close to an intended target will suffer the effects of the pepper spray as well. In an enclosed area, this means that there is a strong likelihood people will panic. There are many instances where people have been killed during panicked stampedes after the deployment of pepper spray and other irritant products such as tear gas.[4] For example, "[t]he E2 nightclub

---

[4] The following are just some of the more notable cases undersigned could find: *See e.g.* "At least 12 people were killed yesterday when police caused a stampede by firing tear-gas near the end of a football match between Zimbabwe and South Africa". https://www.telegraph.co.uk/news/worldnews/africaandindianocean/zimbabwe/1347805/12-crushed-to-death-at-World-Cup-qualifier.html ("last visited 8/12/2018); "The E2 nightclub stampede occurred on February 17, 2003, at the E2 nightclub located above the Epitome Chicago restaurant at 2347 South Michigan Avenue in Chicago, Illinois, in which 21 people died and more than 50 were injured when panic ensued from the use of pepper spray by security guards to break up a fight." *See* https://en.wikipedia.org/wiki/2003_E2_nightclub_stampede ("last visited (8/12/2018) "Eight people have been arrested in connection with the piazza stampede during the broadcast in Turin of last year's Champions League final that killed one and injured 1,500 more, police said on Friday. The suspects are believed to have caused the panic in San Carlo square, where 30,000 people had gathered on June 3rd to watch local team Juventus lose to Real Madrid in Cardiff, by shooting pepper spray into the crowd while trying to commit a robbery." See https://www.thelocal.it/20180413/eight-arrested-turin-football-stampede-piazza-san-carlo (last visited 8/12/2018); "The six people who died when police used pepper spray in a bar in Bogota, Colombia, suffocated in the stampede that followed, officials said Tuesday." *See*

7

stampede occurred on February 17, 2003, at the E2 nightclub located above the Epitome Chicago restaurant at 2347 South Michigan Avenue in Chicago, Illinois, in which 21 people died and more than 50 were injured when panic ensued from the use of pepper spray by security guards to break up a fight." *See* https://en.wikipedia.org/wiki/2003_E2_nightclub_stampede (last visited 8/18/2018). Had the security guards used a Taser, this loss of life might not have occurred. Mr. Avitabile is a history professor. He could easily be forced to defend himself or his students in class. With a Taser he could subdue someone attacking him or his students safely. If he deployed pepper spray indoors, he could cause a stampede which would exacerbate injury and loss of life.  Trooper Shappy testified that if he utilized his pepper spray in an enclosed room it would affect everybody in the room "to some extent."  *See* Deposition of Shappy, Exhibit "2", 37:17-20.  He also testified that if he used his Taser in the same room, it would only affect the subject being exposed to the Taser as long as "everyone else avoided the wires."  *Id*. at 38:5-8.

Additionally, the person deploying the pepper spray always suffers some blowback.  The State's expert testified that he has suffered blowback every time he has deployed pepper spray. *See* Deposition of Shappy, Exhibit "2", 18:6-11. When trying to flee an attacker, the added issues associated with being affected by pepper spray make escape less likely. Furthermore, for those with asthma, taking other drugs, or subject to restraining techniques that restrict the breathing passages, there is a risk of death. In 1995, the Los Angeles Times reported at least 61 deaths

---

https://www.upi.com/Officials-People-killed-in-Colombian-bar-suffocated-in-stampede/63861379457989/ (8/12/2018). Two young men playing with a bottle of pepper spray on the Guangzhou metro caused a disturbance among passengers, and eight were injured in the stampede and sent to the hospital, the Guangzhou Daily reported. http://www.ecns.cn/cns-wire/2014/03-04/103284.shtml (last visited 8/12/2018). Most recently in June of 2018 "the El Paraíso stampede was a stampede of more than 500 people …The stampede was the result of a tear gas canister being detonated during a brawl ... the 21 deaths were caused by asphyxia and polytrauma."  *See*  https://en.wikipedia.org/wiki/El_Para%C3%ADso_stampede  (last visited (8/12/2018).

associated with police use of pepper spray since 1990 in the United States. *See Los Angeles Times* June 18, 1995. Trooper Shappy also testified that he had previously utilized his pepper spray and the subject continued to fight which required him to go "hands on with them and use alternate methods." *See* Deposition of Shappy, Exhibit "2", 20:10-16.

For the foregoing reasons, pepper spray is not an adequate alternative to electric arms. Even if it were, the pepper spray allowed by New York law is not adequate.

> d.   New York's Restrictions on Pepper Spray Make It Ineffective

Pepper spray is highly regulated in the State of New York.  N.Y. Penal Law §265.20(a)(14), (15) N.Y. Comp. Codes R. & Regs. Tit. 10 § 54.1–54.3 regulate the sale and possession of pepper spray. NY State is the only state in the U.S. that limits the strength of Self-Defense Sprays. N.Y. Comp. Codes R. & Regs. Tit. 10 § 54.3 in relevant part states as follows:

> 54.3 Requirements: Every self-defense spray device which is purchased, possessed or used in New York State shall satisfy all of the following requirements: (a) Every self-defense spray device shall contain oleoresin capsicum, and no other substance, as the active ingredient[]; (b) The contents of every self-defense spray device shall not contain more than 0.7% by weight total capsaicinoids[]; (c) The net weight of every self-defense spray device shall not exceed 0.75 ounces.

