UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

MATTHEW AVITABILE,

<em>Plaintiff</em>,

-against-

1:16-CV-01447

(DNH)(CFH)

SUPERINTENDENT GEORGE P. BEACH II,
SUPERINTENDENT OF THE NEW YORK STATE
POLICE,

<em>Defendant</em>.

## DEFENDANT'S MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND IN SUPPORT OF DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT

BARBARA D. UNDERWOOD
Attorney General of the State of New York
*Attorney for Superintendent George P. Beach II,*
*Superintendent of the New York State Police*
The Capitol
Albany, NY 12224

MICHAEL G. McCARTIN
Assistant Attorney General
*Of Counsel*
Bar Roll No. 511158
Telephone: (518) 776-2620

September 9, 2018

## Table of Contents

Preliminary Statement…………………………………………………………………..1

Statement of Facts………………………………………………………………………4

    A.    Plaintiff Matthew Avitabile……………………………………………….4

    B.    Axon Enterprise, Inc…………………………………………………….6

    C.    New York State Trooper Philip Shappy…………………………………..7

Argument………………………………………………………………………………9

Point I    Plaintiff Avitabile does not have a Second Amendment right to possess a Taser because Tasers are not "*in common use*" across the United States…………9

Point II    Even assuming that stun guns are "in common use" across the United States, New York's stun gun ban does not violate the Second Amendment because plaintiff has numerous other "adequate alternatives" in order to protect his home, including handguns, rifles, and shotguns – that can be loaded with lethal *and less-lethal ammunition* – in addition to other items, such as pepper spray………..………………………………………………………………14

Conclusion………………………………………………………….………….……………...19

## Preliminary Statement

Plaintiff Matthew Avitabile ('plaintiff') brings this 42 U.S.C. § 1983 action against George P. Beach II, the Superintendent of the New York State Police. In this lawsuit, plaintiff alleges that certain N.Y. Penal Laws which prohibit the possession of "electronic dart gun[s]" (commonly known as Tasers) and "stun guns" violate the Second Amendment of the United States Constitution. Amend. Complt., ¶¶ 59-60; *see* N.Y. Penal Law § 265.01; § 265.00(15-a); and § 265.00(15-c). For the reasons that follow, however, plaintiff's Second Amendment rights clearly have not been violated by the New York State Legislature's ban of these two weapons. Thus, plaintiff's motion for summary judgment should be denied, and defendant's cross-motion for summary judgment should be granted.

To begin, providing some preliminary background information, the Taser ban was enacted in New York as a crime-fighting measure in 1976 because Tasers had been used in "holdups and robberies" within the State. *See* Declaration of Michael G. McCartin, Exhibit 1, p. 4 (the Bill Jacket for Senate Bill 7151-A/Assembly Bill 9187-A). Also, New York law enforcement and public officials determined that Tasers were hazardous if used against police officers and members of the general public. *See, e.g., id.*, pp. 7-8, 19-20. Similarly, the ban against stun guns was enacted in New York in 1990 as another public-safety measure. It was supported by New York law enforcement and public officials, at least in part because stun guns were "show[ing] up" in "domestic disputes." *Id.*, Exhibit 2, pp. 7, 10-11 (the Bill Jacket for Senate 5301/Assembly 5398-A).

Despite these laudable legislative objectives, though, plaintiff has seized upon a short, five-paragraph per curium decision issued by the U.S. Supreme Court in *Caetano v. Massachusetts*, 136 S.Ct. 1027 (2016), and he attempts to use that rather ambiguous Second Amendment decision to undue the four-decade ban against Tasers, as well as an almost three-

1

decade ban against stun guns, prohibitions that the New York State Legislature saw fit to impose years ago in order to protect New Yorkers. *See, e.g.,* Amend. Complt., ¶ 15. Yet, as this Court rightly ruled in its preliminary injunction decision, "the *Caetano* majority did not actually make any affirmative pronouncements about the continuing permissibility of the Massachusetts stun gun ban.[] 136 S. Ct. at 1028. Instead, the Court simply rejected as inconsistent with its precedent the three reasons the lower court had offered for upholding the law. *Id.*" Dkt. No. 38, p. 14.[1] This Court's ruling remains entirely correct and it is fully consistent with another State court within New York that also got it exactly right when it properly interpreted *Caetano*'s quite limited holding in a similar way:

> [I]n *Caetano*, the Supreme Court did not hold … that a Massachusetts statute banning the possession of stun guns violated the Second Amendment. Rather, the Supreme Court held that the reasons offered by the Supreme Judicial Court of Massachusetts in upholding the statute contradicted the Supreme Court's opinion in *Heller*. The judgment of the Supreme Judicial Court of Massachusetts was then vacated and the case was remanded for further proceedings.

*People v. Buchholz*, 53 Misc. 3d 563, 566-567 (N.Y. City Crim. Ct. 2016). Thus, *Caetano*, which stands for no more than a high court's summary rebuke of a poorly-reasoned lower court decision, one that improperly applied well-known Supreme Court precedent, is of *zero assistance* to the plaintiff's facial and as-applied challenge to New York State's ban against Tasers and stun guns.