The law requires that oleoresin capsicum (OC), and no other substance, be the active ingredient. Also, it requires that pepper spray shall not contain more than 0.7% by weight total capsaicinoids and it requires that pepper spray net weight shall not exceed 0.75 ounces.  These restrictions dramatically reduce the effectiveness of pepper spray. The State's expert, Trooper Shappy, testified that the pepper spray he carries is 10% OC and 1.8 ounces.  *See* Exhibit "2" Deposition of Trooper Shappy, 16:14-21.  If the pepper spray that is available for civilians to purchase in New York is an adequate alternative, then why do police carry pepper spray that is over fourteen times stronger and twice as large than what is allowed for a private citizen?

9

Robert Nance, Vice President of Operations at Security Equipment Corporation and whose company manufactures SABRE brand pepper spray, is a designated expert for the Plaintiff.  Mr. Nance's report outlines how the laws of New York make the pepper spray an inadequate alternative.  Mr. Nance states that under current New York law, only licensed firearms dealers and pharmacists may sell self-defense sprays.  *See* Exhibit "3", Expert Report of Robert Nance.  Mr. Nance states that New York laws are restricted by size and formula.  Additionally, the form required to purchase self-defense sprays must include the purchaser's social security number. *Id*. Mr. Nance states that New York is the only state in the U.S. that "limited the strength of Self-Defense Sprays.  Michigan and Wisconsin used to also limit the size and strength of Self-Defense Sprays" but "… changed their laws in the last 4 to 5 years to remove this limitation."  *Id*.  Mr. Nance states that New York [City] Police Department officers carry 0.67% major capsaicinoids spray but points out that those officers can "elevate their level of force if their pepper spray is not effective" and "can move to a baton, Taser or Firearm.  They can call for back up… We believe that a high level of major capsaicinoids is warranted for the consumer, because it is their only means of defense." *Id*. Further, Mr. Nance states that civilians "need a stronger pepper spray to stop a threat immediately." *Id*.

In any event, the State's presumed position is foreclosed by Circuit precedent. In *N.Y. State Rifle & Pistol Ass'n v. Cuomo,* 804 F.3d 242 (2d Cir. 2015) the Second Circuit reviewed a ban by the States of New York and Connecticut of a limited subset of semiautomatic firearms, which contain one or more enumerated military-style features. "In both states, citizens may continue to arm themselves with non-semiautomatic weapons or with any semiautomatic gun that does not contain any of the enumerated military-style features". *Id* at 267.  Despite the availability of many other firearms, the Court rejected the argument that Connecticut's ban on a pump-action rifle fell

outside of constitutional protection and went on to evaluate the States' ban via an application of intermediate scrutiny. Mr. Avitabile's claims fall within constitutional protection. This Court should find New York's ban on electric arms unconstitutional without resorting to tiered scrutiny.

       e.  Electric Arms are Less Dangerous than Firearms

The multitudes of research and even the testimony of Trooper Shappy demonstrate that electric arms are less dangerous than firearms.  For instance, Trooper Shappy was asked about being voluntarily exposed to a Taser, and he testified that he was exposed four times.  *See* Exhibit "2", 27:8-11.  Trooper Shappy testified that he did not have any scarring, burns or marks from his voluntary exposure to a Taser in either probe mode or drive stun mode.  *Id*. at 29-30:18-6.  Trooper Shappy also testified that he has voluntarily exposed six to seven hundred recruits with a Taser X26 and X26P, CEW.  *Id*. at 66:5-12.  The Trooper also testified that if someone is shot with a firearm, that person would have a high likelihood of death depending on where that person was shot. *Id*. at 70:14-21.   Trooper Shappy testified that he has not had any recruits die from a result of the voluntary exposures he conducted and does not know of any individuals dying from the deployment of a Taser within the New York State Police.  *Id*. 72:2-14.

Trooper Shappy further testified that he has no personal knowledge of any crimes committed with Tasers in New York.  *Id*. at 75:9-13. Further, he testified that he knew of no deaths attributable to a stun gun.  *Id*. at 83-84:24-2.  The fact that electric weapons are less dangerous than firearms is made pellucid by the fact that despite voluntarily exposing a multitude of recruits to a Taser, none have died because of that exposure.  Additionally, recruits are not "voluntarily exposed" to a shot by a firearm because it would be absurd to do so.  This should make it crystal clear that electric arms are less dangerous than firearms.

In fact, Defendant's responses to Plaintiff's Interrogatories further demonstrate this point. For instance, Defendant stated that "Trooper candidates undergo an initial 12-hour Taser training while attending the NYSP Academy." *See* Exhibit "4", Defendant's Interrogatory Response No. 6. For firearms however, a Trooper candidate must undergo "100 hours of classroom and field exercises." *Id*. at No. 7. The large difference in training requirements would demonstrate that it is much easier to use a CEW than a firearm or that CEWs are less lethal than firearms. Defendant stated in his Interrogatory responses that "under certain circumstances, a Taser or stun gun can be less dangerous than a handgun; however, this is not always the case…" *Id*. at No. 16. This statement, however, is belied by the fact that Trooper Shappy has voluntarily exposed six to seven hundred recruits with a Taser and none have died and has himself been exposed four times without adverse effects.