With that stated, this Court can largely lay *Caetano* aside and it can deny plaintiff's request for a permanent injunction preventing enforcement of the Taser and stun gun ban. And it can do so for two primary reasons, neither of which were the basis of the Massachusetts' court decision that was reversed, and both of which are entirely consistent with U.S. Supreme Court

---

[1] Notably, *Caetano* did not even concern a Taser; it merely related to a stun gun. *Caetano*, 136 S.Ct. at 1027. Furthermore, while the parties and amici curiae in *Caetano* all framed the issue as whether the Massachusetts statute violates the Second Amendment, the Supreme Court did not address that issue directly, but merely rejected the lower court's reasoning for its decision.

and Second Circuit precedent regarding the Second Amendment (including the quite limited holding of *Caetano*).

*First*, when it comes to Tasers, this Court should summarily conclude that the challenged legislation does not even begin to impinge upon conduct protected by the Second Amendment. This is so because discovery in this action has now revealed that there are only about 300,000 Tasers in use by civilians across the entire United States. Declaration of Michael Brave, Dkt. No. 52-12, p. 2, ¶ 3. However, that figure – which includes only about 0.09 % of the civilian population of the United States – is simply not enough to show that Tasers are "in common use" today, a necessary element in order to even begin to state a claim under the Second Amendment.

*Second*, when it comes to stun guns, plaintiff's Second Amendment rights are not violated because he has "adequate alternatives" at his disposal in order to protect his home. These adequate alternatives include handguns, rifles, and shotguns. They can be lawfully loaded with lethal ammunition, or, if plaintiff so prefers, they can also be lawfully loaded with less-lethal ammunition – ammunition such as .12 gauge shotgun shells packed with rubber pellets or even beanbags. And, if plaintiff does not prefer to use guns loaded with lethal or less-lethal ammunition, he can still lawfully use items like pepper spray. Under Second Circuit precedent, this quite frankly means that plaintiff's Second Amendment rights have not been violated because New York's stun gun ban passes the required intermediate level scrutiny as it easily is shown to advance public safety.[2]

Consequently, there is no Second Amendment violation here, and if plaintiff wants the ban on Tasers and stun guns lifted within New York State, he must seek to do it the old-

---

[2] Alternatively, if the Court were to determine that Tasers are "in common use" today despite the fact that there are only 300,000 civilians that possess them, this same "adequate alternatives" argument is equally applicable to Tasers. In other words, instead of Tasers, plaintiff still has access to numerous other lethal and non-lethal means to defend his home. Thus, plaintiff's Second Amendment rights have not been infringed.

fashioned, democratic way: he must petition his representatives in the New York State Legislature to do so. That's the proper forum for plaintiff's arguments. This Court is not. As the Seventh Circuit has properly held, "[t]he central role of representative democracy is no less part of the Constitution than is the Second Amendment: when there is no definitive constitutional rule, matters are left to the legislative process." *Friedman v. City of Highland Park*, 784 F.3d 406, 412 (7th Cir. 2015).

<u>**Statement of Facts**</u>

**A. Plaintiff Matthew Avitabile**

Plaintiff Matthew Avitabile owns three (3) bolt-action rifles and a .12 gauge, pump-action shotgun. Avitabile Depo., pp. 13-14. When asked if he would ever use one of these firearms to defend his home, plaintiff testified, "… if the situation ever occurred that I felt it necessary, I would do so in compliance with state law." *Id.*, p. 15. Plaintiff further testified that he would also like to purchase a Taser, but the purchase of a stun gun was still, "depending on how things shake out, … on the table." *Id.*, p. 19. Plaintiff continued: "… [I]f I could place any additional barriers between myself and using lethal force, I think it would – it would make me more comfortable." *Id.*, p. 20. Yet, according to the plaintiff, he does not own any pepper spray, nor has he given the purchase of it any serious consideration:

Q:   Do you presently own any type of what I'll generally refer to as pepper spray?

A:   No.

Q:   And why is that?

A:   I don't know where I would purchase it, for starters. And beyond that, it hasn't come to mind very much.

Q:   Well you have a desire to have a form of non-lethal self defense in your home. Would you agree that pepper spray is a form of non-lethal self defense?

4

A:      I would say that it is a form of non-lethal self-defense, yes.

\*\*\*

Q.      But to date, you haven't even basically researched where you could purchase pepper spray?

A.      I've given it no serious consideration.

*Id.*, pp. 25-26.