To be sure, conducted electrical weapons (CEW) have contributed to arrest-related deaths because of fires and falls. *See* Expert Report of Mark Kroll, PhD, FACC, FHRS, FIEEE, FAIMBE, p.7 ¶1, Exhibit "5". Dr. Kroll's CV is attached as Exhibit "6." However, no such deaths have been reported in the lawful use of civilian CEWs. *See* Exhibit "5" at p. 17. Dr. Kroll's report states that there are differences in the ways that a civilian would use a CEW than law enforcement. For instance, civilians use these devices to "stop the aggression and escape." *Id*. at 18. Law enforcement, on the other hand, "is obligated to continue the struggle until the suspect is under control." *Id*. Further, Dr. Kroll's report demonstrates that CEW use "dramatically reduced both suspect and office injury (by 2/3) compared to alternative force options." *Id*. at 30. After Trooper Shappy provided his expert report, Dr. Kroll submitted a rebuttal. *See* Exhibit "7". Dr. Kroll's rebuttal took issue with Trooper Shappy's suggested opinion that "OC spray is the ideal defense tool for the civilian." *Id*. at p.4. For instance, Dr. Kroll stated that "[t]hese opinions do not explain

12

why electrical weapons have almost completely replace (sic) the use of OC spray by law enforcement.  Contrary to the suggestion that OC spray has minimal risk of injury or death, large studies sponsored by the United States Department of Justice have shown that electrical weapons reduce suspect injury and death by about 2/3 compared to alternatives including OC spray."  *Id*.

Even the State of New York, Division of Criminal Justice Services, in its Municipal Police Training Council, defined conducted energy devices (CED) as "a less lethal weapon…"  *See* Exhibit "8", p. 1.  That same document stated that "injuries to officers and suspects are reduced" because "CEDs are effective at rapidly ending a confrontation…"  *Id*. at iv.  Further, it incorporated a study from Florida Gulf Coast University which found "CEDs … have the benefit of a higher success rate in conflict resolution between a suspect and officer than other less-lethal force options by ending the conflict more rapidly…"  *Id*.

Michael Brave, Esq. of LAAW International, LLC, submitted an expert report and declaration and supporting material for this matter.  *See* Mr. Brave's CV, Exhibit "9."  Mr. Brave serves as Axon's Technical Adviser on National and International CEW Standards and Standards Organizations.  *See* Report of Brave, Exhibit "10", p. 8.  Mr. Brave became a Taser CEW instructor in January 2003 and a Taser Master Instructor in May 2003.  *Id*.  Mr. Brave is designated as the Taser Person Most Knowledgeable (PMK) regarding, *inter alia*, history of Taser CEWs; how Taser CEWs work; modes of operations; how CEWs affect the human body; arrest related deaths and many other areas. *Id*. at p. 9.  Mr. Brave has "authored over 74 periodical publications, 6 book chapters, 17 videos, 100s of training program manuals and PowerPoint presentations regarding law enforcement concepts, issues, procedures, majority of which were force-option involved or related."  *Id*. at p. 10.

Mr. Brave's report demonstrates that Taser CEWs are "generally considered by courts to be 'non-deadly force,' not 'deadly force,' 'a non-deadly weapon,' 'less-than-lethal force,' 'less-than-deadly-force,' 'non-lethal,' 'non-lethal force,' and 'less-lethal weapons.'" *Id*. at p. 17. In Mr. Brave's Selected Science Outline, Exhibit "11"[5], Mr. Brave lists multiple cases where courts have held that Taser CEWs were not "deadly weapons" or did not constitute lethal or deadly force.[6] *Id*. at pp. 344-346.

Mr. Brave describes a number of studies regarding the use of CEWs. In one study, "CEW use was the force modality least likely to result in significant injury. No significant injuries occurred among 504 CEW uses…" *See* Report, Exhibit "10", p. 44. However, "[u]narmed physical force resulted in over one third (6/16) of the significant injuries seen ... These were evenly distributed among 'soft' and 'hard' unarmed physical force and included major head injuries and bony fractures." *Id*.

Mr. Brave's report states that Axon Enterprises, Inc. (formerly known as TASER International, Inc) has sold over "300,000 civilian versions of [CEWs] to civilians and over 1,000,000 CEWs for law enforcement. Over 6,000,000 people have been exposed to TASER CEWs in field use and volunteers." *See* Report, p. 2, ¶3. Mr. Brave further states that chemical

---

[5] Mr. Brave's rebuttal report contained an "updated" Selected Science Outline which repeats a substantial portion of the first Outline and adds additional pages. For purposes of not burdening the record with duplicative pages, undersigned will utilize the most current Selected Science Outline which was provided to opposing counsel with the rebuttal.