As of the time of plaintiff's deposition, though, plaintiff was well aware of less lethal forms of ammunition like "rubber bullets" and "also different shotgun ammunition that includes almost like beanbags," which plaintiff described as being used to "more disperse[] a crowd or push[] someone back rather than potentially kill[] them." *Id.*, p. 27. Along these lines, during his deposition, plaintiff was shown two short videos that depicted law-enforcement officials demonstrating less lethal forms of ammunition, more particularly beanbag rounds. *Id.*, p. 29-30, Exhibit B.[3] After reviewing those videos, the plaintiff testified as follows:

---

[3] The Court can admit these videos and consider them in deciding summary judgment because "[d]emonstrative evidence is admissible in the judge's discretion, and variations between the demonstration and the original event may affect the *weight* of the evidence, but do not require exclusion." *Parkinson v. Kelly*, 2006 U.S. Dist. LEXIS 54661, at *36 (N.D.N.Y. Jan. 23, 2006) (emphasis in original). *See also Allen v. Artus*, No. 09-CV-4562 (JFB), 2014 U.S. Dist. LEXIS 66455, at *57 (E.D.N.Y. May 14, 2014) ("It is within the court's discretion as to whether a computer-edited video may be admitted as demonstrative evidence for the purpose of helping a jury understand a concept."); *United States v. Stone*, No. 10-20123, 2012 U.S. Dist. LEXIS 5920, at *11 (E.D. Mich. Jan. 19, 2012) ("Demonstrative evidence is admissible if it is relevant and probative."); *Conboy v. Wynn Las Vegas, LLC*, No. 2:11-CV-1649 JCM (CWH), 2013 U.S. Dist. LEXIS 55558, at *28 (D. Nev. Apr. 18, 2013) ("Demonstrative evidence is evidence used to explain or illustrate other evidence already on the record."); *United States v. Martinez*, 588 F.3d 301, 311 (6th Cir. 2009) ("Demonstrative evidence is admissible to assist jurors in understanding basic principles."); *In re Air Crash Disaster*, 86 F.3d 498, 539 (6th Cir. 1996) (affirming admittance of video "to demonstrate [a] circuit breaker's inner workings," in part, because "[u]se of the videotape was limited to demonstration, and the court instructed the jury about the limited basis of its admission"); *United States v. Metzger,* 778 F.2d 1195, 1204 (6th Cir. 1985) (holding that video of FBI re-enactment of explosion in car was properly admitted despite the fact that not every variable was identical); *People v. Castillo*, 230 Mich. App. 442, 444, 584 N.W.2d 606, 608 (1998) ("Demonstrative evidence, including physical objects alleged to be similar to those involved in the incident at issue, is admissible where it may aid the fact finder in reaching a conclusion on a matter material to the case.").

> Q:    Okay.  I just have a few questions  for you to follow  up on those videos.  It seems to me that you have a – a goal in mind in this – in defending  your home.  One is to minimize  the likelihood  that you would use deadly force if someone were to break into your home, for instance.  **Would you agree with me that the forms of non – or less lethal ammunition  that you've seen in the videos there would  be one alternative  means of achieving that goal?**
>
> A:    Based upon what I saw, I think  that it – in certain  circumstances,  **it could be.**

*Id.*, p. 30 (emphasis  added).  Later, the plaintiff  testified  with regard to those videos:

> Q:    So would you agree that beanbag rounds like you've seen on the videos today in Exhibit  B, and different  forms of non-lethal  ammunition,  are alternatives  to lethal forms of ammunition  that you presently  own?
>
> A:    It could be under different  circumstances.

*Id.*, 32.  Plaintiff  also admitted  that non-lethal  ammunition  is permitted  in New York State and that he would  certainly  consider  using it even though  it is possible  that a beanbag round shot from a .12 gauge shotgun  could still be lethal.  *Id.*, pp. 34, 40.

**B.  Axon Enterprise,  Inc.**

Axon Enterprise,  Inc. is the name of the company that manufactures  Tasers, only 300,000 of which have been sold to civilians  in the United  States.  Brave Decl., p. 2, ¶ 3.  On Axon's Form 10-K filed with the United  States Securities  and Exchange  Commission,  which was signed on March 1, 2018 by plaintiff's  expert, Mark W. Kroll (among others), Axon states the following:  "Our CEW [Taser Conducted  Electrical  Weapons] products  are often used in aggressive  confrontations  that may result in serious,  permanent  bodily injury or death to those involved.  Our CEW products  may be associated  with these injuries."  Avitabile  Deposition, Exhibit  E, p. 2.  Plaintiff  was asked about this in his deposition:

> Q:    Okay.  So having read that, do you understand  that the manufacturer  of Tasers has basically  stated that Tasers can lead to permanent  bodily injury or death on occasion?

A:      Yes, that there is a potential that that could occur.

***

Q:      Well, a home invasion would be an aggressive confrontation.  Would you agree?

A:      Yes.

Q:      So it is possible, based on Taser's own manufacturer warning, that that could lead to death if you were to ever defend your home with a Taser? Would you agree with that statement?

A:      To the best of my knowledge regarding their statement, yes.

*Id.*, pp. 44-47.  Indeed, Axon's Taser warnings state as much:

- "Can cause death or serious injury."

- "[A]ny use of force, including the use of a CEW, involves risks that a person may get hurt or die due to the effects of the CEW, physical incapacitation, physical exertion, unforeseen circumstances, or individual susceptibilities."

- "In some individuals, the risk of death or serious injury may increase with cumulative CEW exposure."