[6] Mr. Brave lists approximately sixteen court cases. For example, in the *Caetano* case, Justice Alito's concurrence footnoted the following, "[a]s the Commonwealth's witness testified at trial, these sorts of electrical weapons are 'non-lethal force' 'designed to incapacitate' – 'not kill' – a target." Mr. Brave also cites to *De Contreras v. City of Rialto*, 894 F.Supp.2d 1238 (C.D.Cal., September 25, 2012) for the proposition found in footnote 10 which states, "[a]ll circuits that have considered the question, including the Ninth Circuit, designate taser use generally as non-lethal or less-than-lethal force."

aerosols (such as pepper spray), "generally have a much longer post-exposure effects period than CEWs" and "have a much higher risk of inadvertent exposure to non-targets than CEWs." *Id*. at ¶¶9,10.  Most importantly, Mr. Brave states that the "deployment and use of TASER CEWs has resulted in the reduced need to use deadly force." *Id*. at p.3, ¶18.

Mr. Brave's rebuttal provides additional support that OC spray is less effective than a CEW.  *See* Brave Rebuttal, Exhibit "12."  Mr. Brave states, *inter alia*, that "OC exposure often does not induce immediate or debilitating effects of an intended OC target." *Id*. at p. 4, ¶12.  Mr. Brave further states that "OC is limited by many factors… including composition, contents, propellant, methods of dispersal, age, size of canister, prior use… OC usually requires direct and sufficient contact with the subject's vulnerable limited targets, making the user's accuracy severely challenged by the user and the target's movements.  Any person … in the proximity of the OC dispersal area may be affected." *Id*. at p. 5, ¶ 16.

IV.     This Court Should Find New York's Electric Ban Categorically Unconstitutional

Many other Courts have either struck down bans on electric arms or presided over settlements where electric arm ban have been repealed.[7] The two Courts to issue written decisions

---

[7] *See People v. Yanna*, 824 N.W.2d 241, 243 (Mich. Ct. App. 2012) (striking down a Michigan statute criminalizing possession of electronic weapons), *New Jersey Second Amendment Society v. Porrino*, No. 3:16-cv-04906-DEA (D.N.J. April 25, 2017) Doc. No. 30 (consent decree where the Court found New Jersey's complete ban on electric arms is unconstitutional), ("Pursuant to the holdings in *Heller, McDonald and Caetano*, N.J. Stat. Ann . § 2C:39- 3(h), to the extent this statute outright prohibits, under criminal penalty, individuals from possessing electronic arms, is declared unconstitutional in that it violates the Second Amendment to the United States Constitution and shall not be enforced"); *See, Crystal Wright v. District of Columbia*, No. 1:16-cv-01556-JEB (D.D.C. Sept. 26, 2016) Doc. No. 18 (stipulating to a stay of a motion for preliminary injunction pending new legislation and agreeing not to enforce ban against plaintiffs); *Ford v. City of New Orleans*, No. 2:16-cv16433-MVL-KWR (E.D. La. Dec. 14, 2016) Doc. Nos. 17, 19-20 (stipulating that the city will not enforce the ban against plaintiff and consenting to a stay of litigation pending enactment of legislation that decriminalized possession of stun guns); *Hulbert v. Pantelides*, No. 1:16-cv-04121-JFM (D. Md. March 3, 2017) Doc. No. 16 (letter from the City of Annapolis informing the court that the City Council passed an emergency ordinance eliminating all

on this issue struck their respective bans without the need to look to tiered scrutiny. In *Ramirez v.*

*Commonwealth* No. SJC-12340, 2018 Mass. LEXIS 237 (Apr. 17, 2018) the Massachusetts

Supreme Judicial Court stated as follows:

> Having received guidance from the Supreme Court ..., we now conclude that stun
> guns are "arms" within the protection of the Second Amendment. Therefore, under
> the Second Amendment, the possession of stun guns may be regulated, but not
> absolutely banned. Restrictions may be placed on the categories of persons who
> may possess them, licenses may be required for their possession, and those licensed
> to possess them may be barred from carrying them in sensitive places, such as
> schools and government buildings. But the absolute prohibition ... that bars all
> civilians from possessing or carrying stun guns, even in their home, is inconsistent
> with the Second Amendment and is therefore unconstitutional. *Id* at 337-338.

And in *People v. Yanna*, 824 N.W.2d 241 (Mich. Ct. App. 2012) the Michigan Court of

Appeals held that:

> [b]ecause tasers and stun guns do not fit any of the exceptions to the Second
> Amendment enumerated in Heller, we find that they are protected arms. *Heller*
> found unconstitutional a law which completely banned the possession of protected
> arms in the home. 554 U.S. at 628–629. We therefore hold that a complete ban on
> tasers and stun guns in the home violates the Second Amendment. *See Yanna* at
> 246.