*Id.*, Exhibit F, p. 1; *see also* McCartin Decl., Exhibit 4, p. 1 (same for warnings related to civilian use of Tasers).

### C.   New York State Trooper Philip Shappy

New York State Trooper Philip Shappy has been a Trooper with the New York State Police since 2002, and he is the Defendant's expert.  Since 2012, he has been assigned in a full-time capacity to the State Police Academy in Albany where he is a Senior Defensive Tactics Instructor involved in the daily training operations that take place at the Academy.  His duties include training new State Police recruits and current State Police members in use of force and defensive tactics.  Affidavit of Trooper Philip Shappy, ¶¶ 1-2.

Trooper Shappy asserts that, in his professional expert opinion, based upon his many years of experience, Tasers are best used as strictly a "law enforcement tool" by trained officers

7

in order to "deescalate a precarious situation for purposes of controlling and gaining compliance of actively resistant and violent subjects. A Taser is only an intermediate and temporary solution, which if used inappropriately could have grave and deadly consequences." *Id.*, ¶ 18. He further asserts that for "civilian self-defense purposes, Oleoresin Capsicum ("OC") spray," which is usually referred to as pepper spray, "is an easier to use and more effective alternative to a Taser. While use of a Taser requires robust training and an understanding of the inherent safety considerations and operational limitation, the dispersal of OC spray requires little, if any, training and experience." *Id.*, ¶ 19.

Further, in Trooper Shappy's expert opinion, "OC spray has a wide area of impact when dispersed, thereby alleviating the need for precision accuracy that is required for deployment of a Taser." *Id.*, ¶ 20. Also, Trooper Shappy asserts that "OC spray does not require direct impact on a subject, nor is the user's accuracy severely impacted by the target's mobility." *Id.* Additionally, Trooper Shappy states that:

> OC spray has a longer lasting impact with a greater temporary incapacitation, with only minimal risk of injuries or death. OC spray significantly impacts a subject's senses and abilities to fight back or resist, with the effects generally lasting for up to 45 minutes after exposure, if not longer depending on the extent of the exposure and the susceptibility of the subject. On the other hand, a Taser's utility ceases once the Taser runs through its full cycle and/or detaches from the subject's body.

*Id.*, ¶ 21. For these reasons, Trooper Shappy asserts that pepper spray is a much more effective means of self-defense for the civilian community than are Tasers or stun guns, which means that *pepper spray is a sufficient alternative to the use of Tasers or stun guns in New York State*.

## Argument

## Point I

**Plaintiff Avitabile does not have a Second Amendment right to possess a Taser because Tasers are not *"in common use"* across the United States.**

The Second Amendment provides that "[a] well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const., Amend. II.  In *District of Columbia v. Heller*, 554 U.S. 570 (2008), the Supreme Court concluded that the Second Amendment codifies a pre-existing "individual right to possess and carry weapons in case of confrontation." *Id.*, 554 U.S. at 592.  Once it made that determination, the Supreme Court struck down the District of Columbia's prohibition on the possession of firearms in the home because, quite importantly, the law banned "*the quintessential self-defense weapon*" – the *handgun* – and it did so in the place that Americans hold most dear – within their own homes.  *Id.* at 628-29 (emphasis added).  *See also Kolbe v. Hogan*, 849 F.3d 114, 132 (4th Cir. 2017).  But the high court still noted that the Second Amendment does not ensure a right to possess "any weapon whatsoever":

> Like most rights, the right secured by the Second Amendment is not unlimited. From Blackstone through the 19th-century cases, commentators and courts routinely explained that the right was not a right to keep and carry ***any weapon whatsoever*** in any manner whatsoever and for whatever purpose.

*Heller*, at 626 (emphasis added).  The Second Amendment right includes an "important limitation" relating to the type of weapon that is protected. *Id.*, at 626–27.  For instance, it is clear that the government can regulate and even ban certain types of weapons, including but not limited to short-barreled shotguns and machine guns.  *See, e.g., United States v. Miller*, 307 U.S. 174 (1939); *Heller*, 554 U.S. at 626-27.  Thus, the Second Circuit has held, "*Heller* was never meant to clarify the entire field of Second Amendment jurisprudence."  *Kachalsky v. County of Westchester*, 701 F.3d 81, 89 (2d Cir. 2012) (upholding New York State's concealed weapon

9

licensing requirements) (omits internal quotations).  Indeed, within the Second Circuit, district courts have stated that "'the contours of [the Second Amendment right to bear arms] are as of yet underdeveloped and ill-defined.'"  *Hudson v. County of Dutchess*, 2015 U.S. Dist. LEXIS 154632, \*42 (S.D.N.Y. Nov. 14, 2015) (quoting *Doutel v. City of Norwalk*, 2013 U.S. Dist. LEXIS 93436, 2013 WL 3353977, at \*23 (D. Conn. July 3, 2013)).