This Court should apply a categorical approach in finding that a complete ban on a class

of arms, i.e. electric arms, is unconstitutional. This was the approach taken in *District of Columbia*

*v. Heller*, 554 U.S. 570 (2008) when confronted with a complete ban on handguns.  Electric arms

are also a class of arms. Pursuant to *Heller I*, "complete prohibition[s]" of Second Amendment

rights are always invalid. *Id*. at 629. It is appropriate to strike down such "total ban[s]" without

bothering to apply tiers of scrutiny because no such analysis could ever sanction obliterations of

---

restrictions on ownership and possession of electronic weapons for personal defense); *Ramirez v.*
*Commonwealth* No. SJC-12340, 2018 Mass. LEXIS 237 (Apr. 17, 2018) (striking Mass. ban on
stun guns); *Baran, et al*. *v. City of Baltimore, et al*.; 1:17-cv-00253 (D. Md. March 3, 2017)
(lawsuit resulting in repeal of electric arm bans in Baltimore City, Baltimore County and Howard
County).

an enumerated constitutional right. *Id.* Per *Heller* this Court could strike down New York's electric arm ban without the need to look to scrutiny analysis. This is the approach that many other courts have taken in other contexts when dealings with severe restrictions on the Second Amendment.

The State Supreme Court of New Jersey also applied no scrutiny test in finding a conviction for possession of a machete in the home violated the litigant's Second Amendment right. *See State v. Montalvo*, 077331, 2017 WL 2471030 (N.J. June 8, 2017). In *Wesson v. Town of Salisbury*, 13 F. Supp. 3d 171 (D. Mass. 2014) and *Richmond v. Peraino*, 128 F. Supp. 3d 415 (D. Mass. 2015) the Court found that a ban on firearms ownership based on decades old marijuana convictions was unconstitutional without the need to apply scrutiny. *See also Veasey v. Wilkins*, 2015 U.S. Dist. LEXIS 53894, 2015 WL 1884832 (enjoining North Carolina's law barring resident aliens from being issued handgun carry permits without applying a scrutiny analysis).

The Court in *Morris v. United States Army Corps of Eng'rs,* 60 F. Supp. 3d 1120 (D. Idaho 2014) found the U.S. Corps of Engineers' ban on firearms carry for self-defense was categorically invalid. The 7th circuit also invalidated Illinois's total ban on any carrying of firearms in public as categorically unconstitutional. *See Moore v. Madigan*, 702 F.3d 933, 940 (7th Cir. 2012). The Illinois Supreme Court followed suit in *People v. Aguilar*, 2 N.E.3d 321, 327 (Ill. 2013) and found the Class 4 form of the Illinois aggravated unlawful use of weapons statute violated the Second Amendment without scrutiny analysis. Same as to the District of Colombia's ban on handgun carry in *Palmer v. District of Columbia*, 59 F. Supp. 3d 173(D.D.C. 2014). And again, later regarding DC's licensing scheme put in place post-*Palmer* in *Wrenn v. District of Columbia*, 864 F.3d 650, 665 (D.C. Cir. 2017). Most recently, the Ninth Circuit in *Young v. Hawaii*, No. 12-17808, 2018 U.S. App. LEXIS 20525 (9th Cir. July 24, 2018) recently found that the County of Hawaii's effective ban on handgun carry for self-defense was categorically unconstitutional. This Court

should follow the lead of these Courts in finding that New York's complete ban on electric arms is unconstitutional without the need to look to tiered scrutiny. However, if a level of scrutiny is required, Second Circuit precedent suggests that strict scrutiny should be applied.

a.   <u>Strict Scrutiny Should Apply</u>

Post-*Heller*, the Second Circuit has developed a body of case law which supports the application of strict scrutiny where a law places a substantial burden on the core right to self-defense of a law-abiding person. *See United States v. Jimenez*, 895 F.3d 228 (2d Cir. 2018); *see also N.Y. State Rifle & Pistol Ass'n v. City of N.Y.*, 883 F.3d 45, 51 (2d Cir. 2018) (upholding New York City's ban on transporting firearms outside the City). The Second Circuit most recently tackled this issue in *United States v. Jimenez*, 895 F.3d 228 (2d Cir. 2018) and found:

> On the assumption that Jimenez maintained an individual right to bear arms under the Second Amendment, we must first determine the appropriate level of scrutiny to apply. In doing so, "we consider two factors: (1) how close the law comes to the core of the Second Amendment right and (2) the severity of the law's burden on the right." *NYSRP v. Cuomo*, 804 F.3d at 258 (internal quotation marks omitted). Laws that place substantial burdens on core rights are examined using strict scrutiny. *See NYSRP v. City*, 883 F.3d at 56. It is clear from *Heller* and our decisions applying it that protecting oneself in one's home with a weapon in common use is at the core of the Second Amendment. *See Heller,* 554 U.S. at 634-35; *NYSRP v. City*, 883 F.3d at 56; *Kachalsky*, 701 F.3d at 93-94…. Consistent with this precedent, we hold that those who, like Jimenez, have been found guilty of felony-equivalent conduct by a military tribunal are not among those "law-abiding and responsible" persons whose interests in possessing firearms are at the Amendment's core. *Id* at *5-6. [footnotes omitted].

The Second Circuit ultimately applied intermediate scrutiny because Mr. Jimenez was not a law-abiding person. Here, the record demonstrates that Mr. Avitabile is a law-abiding person that has never been convicted of a crime. Additionally, his core right to self-defense is implicated both in the home and elsewhere by the State of New York's complete ban on electric arms. Thus, per this Circuit's precedent, strict scrutiny should apply.