And this is true even though two years after *Heller*, the Supreme Court further addressed a Second Amendment case and held there that the Second Amendment's protections apply fully to the states through the Fourteenth Amendment.  *McDonald v. City of Chicago*, 130 S. Ct. 3020, 3026, 3042 (2010).  Importantly, though, while *McDonald* struck down a Chicago law that banned handguns in the home, *id.* at 3050, it also reaffirmed *Heller*'s assurances that Second Amendment rights are far from absolute and that many longstanding handgun regulations are "presumptively lawful."  *Heller*, 554 U.S. at 627 n.26; *see McDonald*, 130 S. Ct. at 3047. Furthermore, the Court explicitly noted that the doctrine of "incorporation does not imperil every law regulating firearms."  *McDonald*, 130 S. Ct. at 3047.  This has caused the Second Circuit to recognize that "*McDonald* did not expand upon *Heller*'s analysis and simply reiterated *Heller*'s assurances regarding the viability of many gun-control provisions."  *N.Y. State Rifle & Pistol Ass'n v. Cuomo*, 804 F.3d 242, 254 (2d Cir. 2015), cert. denied sub nom. *Shew v. Malloy*, 136 S. Ct. 2486 (2016)).

As the Second Circuit held just this year in *N.Y. State Rifle & Pistol Ass'n v. City of N.Y.*, 883 F.3d 45 (2d Cir. 2018), following *Heller*, there is a "two-step inquiry" for "determining the constitutionality of firearm restrictions."  *Id.*, at 55 (omits internal quotations).  First, the court "determine[s] whether the challenged legislation impinges upon conduct protected by the Second Amendment," and second, if the court "conclude[s] that the statute[] impinge[s] upon Second Amendment rights, [the court] must next determine and apply the appropriate level of scrutiny."

*Id.* (omits internal quotations).  When it comes to Tasers, though, this Court should conclude that the challenged legislation does not even impinge upon conduct protected by the Second Amendment, and thus this Court should not even get to the second step in the Second Circuit's analysis.

On this point it is critical to note that the *Heller* Court struck down the handgun ban at issue in that case because it "amount[ed] to a prohibition of an entire class of 'arms' that is ***overwhelmingly*** *chosen by American society*" for the "lawful purpose" of self-defense in the home, "where the need for defense of self, family, and property is most acute." *Heller,* at 628 (emphasis added). Stated differently, while "the Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding", *id.*, at 582, there is no prima facie case when the weapon is not one "in common use at the time," "possessed at home," and for "lawful purposes like self-defense." *Id.* at 627, 624.

For this reason, the Second Circuit has held that "[t]he Second Amendment protects ***only*** 'the sorts of weapons' that are (1) '***in common use***' *and* (2) '***typically possessed*** by law-abiding citizens for lawful purposes.'" *N.Y. State Rifle*, 804 F.3d at 254-255 (emphasis added). And, following this same line of thought, in *Maloney v. Singas*, 106 F. Supp. 3d 300, 310 (E.D.N.Y. 2015), a district court previously held that this means that "there is a separate and distinct requirement that a weapon be 'in common use at the time' in order to be protected by the Second Amendment." *Id.*, at 310 (citing *Heller*, 554 U.S. at 627). "[T]o reiterate," the *Maloney* district court went on to properly state, "the weapon at issue must be 'in common use' *and* its common use must be a lawful one." *Maloney*, at 310 (emphasis in the original).  When it comes to Tasers, this is the key point of law that the Court needs to apply, and it means that there is no Second Amendment violation because Tasers are not "in common use" today.

In *N.Y. State Rifle*, the court reviewed gun-control legislation by the New York and Connecticut legislatures prohibiting the possession of certain semi-automatic assault weapons and large-capacity magazines.  *Id*., at 247.  In addressing the issue of whether those weapons were "in common use," the court examined statistics advanced by the parties that asserted there were between *four million* and *seven million* such assault weapons in general use by the public across the Nation.  *Id*., at 255.  Looking to these high numbers, the Second Circuit concluded, "[t]his much is clear: Americans own *millions* of the firearms that the challenged legislation prohibits."  *Id*. (emphasis).  Based upon this fact, that is, that *millions* of such firearms were held across the country, the Second Circuit assumed for the sake of argument that those weapons were indeed "in common use."  *Id*., at 257 ("In the absence of clearer guidance from the Supreme Court or stronger evidence in the record, we …. assume for the sake of argument that these 'commonly used' weapons and magazines are also "typically possessed by law-abiding citizens for lawful purposes.").  This is not the case with Tasers, though.

Here, plaintiff can only show that about 300,000 Tasers are in use by civilians in the entire United States.  Brave Decl., p. 2, ¶ 3.  This figure for Tasers is markedly different from the "*millions*" of firearms that were at issue in *N.Y. State Rifle*.  Indeed, this figure is closer to the figure that was addressed by the Fifth Circuit in *Hollis v. Lynch*, 827 F.3d 436 (5th Cir. 2016).  There, the Fifth Circuit found that a machinegun was an *unusual* weapon because one ATF statistic indicated that there were only "175,977 pre-1986 civilian-owned machineguns in existence", and, thus, because of that, the circuit court concluded, "Hollis does not have the numbers to support his [Second Amendment] claims."  *Id*., at 449-50.  The same is true here.  And this is especially so in light of the fact that in *Friedman v. City of Highland Park*, 784 F.3d 406 (7th Cir. 2015), the Seventh Circuit determined that AR-15s were not in common use, and it cited the fact that only "9 % of the nation's firearms owners have assault weapons."  *Id*., at 409.