The State may argue that *N.Y. State Rifle & Pistol Ass'n v. Cuomo,* 804 F.3d 242 (2d Cir. 2015) supports the application of intermediate scrutiny because the Second Circuit applied that level of scrutiny to review the constitutionality of the SAFE ACT. However, a closer analysis of the opinion reveals that intermediate scrutiny was applied because the law only banned a small subset of firearms and this case is highly distinguishable.

> The instant bans are dissimilar from D.C.'s unconstitutional prohibition of "an entire class of 'arms' that is overwhelmingly chosen by American society for [the] lawful purpose" of self-defense. New York and Connecticut have not banned an entire class of arms. Indeed, plaintiffs themselves acknowledge that there is no class of firearms known as "semiautomatic assault weapons"—a descriptor they call purely political in nature. Plaintiffs nonetheless argue that the legislation does prohibit "firearms of a universally recognized type— semiautomatic." Not so. Rather, both New York and Connecticut ban only a limited subset of semiautomatic firearms, which contain one or more enumerated military-style features. As *Heller* makes plain, the fact that the statutes at issue do not ban "an entire class of 'arms'" makes the restrictions substantially less burdensome. In both states, citizens may continue to arm themselves with non-semiautomatic weapons or with any semiautomatic gun that does not contain any of the enumerated military-style features. *Id.* at 260.

Here, as this Court acknowledged in its previous order, *Avitabile v. Beach*, 277 F. Supp. 3d 326 (N.D.N.Y. 2017), Mr. Avitabile is challenging the State of New York's ban on an entire class of arms.

> [T]he current state of New York law renders illegal the object of Avitabile's desire, since a person is guilty of fourth degree criminal possession of a weapon when he or she possesses, inter alia, any "electronic dart gun" or "electronic stun gun." N.Y. Penal Law § 265.01(1). New York's penal law defines an "electronic dart gun" as "any device designed primarily as a weapon, the purpose of which is to momentarily stun, knock out or paralyze a person by passing an electrical shock to such person by means of a dart or projectile," § 265.00(15-a), and an "electronic stun gun" as "any device designed primarily as a weapon, the purpose of which is to stun, cause mental disorientation, knock out or paralyze a person by passing a high voltage electrical shock to such person," § 265.00(15-c). *Id.*

Unlike the ban on a subset of rifles at issue in the *NYRPSA* litigation, the State bans an entire class of arms, i.e. all electric arms, for use by law-abiding citizens. Thus, strict scrutiny applies, and the State of New York must demonstrate a compelling government interest to banning

19

these arms that is narrowly tailored to achieve its interest. *See Thomas v. Review Bd. of Ind. Employment Sec. Div.*, 450 U.S. 707, 718 (1981) ("The state may justify an inroad on religious liberty by showing that it is the least restrictive means of achieving some compelling state interest."). This is the approach that was taken by the court in *Bateman v. Perdue* 881 F.Supp.2d 709 (2012) in evaluating North Carolina's ban on carrying firearms during an emergency.

> There is no dispute that defendants have a compelling interest in public safety and general crime prevention. *See Schenck v. Pro-Choice Network of Western New York,* 519 U.S. 357, 376, 117 S.Ct. 855, 137 L.Ed.2d 1 (recognizing "significant governmental interest in public safety"). "`[P]rotecting the community from crime' by keeping guns out of the hands of dangerous persons is an important governmental interest." *United States v. Carter,* 669 F.3d 411, 417 (2012).
>
> The problem here is that the emergency declaration statutes, are not narrowly tailored to serve the government's interest in public safety. They do not target dangerous individuals or dangerous conduct. Nor do they seek to impose reasonable time, place and manner restrictions by, for example, imposing a curfew to allow the exercise of Second Amendment rights during circumscribed times. Rather, the statutes here excessively intrude upon plaintiffs' Second Amendment rights by effectively banning them (and the public at large) from engaging in conduct that is at the very core of the Second Amendment at a time when the need for self-defense may be at its very greatest. *See Heller,* 128 S.Ct. at 2799 ("[A]mericans understood the `right of self-preservation' as permitting a citizen to `repe[l] force by force' when `the intervention of society in his behalf, may be too late to prevent an injury.'" (quoting 1 Blackstone's Commentaries 145-146, n.42 (1803)) (second alteration in original)). Consequently, the emergency declaration laws are invalid as applied to plaintiffs.

This Court should apply strict scrutiny as well because New York's electronic arms ban intrude upon Mr Avitabile's Second Amendment rights by effectively banning him (and the public at large) from engaging in conduct that is at the very core of the Second Amendment. A district court in Louisiana also applied strict scrutiny in striking a law banning firearms from the parking lot of any store that sells alcohol. *See Taylor v. City of Baton Rouge,* 39 F. Supp. 3d 807 (M.D. La. 2014).

20

In *Ezell*, the 7th circuit applied "not quite strict scrutiny" to Chicago's prohibition on live-fire training ranges—in part because Chicago required residents to undergo such training to obtain a license to possess firearms at all. 651 F.3d 684 (7th Cir. 2011). It found:

> To be appropriately respectful of the individual rights at issue in this case, the City bears the burden of establishing a strong public-interest justification for its ban on range training: The City must establish a close fit between the range ban and the actual public interests it serves, and also that the public's interests are strong enough to justify so substantial an encumbrance on individual Second Amendment rights. Stated differently, the City must demonstrate that civilian target practice at a firing range creates such genuine and serious risks to public safety that prohibiting range training throughout the city is justified. *Id*. at 708-709.