12

In this instance, *only about 0.09 % of the entire 325,000,000 civilian population in the U.S. owns a Taser*.  That has got to be the epitome of when a weapon is *not* "in common use" and when it is *not* "*typically possessed* by law-abiding citizens".  This is especially so when compared to the fact that, "[i]n 2017, about 42 percent of U.S. households had at least one gun in possession."[4]  Handguns, rifles and shotguns are "in common use" today; Tasers quite simply are not.  Indeed, there is no court in the United States that has ever found that a weapon is "in common use" based upon the fact that there are 300,000 of them found in the Nation, or that less than 1 % of the population owns that weapon.  This Court should not be the first one to do so. To the contrary, this Court should find that "in common use" means what it says.[5]

Thus, when it comes to his Taser Second Amendment claim, plaintiff "does not have the numbers to support" that claim.  *Hollis*, at 450.  And it must be dismissed as a result because the Second Amendment *is not even implicated* by New York's "electronic dart gun" ban found at N.Y. Penal Law §§ 265.01 and 265.00(15-a).

---

[4] https://www.statista.com/statistics/249740/percentage-of-households-in-the-united-states-owning-a-firearm/

[5] Quite interestingly, a discussion of what the phrase "in common use" from *Heller* means was recently had on September 5, 2018 during the confirmation hearings of Judge Brett M. Kavanaugh.  Under questioning by Sen. Dianne Feinstein, Judge Kavanaugh asserted that, under *Heller*, semi-automatic rifles are "widely possessed in the United States" because "there are millions and millions and millions of semi-automatic rifles that are possessed, so that seemed to fit 'common use' and not being a 'dangerous and unusual' weapon."  (Notably, Judge Kavanaugh also asserted that "all weapons are dangerous.")  *See* https://www.youtube.com/watch?v=FFC1-PvSe14.  Applying that same numerical logic here, which is similar to the logic used by the Second Circuit in *N.Y. State Rifle*, it would seem that when there is a weapon that has only 300,000 sold and possessed in the entire United States – not "millions and millions and millions" sold and possessed – that does not meet the "in common use" test of *Heller*.

<u>Point II</u>

**Even assuming that stun guns are "in common use" across the United States, New York's stun gun ban does not violate the Second Amendment because plaintiff has numerous other "adequate alternatives" in order to protect his home, including handguns, rifles, and shotguns – that can be loaded with lethal *and less-lethal ammunition* – in addition to other items, such as pepper spray.**

Although plaintiff has obtained evidence that there are *millions* of stun guns that have been purchased by civilians in the United States over the past decade,[6] plaintiff's Second Amendment claim as it relates to stun guns is still without merit, even assuming for the sake of argument that stun guns are in fact "in common use" today.

Importantly, in this Court's decision on the plaintiff's preliminary injunction motion, the Court properly suggested that, when there are a "myriad other non-lethal or less-lethal devices that exist for in-home self-defense purposes", it is "hard to conclude … that the stun gun ban effectively disarms individuals or substantially affects their ability to defend themselves." Dkt. No. 38, p. 15 (citing *N.Y. State Rifle*, 804 F.3d at 260).

This point is vital here because the Second Circuit has repeatedly found, as it did in *Decastro*, that a "law that regulates the availability of firearms is *not a substantial burden on the right to keep and bear arms if **adequate alternatives** remain for law-abiding citizens to acquire a firearm for self-defense*." *United States v. Decastro*, 682 F.3d 160, 168 (2d Cir. 2012) (emphasis added). Similarly, in *N.Y. State Rifle*, the Second Circuit underscored this point by stating that "[n]o substantial burden exists … if **adequate alternatives** remain for law-abiding citizens to acquire a firearm for self-defense." 804 F.3d at 259 (internal quotation marks omitted) (emphasis added). And finally, most recently just this year, in *N.Y. State Rifle & Pistol Ass'n v. City of N.Y.*, 883 F.3d at 60, the Second Circuit reiterated this same point by quoting the same

---

[6] *See* Dkt. No. 52-1, ¶ 11.

language from *Decastro* that is quoted above, and then it cited a case from the Ninth Circuit that made the same point that the Second Circuit had made in *Decastro*: "[W]hen deciding whether a restriction on gun sales substantially burdens Second Amendment rights, we should ask whether the restriction leaves law-abiding citizens with *reasonable alternative means for obtaining firearms sufficient for self-defense purposes.*"  *Nordyke v. King*, 644 F.3d 776, 787 (9th Cir. 2011), aff'd. en banc, 681 F.3d 1041 (9th Cir. 2012) (emphasis added).