A district court in *Hatfield v. Sessions,* No. 3:16-cv-00383-JPG-RJD, 2018 U.S. Dist. LEXIS 70431 (S.D. Ill. Apr. 26, 2018) followed this approach in finding § 922(g)(1) unconstitutional as applied to the litigant. Another district court enjoined the City of Chicago's ban on guns stores using this approach in *Ill. Ass'n of Firearms Retailers v. City of Chicago*, 961 F. Supp. 2d 928, 930 (N.D. Ill. 2014) And in *Ezell v. City of Chicago* ("Ezell II"), 846 F.3d 888 (7th Cir. 2017), the 7th Circuit enjoined Chicago's zoning regulations at issue in that case which so "severely limit[ed] where shooting ranges may locate" that "no publicly accessible shooting range yet exist[ed] in Chicago." *Id*. at 894. As a result, the zoning regulations, "though not on their face an outright prohibition of gun ranges, nonetheless severely restrict the right of Chicagoans to train in firearm use at a range." *Id.* New York has similarly curtailed Mr. Avitabile's Second Amendment rights. This Court should apply true strict scrutiny and find that the State of New York does not have a compelling governmental interest in regulating electric arms. And even if it does, a complete ban on electric arms is not narrowly tailored in achieving that goal. In the alternative, it should employ the *Ezell* approach and find New York has not demonstrated electric arm ownership presents such a risk to public safety that prohibiting electric arm ownership throughout

21

the State is justified. However, the State of New York's ban is so nonsensical that even if intermediate scrutiny applies this Court should rule in Mr. Avitabile's favor.

      b.  <u>Under Intermediate Scrutiny New York's Electric Arm Ban is Unconstitutional</u>

Even if this Court finds intermediate scrutiny is appropriate to the instant case, New York's ban on electric arms cannot withstand constitutional muster. But even applying intermediate scrutiny, "… the state cannot 'get away with shoddy data or reasoning.' To survive intermediate scrutiny, the defendants must show 'reasonable inferences based on substantial evidence' that the statutes are substantially related to the governmental interest." *N.Y. State Rifle & Pistol Ass'n v. Cuomo*, 804 F.3d 242, 264 (2d Cir. 2015).  It may be that "[t]he regulation of firearms is a paramount issue of public safety," *Osterweil v. Bartlett*, 706 F.3d 139, 143 (2d Cir. 2013), which is always a "compelling" governmental interest. However, the matter before this Court is the prohibition of a less than lethal arm. There is no government interest in banning a less than lethal arm especially when the Supreme Court held in *Heller* that handguns cannot be banned.

New York's ban on electric arms is most analogous to the seven-round load limit that was struck by the Second Circuit in *N.Y. State Rifle & Pistol Ass'n v. Cuomo*. There the Court applied intermediate scrutiny and found:

> On the record before us, we cannot conclude that New York has presented sufficient evidence that a seven-round load limit would best protect public safety. Here we are considering not a capacity restriction, but rather a load limit. Nothing in the SAFE Act will outlaw or reduce the number of ten-round magazines in circulation. It will not decrease their availability or in any way frustrate the access of those who intend to use ten-round magazines for mass shootings or other crimes. It is thus entirely untethered from the stated rationale of reducing the number of assault weapons and large capacity magazines in circulation. New York has failed to present evidence that the mere existence of this load limit will convince any would-be malefactors to load magazines capable of holding ten rounds with only the permissible seven. [footnote omitted]. *Id*. at 264.

The State of New York simply has not presented evidence that a complete ban on electric arms protects public safety. Even if this Court finds intermediate scrutiny applicable, *NY. State Rifle & Pistol Ass'n v. Cuomo* commands that New York's ban on electric arms be struck.

Many Courts have struck similar or less restrictive laws based on intermediate scrutiny. The Connecticut Supreme Court applied intermediate scrutiny in *State v. DeCiccio*, 315 Conn. 79, 108-150, 105 A.3d 165, 185-210 (Conn. 2014), and found that a Connecticut statute criminalizing the transport of dirk knives and police batons in a motor vehicle was unconstitutional.  The District Court for the Northern Marianas Islands recently struck several of its weapons laws applying intermediate scrutiny including its ban on "assault weapons".  *See Murphy v. Robert Guerrero*, et al., 1:14-CV-00026, 2016 WL 5508998, (D.N. Mar. Is. Sept. 28, 2016).  In *THE PEOPLE OF THE STATE OF ILLINOIS, Appellant, v. JULIO CHAIREZ, Appellee*., 2018 IL 121417, 2018 WL 652814, the Illinois Supreme Court found that found the State of Illinois' ban on carrying a handgun within 1000 feet of public parks violated the Second Amendment.  In *Fotoudis v. City of Honolulu* 54 F. Supp. 3d 1136 (D. Haw. 2014) and in *Fletcher v. Haas*, 851 F. Supp. 2d 287 (D. Mass. 2012), the respective courts applied intermediate scrutiny and struck Hawaii's and Massachusetts' respective bans on permanent resident aliens owning firearms.  *See also Duncan v. Becerra*, No. 17-56081, 2018 U.S. App. LEXIS 19690 (9th Cir. July 17, 2018) (unpublished) (upholding preliminary injunction grant against California's ban on large capacity magazines). In *State v. Herrmann,* 2015 WI App 97, 366 Wis. 2d 312, 873 N.W.2d 257, the Wisconsin Court of Appeals held that a complete ban on switchblades failed intermediate scrutiny.