This simple rule of law is quite plainly dispositive here because plaintiff has "adequate alternatives" at his disposal – that is, handguns, rifles, and shotguns – all of which can be lawfully purchased by him to protect his home.  Indeed, plaintiff presently owns three (3) rifles and a .12 gauge, pump-action shotgun.  Avitabile Depo., pp. 13-14.  And if plaintiff still wants a "less lethal" form of self-defense for his home, he can load these same types of firearms with effective *less-lethal ammunition*. *See* Avitabile Deposition, pp. 29-30, Exhibit B (two videos showing the demonstration of the use of less-lethal ammunition).  This less-lethal ammunition includes .12 gauge shotgun shells that shoot large rubber pellets or even beanbags at a potential home intruder.  *Id*., Exhibits A and C. And, if plaintiff wants to use a handgun, less-lethal rubber bullets can similarly be loaded into handguns.  *Id*., p. 52.[7]  Furthermore, if plaintiff does not prefer that form of less-lethal self-defense, he still has access to items like pepper spray, which are also effective and can be lawfully purchased in New York State.  *See* Trooper Philip Shappy Decl., ¶¶ 18-21.

Thus, under the rule of law set forth by the Second Circuit in (a) *Decastro*, (b) *N.Y. State Rifle*, and (c) *N.Y. State Rifle & Pistol Ass'n v. City of N.Y.*, these "adequate alternatives"

---

[7]    https://www.conceptsinammunition.com/Pistol_Products/40cal.htm    ("Our 40 caliber Rubber Ammunition is a specially designed composite that packs a punch on any assailant, with less chance of penetrating walls and interior doors subjecting innocent people to what could be catastrophic injury or death.").

necessarily mean that plaintiff's Second Amendment rights have not been substantially burdened as relates to stun guns. (And this would also be the circumstance with regard to Tasers, if the Court were to determine that Tasers are "in common use", even though there are only 300,000 of them – not millions – in use by civilians throughout the United States.)

As this Court noted in its decision on the plaintiff's preliminary injunction motion, the Second Circuit has held that, under these types of circumstances, courts within this Circuit need only apply intermediate scrutiny even to those laws found to implicate the Second Amendment. *See* Dkt. No. 38, p. 12 ("[T]he Second Circuit concluded intermediate scrutiny was appropriate where the gun-control legislation at issue left open numerous alternative ways for a citizen to lawfully acquire and possess a weapon for self-defense.") (citing *N.Y. Rifle*, 804 F.3d at 260). *See also Mishtaku v. Espada*, 669 Fed. Appx. 35, 35-36 (2d Cir. 2016) ("We apply intermediate scrutiny to laws implicating the Second Amendment.") (omits internal quotation); *Decastro*, 682 F.3d at 166 ("Given *Heller*'s emphasis on the weight of the burden imposed by the D.C. gun laws, we do not read the case to mandate that any marginal, incremental *or even appreciable restraint* on the right to keep and bear arms be subject to heightened scrutiny.") (emphasis added); *Maloney v. Singas*, 106 F. Supp. 3d at 311 ("a majority of courts have applied intermediate scrutiny to general challenges under the Second Amendment, even when reviewing statutes or laws that may restrict the possession of [weapons] in the home") (internal quotations omitted); *United States v. Laurent*, 861 F. Supp. 2d 71, 101 (E.D.N.Y. 2011) ("most courts of appeals have found that regulations which substantially burden the right to keep and to bear arms for the purpose of self-defense should receive intermediate scrutiny").

And since strict scrutiny does not apply to the ban of stun guns, and intermediate scrutiny does, that means that "New York's law need only be substantially related to the state's important public safety interest" and a "perfect fit between the means and the governmental objective is not

required." *Kachalsky*, 701 F.3d at 98. Thus, in the Second Circuit, under this intermediate scrutiny test, "a regulation that burdens a plaintiff's Second Amendment rights passes constitutional muster if it is substantially related to the achievement of an important governmental interest." *Kwong v. Bloomberg*, 723 F.3d 160, 168 (2d Cir. 2013). On this point, it is beyond cavil that "New York has substantial, indeed compelling, governmental interests in public safety and crime prevention." *Id*. (omits internal quotations).

In this regard, the Legislature of New York has simply acted within this time-worn historical tradition in order to protect its citizens from a weapon that it considers to be "dangerous" to public safety. And, even considering plaintiff's expert witness evidence to the contrary, this determination certainly has a sufficiently sound basis in law. *See, e.g., United States v. Agron*, 921 F.2d 25 (2d Cir. 1990) (holding that the stun gun that defendant possessed during the commission of underlying drug offense caused a physical impairment consonant with serious bodily injury, so his sentence was properly enhanced under the United States Sentencing Guidelines' "dangerous weapon" provision); *United States v. Wallace*, 800 F.2d 1509, 1513 (9th Cir. 1986) (holding that a stun gun is a "dangerous weapon" under Federal Aviation Act of 1958, § 902(l), 49 U.S.C. § 1472 (L)), cert. denied, 481 U.S. 1019 (1987)); *United States v. Quiver*, 805 F.3d 1269, 1272 (10th Cir. 2015) ("As the burn marks to [the police officer's] thigh show, a Taser in drive-stun mode is capable of causing serious bodily injury if applied to a sensitive spot, for instance, an eye.")[8]; *Gordon v. Runyon*, 1994 U.S. Dist. LEXIS 4959 (E.D. Pa. 1994) ("case law suggests that stun guns are inherently dangerous").