In *Tyler v. Hillsdale Cnty. Sheriff's Dep't,* 837 F.3d 678 (6th Cir. 2016) (en banc) the Sixth Circuit sitting *en banc* ruled that a person who "has been adjudicated intellectually disabled" or "has been committed to a mental institution" is not permanently barred from possessing firearms.

Judge Julia Gibbons wrote that under intermediate scrutiny, the burden of justification is demanding and it rests entirely on the State and "in discharging this burden, the government can rely on a wide range of sources, including legislative history, empirical evidence, case law, and even common sense, but it may not 'rely upon mere anecdote and supposition'" (*Tyler*, No. 13-1876, slip op. at 20). In *Tyler*, according to Judge Gibbons, the government had not presented sufficient evidence of the continued risk presented by persons who were previously committed (*id.* p. 24). Thus, the statute, as applied, given the evidence supplied, failed intermediate scrutiny.

In *Binderup v. Att'y Gen.*, 836 F.3d 336 (3d Cir. 2016) (en banc) the Third Circuit sitting *en banc* applied intermediate scrutiny in finding 18 U.S.C. § 922(g)(1) unconstitutional as applied to the litigants:

> [b]ut whether we apply intermediate scrutiny or strict scrutiny…the Government bears the burden of proof on the appropriateness of the means it employs to further its interest. *See*, e.g., *Bd. of Trs. of State Univ. of N.Y. v. Fox*, 492 U.S. 469, 480 (1989); *Johnson v. California*, 543 U.S. 499, 505, 506 n.1 (2005). Here the Government falls well short of satisfying its burden—even under intermediate scrutiny. The record before us consists of evidence about the Challengers' backgrounds, including the time that has passed since they last broke the law. It contains no evidence explaining why banning people like them (i.e., people who decades ago committed similar misdemeanors) from possessing firearms promotes public safety. *Id* at 353-354.

*Keyes v. Sessions,* 282 F. Supp. 3d 858 (M.D. Pa. 2017) follows *Binderup* and is an as-applied challenge to 18 U.S.C. § 924(g)(4). There, the Court held "[w]e have been presented with no evidence to indicate that disarming those who went through a period of mental illness and suicide attempts over a decade ago and who have regularly carried firearms in their professional capacity since that time reasonably fits within the governmental interest to promote safety. As such, [18 U.S.C]. § 924(g)(4) cannot withstand intermediate scrutiny in the face of Keyes' as-applied challenge." *Id* at 878.  Finally, the D.C. Court of Appeals in *Heller v. District of Columbia*, 419 U.S. App. D.C. 287, 801 F.3d 264 (2015) struck four registration laws applying intermediate

scrutiny in *Heller III*.  There the Court found that a requirement that an individual brings his or her firearm to the police department to register it; a requirement that individuals re-register their firearms every three years and pay additional fees; a requirement that individuals pass a knowledge test of local firearm laws to register any firearm; and a prohibition against registering more than one handgun in a 30-day period. *Id.* at 281.

The D.C. Court of appeals enjoined the knowledge test requirement "[b]ecause the District has offered no evidence from which the court can infer it reasonably concluded that knowledge of its gun laws, as shown by passing its test, will promote public safety, on this record the requirement must be held constitutionally invalid." *Id.* at 279.  Similarly, the State of New York has failed to offer evidence from which this Court can infer it reasonably concluded that public safety will be promoted by banning electric arms. This Court should find that New York law is unconstitutional even if it decides to apply intermediate scrutiny.

V.     Conclusion

Post-*Heller, McDonald* and *Caetano,* New York's ban on electric arms is unconstitutional. It simply cannot be that the government cannot ban handguns without violating the Second Amendment, but it may ban an entire class of less-than-lethal arms.  Removing New York's ban on electric arms will promote public safety because it will give Mr. Avitabile and other similarly situated persons an intermediate form of force that they can look to prior to using a firearm. There is no government interest in maintaining this ban. For the foregoing reasons, this Court should enjoin the State of New York's electric arm ban and declare the ban on electric arms unconstitutional and grant summary judgment in favor of Mr. Avitabile.

Respectfully submitted, this the 27th day of August, 2018.

*/s/ Stephen D. Stamboulieh*
Stephen D. Stamboulieh

## **Certificate of Service**

I, Stephen D. Stamboulieh, hereby certify that I have caused to be filed a true and correct copy of the foregoing document or pleading with the Court's ECF system, which generated a Notice and delivered a copy of same to all counsel of record.


Dated: August 27, 2018.

/s/ *Stephen D. Stamboulieh*
Counsel for Plaintiff

26