In fact, in *People v. MacCary*, 173 A.D.2d 646 (2d Dep't 1991), a New York Appellate Division court held as follows:

---

[8] Notably, Exhibit D of the Declaration of Trooper Philip Shappy shows several photographs of Tasers "drive-stun marks."

> Evidence was adduced at the trial to the effect that a stun gun, if applied to the body for a sufficient period of time, could cause serious or protracted disfigurement, substantial pain and burns to the body and, if applied to the eye, loss or impairment of the functioning of the eye.  Additionally, evidence was adduced at the trial that, while the defendant restrained the complainant, the defendant's accomplice applied the stun gun several times to the complainant's body for several seconds during each application and that extreme pain, severe skin lesions and 'significant' burns were thereby caused.  There was an ample basis upon which the jury could reasonably conclude that a stun gun, as used herein, was a dangerous instrument.

*People v. MacCary*, 173 A.D.2d at 647.  *See also State v. Geier*, 484 N.W.2d 167, 171 (Iowa 1992) ("many courts as well as legislatures have deemed it appropriate to characterize stun guns as dangerous or deadly weapons"); *State v. Smith*, 2014 Ohio App. LEXIS 4219, **14 (Ct. of App. Ohio September 30, 2014) ("We note that many courts, as well as legislatures, have deemed it appropriate to characterize stun guns as dangerous or deadly weapons, possible of inflicting substantial physical injury.").

Because "New York has substantial, indeed compelling, governmental interests in public safety and crime prevention", *Kwong*, 723 F.3d at 168 (omits internal quotations), and because stun guns are inherently dangerous under both Second Circuit and New York State case law – as well as other legal precedent throughout the Nation – there is no doubt that the New York Legislature was properly permitted to ban stun guns in order to advance its laudable public safety goals.  Thus, plaintiff's Second Amendment challenge to the stun gun ban fails as a matter of law.[9]

---

[9] Again, even if the Court were to conclude that Tasers are "in common use" today, despite the fact that there are only 300,000 in use in the United States, plaintiff still would not be able show a Second Amendment violation here.  Despite plaintiff's insistence that Taser's are a non-lethal means of self-defense, that is plainly *not always true*.  In fact, Axon itself warns of the risks of serious injury and death associated with the use of its products.  *See Williams v. City of Cleveland*, 736 F.3d 684, 687 (5th Cir. 2013) ("Taser's product warnings explicitly and repeatedly warned of the risks of serious injury and death ...").  The Axon warnings in evidence in this case show that this is still true.  In fact, in an SEC Form 10-K filing, Axon admitted the following: "Our CEW [Taser] products are often used in aggressive confrontations that may result in **serious, permanent bodily injury or death to those involved. Our CEW products may be associated with these injuries.**"  Avitabile Depo., Exhibit D and E;

As the Second Circuit recognized in *Kachalsky*, "[i]n the context of firearm regulation, the legislature is far better equipped than the judiciary to make sensitive public policy judgments (within constitutional limits) concerning the dangers in carrying firearms and the manner to combat those risks." *Kachalsky*, 701 F.3d at 97. *See also Kolbe*, 849 F.3d at 140 ("enacting the [gun ban at issue] is precisely the type of judgment that legislatures are allowed to make without second-guessing by a court"). That is true here, too.

## Conclusion

Based upon the above, summary judgment should be granted to Defendant Beach and plaintiff's sought-after relief of a permanent injunction against New York's Taser and stun gun ban should be denied by the Court.


Dated: Albany, New York
        September 9, 2018

                          BARBARA D. UNDERWOOD
                          Attorney General of the State of New York
                          *Attorney for Superintendent George P. Beach II,*
                          *Superintendent of the New York State Police*
                          The Capitol
                          Albany, NY 12224


                          s/ *Michael McCartin*
                          Michael G. McCartin
                          Assistant Attorney General
                          *Of Counsel*
                          Bar Roll No. 511158
                          (518) 776-2620
                          michael.mccartin@ag.ny.gov

---

https://perma.cc/Y3WY-SPKR (emphasis added). Further, Axon's Taser warnings for civilians plainly state that Tasers **"[c]an cause death or serious injury**." McCartin Decl., Exhibit 4, p. 1 (emphasis added). Thus, the intermediate level of scrutiny is met here as public policy allows for the banning of dangerous weapons, as long as "adequate alternatives" are permitted to protect the home.

TO:    Stephen D. Stamboulieh, Esq.
*Attorney for Plaintiff*
Stamboulieh Law, PLLC
P.O. Box 4008
Madison, MS 39130

Alan Alexander Beck, Esq.
*Attorney for Plaintiff*
Law Office of Alan Beck
4780 Governor Drive
San Diego, CA 92122