**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF NEW YORK**
**Albany Division**

| | |
|---|---|
| MATTHEW AVITABILE ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| **)** | |
| v. ) Civil Action No. 1:16-cv-1447 (DNH/CFH) | |
| ) | |
| LT. COL. GEORGE BEACH, in his ) | |
| Official capacity as Superintendent of the ) | |
| New York State Police ) | |
| ) | |
| Defendant. ) | |
| _____) | |

PLAINTIFF'S MEMORANDUM OF AUTHORITIES IN SUPPORT OF PLAINTIFF'S

OPPOSITION TO DEFENDANT'S CROSS MOTION FOR SUMMARY JUDGMENT AND

REPLY TO DEFENDANT'S RESPONSE TO PLAINTIFF'S

MOTION FOR SUMMARY JUDGMENT


/s Stephen D. Stamboulieh
Stamboulieh Law, PLLC              Alan Alexander Beck
P.O. Box 4008                      Law Office of Alan Beck
Madison, MS  39130                 4780 Governor Drive
(601) 852-3440                     San Diego, CA  92122
stephen@sdslaw.us                  (619) 905-9105
MS Bar No. 102784                  Alan.alexander.beck@gmail.com
NDNY Bar Roll# 520383              *Admitted pro hac vice
*Counsel for Plaintiff, Matthew Avitabile*

Dated: September 17, 2018

## TABLE OF CONTENTS

*Page*

I. Electric Arms are a Class of Arms..........................................................................1

II. The Defendant Failed to Present Evidence that Electric Arms are not "Typically Possessed by Law-Abiding Citizens for Lawful Purposes"…………...………….7

III. The Laws at Issue are not Long Standing………………………...……………7

IV. There is no Legitimate Adequate Alternative………………………..………….8

V. The Defendant has not Produced Evidence Needed to Survive Heightened Scrutiny……………………………………………………………………..………12

VI. Conclusion………………………………………………………………..…16

Certificate of Service……………………………………….…………………………17

The Defendant, Superintendent George P. Beach, II, as the Superintendent of the New York State Police, responded to Plaintiff's motion for summary judgment and filed his cross-motion for summary judgment. The Defendant essentially raised two points. The first point is that the Plaintiff does not have a Second Amendment right to possess a Taser because Taser's are not in "common use" in the United States. Defendant's second point is that even if this Court assumed stun guns (and Tasers) are in "common use", Plaintiff has "adequate alternatives" (including rifles, handguns and shotguns) and pepper spray. For the foregoing reasons, Defendant's positions are misguided, contrary to Supreme Court and this Circuit's precedent, and does not demonstrate that New York has justified its burden in banning electric arms.

The Defendant's position is foreclosed by Circuit precedent and conflicts with several other courts. In doing so, the Defendant has failed to address most of the authority raised by Plaintiff including the only two Courts to deal with the merits of the question presented to the Court. Further, the Defendant has failed to present any evidence that maintaining a ban on electric arms will enhance public safety. For the reasons stated below and in Plaintiff's motion for summary judgment, this Court should deny the Defendant's motion for summary judgement and grant Plaintiff motion and enjoin the State of New York's ban on both stun guns and electric dart guns.

I.    Electric Arms are a Class of Arms

Here, the Defendant sidesteps a preliminary question: what is a class? The Defendant appears to assume without argument that stun guns and Tasers are two separate classes of arms. The handgun at issue in *District of Columbia v. Heller*, 554 U.S. 570 (2008), was a High Standard 9-shot revolver in .22 with a 9.5" Buntline-style barrel. The Court did not analyze whether this brand of handgun is in common use. Nor did it analyze whether revolvers are in common use. Rather it broadly found handguns are a "class" of arms despite their being differences between

1

various types of handguns in both form and function. And further, the handgun as a class receives Second Amendment protection because handguns are in common use for lawful purposes.

Similarly, electric arms are also a class of arms. While there are functional differences between an electronic dart gun and a stun gun, these differences do not make them more dissimilar than a revolver and a semi-automatic handgun. And both types of handguns (revolvers and semi-automatic handguns) are included in the class of handguns. An electronic dart gun and a stun gun both have the same basic function which is to utilize an electronic charge to incapacitate an attacker. Furthermore, a Taser can be used in both "electronic dart gun" mode and "drive-stun" mode. A Taser in "drive-stun" mode is functionally identical to a stun gun.[1] As such, both are included in the same class of arms: electric arms. The Defendant makes no argument as to why they should be separated into distinct sub-classes and thus, this Court should apply the combined number of 300,000 Tasers and 4,478,330 stun guns (totaling 4,778,330) to find that these arms, as a part of the same class, are protected by the Second Amendment.

Even if this Court were to find that electronic dart guns and electronic stun guns operate as two independent classes of arms, this Court should find both are in common use. Tasers are only a brand of electronic dart guns and the State has presented no evidence that electronic dart guns as a class are not in common use. In addition, as stated previously, a Taser in drive-stun mode is functionally an "ordinary stun gun." As argued in Plaintiff's motion for summary judgment per Circuit precedent, the burden is on the Defendant to demonstrate that electric dart guns are not in common use. The State appears to concede that stun guns are in common use, so Plaintiff will not belabor this point and will instead focus on electronic dart guns.

---

[1] See Affidavit of Trooper Shappy [Docket No. 58-12], ¶ 14. "In drive-stun mode, a Taser operates similar to an ordinary stun gun…"

2

The Defendant cites to *Maloney v. Singas*, 106 F. Supp. 3d 300, 310 (E.D.N.Y. 2015) which was an order denying summary judgement to both parties to support its contention that Tasers are not in common use. However, it ignores the fact two years later the Maloney Court ruled in *Maloney v. Singas*, No. 03-CV-786 (PKC) (AYS), (E.D.N.Y. Jul. 23, 2017) (unpublished) (attached as Exhibit "A") in deciding a trial in that case:

> … because of the Second Amendment right at issue, Defendant must meet its initial burden of presenting evidence to rebut the presumption that the Second Amendment covers nunchakus. *See NYSPRA*, 804 F.3d at 257 n.73; Fed. R. Evid. 301.
>
> Even assuming arguendo that the rules of evidence are abandoned and Defendant was allowed to utilize evidence submitted by Plaintiff, Defendant cannot succeed in rebutting the presumption. The evidence Plaintiff relied on, in his attempt to establish that nunchakus are commonly used for legal purposes, consists of manufacturing and sales data of nunchakus by Asian World of Martial Arts, Inc. ("AWMA")—a small closely held family-operated company—and a martial arts teacher's testimony estimating the number of martial arts studios that teach nunchakus. (See Dkt. No. 182, Tr. 355:5 (Testimony of AWMA's representative); Dkt. No. 181, Tr. 282:13– 283:2 (Testimony of Chris Pellitteri).) The manufacturing and sales data introduced by Plaintiff cannot be used by Defendant to demonstrate that nunchakus are not in common use because there is no evidence that AWMA's manufacturing and sales data reliably encompasses the majority of, let alone all of, the nunchakus used or possessed in the United States. In other words, there is no evidence that other nunchakus manufacturers or sellers do not exist. *Id*. at *5-6.

Here, Defendant cannot rely on the manufacturing and sales data submitted by Plaintiff to argue that electronic dart guns are <u>not</u> in common use for the same reasons held by Judge Chen in *Maloney*. The burden is on the Defendant to produce evidence which would rebut the presumption that the Second Amendment applies to an electronic dart gun. While Taser is a popular brand of electronic dart gun, there are other companies that produce electronic dart guns. PhaZZer

3

Electronics appears to be Taser's leading U.S. competitor. There are also other companies around the world that appear to ship their electronic dart guns to the U.S. [2]

As Judge Chen stated in *Maloney*, the burden is on the Defendant to put forth his own evidence to prove that electronic dart guns are not in common use. Defendant attempts to use the United States' "325,000,000 civilian population" as a backdrop for his calculation that "only about 0.09%" of the civilian population owns a Taser.  See Defendant's Motion, p. 13.  This is inaccurate because Defendant has failed to take into account that New York, Rhode Island and Hawaii all ban electric arms; both stun guns and Tasers. Further, New Jersey, Washington, D.C. and a host of other counties/municipalities have only just <u>recently</u> rescinded their respective electric arms bans. But in attempt to provide a better statistical inquiry, Plaintiff would show as follows using data that is judicially noticeable found at the United States Census webpage: https://www2.census.gov/programs-surveys/popest/tables/2010-2017/state/totals/nst-est2017-01.xlsx (State Population Totals and Components of Change: 2010-2017).

In 2017, New York is shown to have approximately 19,849,339 citizens who are banned from owning or possessing electric arms. Rhode Island shows approximately 1,059,639 citizens who are banned from owning or possessing electric arms.  Hawaii shows approximately 1,427,538 citizens that are banned from owning or possessing electric arms.  Combining these numbers totals

---

[2] A review of google using the search term "shooting stun guns" and "dart firing stun guns" demonstrates that there are many more companies that sell electronic dart guns. Listed below is not a comprehensive list, but instead a few electronic dart guns sold by other companies. E.g. the PhaZZer® Dragon Shooting Stun Gun Black 80Khttps://www.thehomesecuritysuperstore.com/self-defense-stun-guns-low-voltage-stun-guns-phazzer-dragon-shooting-stun-gun-855700001-dblk-p=3964 https://www.thehomesecuritysuperstore.com/self-defense-stun-guns-shooting-stun-guns-sub=252 The SYRD-5M https://bailongan.en.made-in-china.com/product/GBRxpgSjgNcm/China-High-Quality-Shooting-Self-Defence-Taser-Stun-Guns-SYRD-5M-.html ; The Red Devil http://www.russianstungun.com/item/Taser-Stun-Gun-PDG-S5-RED-DEVIL;  https://bntonline.co.za/shop/shoot-out-taser/

approximately 22.3 million citizens who should be excluded from Defendant's calculations and further, Defendant's calculation should include the total number of electric arms. In doing so, the Defendant's calculation would materially change as follows. Utilizing a total population of 302,663,484 and the bare minimum of electric arms Plaintiff has proven to be in use in the United States, approximately 1.47% utilize electric arms in the United States. While handguns may far outnumber the percentage of electric arms in circulation, the fact, as Justice Alito, with whom Justice Thomas joined, stated, "[w]hile less popular than handguns, stun guns are widely owned and accepted as a legitimate means of self-defense across the country. Massachusetts' categorical ban of such weapons therefore violates the Second Amendment." *Caetano v. Massachusetts*, 136 S. Ct. 1027, 1032-33 (2016) (Alito, J. Concurring). Further, both current Justices agreed that "people may have reservations about using deadly force, whether for moral, religious, or emotional reasons…" and were "not prepared to say that a State may force an individual to choose between exercising that right and following her conscience, at least where both can be accommodated by a weapon already in widespread use across the Nation." *Id*.at 1033.

But even if the Court were to assume that there are only three-hundred thousand electronic dart guns in private hands, they are in still common use. Even though Defendant states that "there is no court in the United States that has ever found that a weapon is 'in common use' based upon the fact that there are 300,000 of them found in the Nation", this assertion is incorrect. See Defendant's Motion, p. 13.[3] In fact, this is the position taken by the only two Courts to grapple with this issue despite being presented with a smaller number of arms. Strangely, the Defendant

---

[3] In a strange footnote, Defendant cites to Judge Kavanaugh's confirmation hearing testimony where the Judge answered a question posed by Senator Dianne Feinstein about semi-automatic rifles. It is curious that Defendant states that *Caetano* can be largely cast aside yet somehow believes that confirmation hearings of a potential Supreme Court Justice should be given more weight than two sitting United States Supreme Court Justices' concurrence…

does not cite to either of these cases despite Plaintiff citing to them in his principle brief. In *People v. Yanna*, 824 N.W.2d 241 (Mich. Ct. App. 2012) the Court held:

> [t]he prosecution also argues that tasers and stun guns "unusual" or rare weapons. However, they are legal in forty-three states, and in Michigan are routinely used by law enforcement officers. They have been in use for several decades. Though far less prevalent than handguns, we do not think that stun guns or tasers may be fairly labeled as unusual weapons. *Id.*

This was followed by *Ramirez v. Commonwealth* No. SJC-12340, 2018 Mass. LEXIS 237 (Apr. 17, 2018) which struck Massachusetts' ban on Tasers and stun guns. The Defendant does cite to *Hollis v. Lynch*, 827 F.3d 436 (5th Cir. 2016) for the proposition that electric arms are not in common use.  However, the Defendant ignores the relevant portion of *Hollis* which expressly distinguishes *Caetano*:

> [m]ore recently, two Supreme Court justices observed that the "relevant statistic" involves the counting of jurisdictions. In addressing whether stun guns are in common use, Justice Alito, joined by Justice Thomas, implied that the number of states that allow or bar a particular weapon is important: [T]he number of Tasers and stun guns is dwarfed by the number of firearms. This observation may be true, but it is beside the point. . . . The more relevant statistic is that [200,000] . . . stun guns have been sold to private citizens, who it appears may lawfully possess them in 45 States. . . . While less popular than handguns, stun guns are widely owned and accepted as a legitimate means of self-defense across the country. *Caetano*, 136 S. Ct. at 1032–33 (citations and quotation marks omitted). These two justices suggested that the 200,000 absolute number, plus that 45 states have "accepted [stun guns] as a legitimate means of self-defense," …. For purposes of the present case, we conclude it does not matter which set of numbers we adopt. None of them allow a conclusion that a machinegun is a usual weapon.

*Hollis'* application of *Ceatano* would be even stronger now, as the jurisdictions banning electric arms are even further reduced after litigation (New Jersey, the District of Columbia and a variety of municipalities/cities have had their bans overturned since *Caetano*, and only Rhode Island, Hawaii and New York ban electric arms).  Further, *Caetano* was limited in number to 200,000 stun guns and the numbers Plaintiff demonstrates establishes the minimum number of electric arms in civilian hands in the United States at almost 4.8 million.  Thus, this Court should

6

follow the lead of the cited courts and find that both stun guns and electronic dart guns are protected by the Second Amendment. If so, under any level of scrutiny this Court should rule in Plaintiff's favor because the Defendant has not presented evidence that banning electric arms enhances public safety.

> II. The Defendant Failed to Present Evidence that Electric Arms are not "Typically Possessed by Law-Abiding Citizens for Lawful Purposes"

The Defendant appears to conflate two different prongs of the *N.Y. State Rifle & Pistol Ass'n v. Cuomo* analysis. The Second Circuit held that "[t]he Second Amendment protects only 'the sorts of weapons' that are (1) 'in common use' and (2) 'typically possessed by law-abiding citizens for lawful purposes.'" *N.Y. State Rifle*, 804 F.3d at 254-255 (emphasis added). As shown above, the common use prong is at least in part a numerical analysis. That is not the case as to the second prong. It appears that once a bearable arm is deemed to be in common use, the burden again shifts to the Defendant to show an arms typical use is for unlawful purposes. *Id*. at 257 n.73. The Defendant has made no argument that of those electric arms that are owned, that their typical use is for anything other than lawful purposes.  Thus, this Court must find that electric arms survive this portion of the Second Circuit's test.

> III. The Laws at Issue are not Long Standing

In *District of Columbia v. Heller*, 554 U.S. 570 the Supreme Court made clear, "[N]othing in our opinion should be taken to cast doubt on longstanding prohibitions" *Id. at 626-27*; *see also McDonald, 561 U.S. at 786*. The electric arm laws challenged are not long standing. The laws were put in place in 1976 and 1990 respectively. *See* State Memorandum of Law in Support of Summary Judgement at 1. This cannot qualify to be longstanding because the law successfully challenged in *Heller* was the Firearms Control Regulations Act of 1975 which was enacted by the District of Columbia city council on September 24, 1976. *See McIntosh v. Washington*, 395 A. 2d 744, 746

7

(D.C. 1978)(Unsuccessful equal protection to the same law at issue in *Heller*). Laws signed the same year or later than the one at issue cannot qualify to be longstanding.

Further, in a recent Fifth Circuit Court of Appeals case, *Mance v. Sessions*, 896 F.3d 699 (5th Cir. 2018), the Fifth Circuit assumed without deciding that a law enacted in 1968 was not a "longstanding regulatory measure" and "not presumptively lawful regulatory measure[]." *Id*. at 704. Plaintiff addresses this because Defendant made a passing remark that there is a "four-decade ban against Tasers, as well as an almost three-decade ban against stun guns…" See Defendant's Cross-Motion, pp. 1-2. Defendant states that *Caetano* is of "*zero assistance*" (emphasis in original) and this Court can "largely lay *Caetano* aside", but this is incorrect. *Id*. at p.2. The Defendant is only correct in that the Supreme Court did not state that stun guns were protected by the Second Amendment in *Caetano*. However, it seems to strain credulity that the Supreme Court would go through all the trouble of granting *certiorari*, writing a unanimous per curiam opinion, and then remanding it back down to the lower court if stun guns were not protected by the Second Amendment. As such, while *Caetano* did not explicitly hold stun guns protected by the Second Amendment, it at least inferred constitutional protection and for that reason is not of "zero assistance" to this Court.

IV. There is no Legitimate Adequate Alternative

Defendant points to what he believes would be adequate alternatives to an electric arm. See Defendant's Motion, p. 15. Plaintiff has disposed with the argument regarding pepper spray as briefed in Plaintiff's Motion for Summary Judgment and Plaintiff incorporates his arguments and authorities responding to Defendant's argument in his brief regarding pepper spray. To put it simply, it is a watered-down version of what is available in other states and is inadequate.

8

But Defendant points to other alternatives. For instance, Defendant believes that "handguns, rifles and shotguns" are adequate alternatives and they can be loaded with "less lethal" ammunition if Plaintiff so desires. *Id.* Defendant's "evidence" of the less lethal ammunition was provided by way of two videos showing law enforcement shooting bean bag rounds and a bean bag sock round fired out of a twelve-gauge shotgun. First, a deadly weapon (shotgun, rifle, handgun) is not a serious adequate alternative to a less-than-lethal or non-lethal electric arm. This is because, as Trooper Shappy testified, if you point a handgun at a person, it would be considered deadly force. *See* Deposition of Trooper Shappy, Docket 52-4, 70:8-13. That then must also be true for a shotgun and a rifle. So, we are left with the proposition that Plaintiff's shotgun, even if loaded with a bean bag round, will still constitute deadly force.

It is true, as depicted in the videos Defendant placed into evidence, that law enforcement use bean bag rounds fired through dedicated firearms which are only used for non-lethal round purposes.[4] It also looks apparent that the bean bag rounds identified and fired in the video labeled "Toronto Police Chief Mark Saunders Demonstrates New Sock Gun" require hearing protection and eye protection when being fired. This makes sense because it is ammunition which uses an explosive to expel the projectile which would be expected to make some amount of noise. In order to demonstrate that ear and eye protection is used, Plaintiff has taken a screenshot directly from the video:

---

[4] The reason for the color variation is so that law enforcement officers do not mistakenly grab "lethal" firearms when reaching for "less lethal" loads, or mistakenly load "lethal" rounds into a specially colored shotgun, as happened in *William Kyle Monroe v. City of Portland, et al*, In the United States District Court for the District of Oregon, Civil Action No. 3:13-cv-00625-HA. In that case, Officer Dane Reister mistakenly loaded "lethal" rounds in his specially marked bean bag shotgun and shot the plaintiff.

9



Notice that the firearm being utilized is orange and that the law enforcement officer firing the weapon is wearing hearing protection.  In Defendant's exhibit attached to his Cross-Motion as Document 58-6 which lists various "12 Gauge Less Lethal", the warning on the front states that: "ALL LESS LETHAL AMMO HAS THE POTENTIAL TO BE FATAL. NEVER USE LESS LETHAL AMMO AS A JOKE OR A PRANK.  EVEN A BLANK HAS THE ABILITY TO HARM OR KILL."  The listing claims that some of the rounds cannot be shipped into New York.  But these are not legitimate adequate alternatives to a Taser or a stun gun.

For instance, the first listing on that same document, the Beehive, states that it has "38 6mm .12g balls come together to give you the power to protect yourself without the worry of imminent death…"  It looks very similar to buckshot and being fired out of a regular shotgun, one would assume that the pellets would spread accordingly.  Compare this with the case cited by Defendant on p. 17 of his Brief, *People v. MacCary*, 173 A.D.2d 646 (2d Dep't 1991), for the proposition that a stun gun is a dangerous instrument.  In that case, while there does not appear to include an allegation that the defendant used a stun gun on the person's eye, the court held that a

10

stun gun, if "applied to the eye, [would cause] loss or impairment of the functioning of the eye." Certainly, if one was shot with a bean bag round or a Beehive round to the eye, it would cause "loss or impairment of the functioning of the eye" as well.

Further, a shotgun or rifle, even loaded with a less-lethal round, is not as portable, maneuverable or concealable as a Taser or a stun gun. The Plaintiff testified that a Taser would be an effective tool to defend his home because "portability plays a large factor … even within one (sic) home – one's home, how much portability has to do with keeping yourself and … any potential family members safe." *See* Docket 52-3, Deposition of Matthew Avitabile, 18:15-22. As such, a shotgun with a bean bag round or plastic/rubber pellets is not an adequate alternative for Plaintiff.

And while this is not a handgun case, Defendant alleges in his brief that Plaintiff has an adequate alternative in a handgun. First, Plaintiff does not own a handgun and has never owned a handgun. *Id*. at 13:2-6. Plaintiff does not have a pistol permit which is required under New York law for him merely to possess a handgun in his home. Plaintiff testified that New York State "has made it, relative to the other states, onerous for an average person, law abiding individual, to purchase one, compared to the large majority of the states in the union." *Id*. at 35:9-14. As a matter of state law, New York forbids its residents to possess handguns in their homes without a license. N.Y. Penal Law §265.01. To exercise this core Second Amendment right, residents must apply for a license "to the licensing officer in the city or county … where [he or she] resides." *Id.* Further, Schoharie County, New York requires two applications, a residence in Schoharie County, be at least 21 years of age, and among other things, four character references who are residents of

Schoharie which cannot be the applicants relatives, related to each other or employees of any law enforcement agency -- just to apply for a pistol license.[5]

This application is simply to have a handgun in your residence. One would think that post-*Heller* and *McDonald*, this would not be necessary to exercise an enumerated right, yet this is what average citizens must do in order to merely possess a handgun within the confines of his or her own home in New York. In any event, Plaintiff does not have this permit and has no handgun, so this is not an adequate alternative. Further, Plaintiff would face the same safety issues if he were to mis-load lethal handgun ammunition into his handgun meant for non-lethal usage. Or, perhaps Plaintiff would be required to keep two handguns when he does not even have one: one to load non- or less-than-lethal ammunition and another to keep regular or "lethal" ammunition loaded. Both of those scenarios are inadequate and not an adequate alternative to having a Taser or a stun gun readily available to him.

    V.    <u>The Defendant has not Produced Evidence Needed to Survive Heightened Scrutiny</u>

As a preliminary matter, the Defendant has failed to respond to Plaintiff's argument that per Second Circuit precedent this Court should apply strict scrutiny. Plaintiff maintains that this is the correct level of scrutiny to apply. Further, the Defendant has made no argument defending the electric arms ban under strict scrutiny. Thus, if strict scrutiny applies the ban must be declared unconstitutional.

But even if intermediate scrutiny applies, the Defendant has not effectively defended the ban. Applying intermediate scrutiny, as the Second Circuit cautioned, "on intermediate scrutiny review, the state cannot 'get away with shoddy data or reasoning.' To survive intermediate scrutiny, the defendants must show 'reasonable inferences based on substantial evidence' that the

---

[5] http://www.schohariecounty-ny.gov/CountyWebSite/Sheriff/pistolpermits.html

statutes are substantially related to the governmental interest." *NYSR&PA*, 804 F.3d at 264 (citations omitted) (striking down New York State's 7-round magazine load limit).

The Defendant has not done that. The Defendant argues that New York has an interest in promoting public safety. There is no dispute there. Then it argues that electric arms can potentially be misused. Again, there is no dispute because as common sense would dictate, any item or tool has the potential to be misused in the wrong hands. But, where the argument fails to connect is that based on such a flimsy analysis, New York concludes that it can justify a complete prohibition on electric arm ownership because this <u>might</u> enhance public safety.

The Ninth Circuit has already rejected such cursory analysis in *Young v. Hawaii*, No. 12-17808, 2018 U.S. App. LEXIS 20525 (9th Cir. July 24, 2018). In *Young*, the Court first explained that:

> "Although we do 'accord substantial deference to the predictive judgments' of the legislature" when conducting intermediate scrutiny, "the [State] is not thereby 'insulated from meaningful judicial review.'" *Heller v. District of Columbia* (*Heller II*), 670 F.3d 1244, 1259 (D.C. Cir. 2011) (quoting *Turner II*, 520 U.S. at 195 & *Turner I*, 512 U.S. at 666). Quite the contrary, a court must determine whether the legislature has "base[d] its conclusions upon substantial evidence." *Turner II*, 520 U.S. at 196. Indeed, despite the deference owed, the State bears the burden "affirmatively [to] establish the reasonable fit we require." S*ee Bd. of Trs. of State Univ. of N.Y. v. Fox*, 492 U.S. 469, 480 (1989). *Id* at * 56.

Based on this standard, it later went on to explain that the evidence offered by the County and State of Hawaii to defend its ban on handgun carry was insufficient:

> [m]ere citation is an inadequate application of intermediate scrutiny, even according deference to the predictive judgment of a legislature, and *Turner Broadcasting* itself shows why. There, the Supreme Court extensively analyzed over the course of twenty pages the empirical evidence cited by the government, and only then concluded that the government's "policy [was] grounded on reasonable factual findings supported by evidence that is substantial for a legislative determination." *See Turner II*, 520 U.S. at 196–224. *Id* at * 57.

Here, the Defendant has failed to justify its position with evidence that banning electric arms will enhance public safety. The State of New York has been made aware of the need for

13

evidence by the Second Circuit in *N.Y. State Rifle & Pistol Ass'n v. Cuomo*, 804 F.3d 242 (2d Cir. 2015) ("New York has failed to present evidence that the mere existence of this load limit will convince any would-be malefactors to load magazines capable of holding ten rounds with only the permissible seven.")[footnote omitted]. *Id*. at 264.

      To be fair, Defendant did provide the Court with evidence of the legislative record when the bills were enacted with the electronic dart gun ban being enacted in 1976 and the stun gun ban enacted in 1990.  In 1976, Taser's were actually considered firearms by the federal government because it used an explosive charge to fire the barbs from the Taser itself which classified it as a firearm under the Gun Control Act of 1968.[6]  Beginning in the early 1990's, Taser removed the explosive charge and replaced it with compressed nitrogen and thus are no longer regulated as firearms.  Defendant's legislative history provides that New York originally wanted to ban the electronic dart gun, naming Taser as the "most popular" device being manufactured, because "it has already been used in holdups and robberies, and it is apparent that its use must be controlled." See Docket 58-2, p.4.   The "pertinent considerations" provided further that "the penal law must be amended to specifically outlaw their unregulated use." *Id*. at p. 5.  Then the proposed regulation becomes a total ban on possession. *Id*. at p. 7.  Then the New York State Police argued that the electronic dart guns may be used on them and "would leave him [or her] vulnerable to the loss of his [or her] service weapon." *Id*. at p. 8.

      Interestingly, Taser Systems, Incorporated, the manufacturer of Tasers at that time, commented after the Senate Bill was passed, that argument made in support of the ban was incorrect and that Tasers are "meaningfully less dangerous than any other self-defense weapon heretofore created." *Id*. at 15.  Besides Taser Systems, Incorporated, the Association of the Bar of

---

[6] https://www.atf.gov/firearms/docs/ruling/1976-6-tasers-firearms/download

the City of New York on Criminal Courts Law and Procedure disapproved of the Bill because it made "the mere possession of an electronic dart gun, without criminal intent, a crime equivalent to the unlicensed possession of a firearm." *Id*. at 17.  The Association also stated that: "[r]ecognizing the fact that large numbers of people in New York City possess illegal weapons, not with intent to commit crime but because of understandable fear, it would be at least a relative improvement if they would arm themselves with 'stun guns' as opposed to the firearms so many now possess." *Id*.  Eventually, instead of merely controlling its use, New York moved to ban the devices completely.

As to stun guns, in 1988 the issue came up about the misuse of a stun gun and they were banned in 1990. *See* Docket No. 58-3, p. 10.  Ironically, the reason for the rush to ban them is that an "Albany county worker shocked two girls with an electrical stun gun.  Police arrested Mark L. Rooney at his office at the Albany County Real Property Tax Service in mid-afternoon after two female workers complained that Rooney had given them shocks and burns on their hips and buttocks." *Id*.  Further, it states that the "stun gun delivers about 1200 volts of electricity, an amount which is painful, but not often too harmful." *Id*.  So, we are left with the proposition that stun guns were made illegal in New York because a government official misused a stun gun.  Twice.  Again, this ban proscribed mere possession of the device, even possession without criminal intent.

Given the paucity of evidence to support the electric arms ban, it fails intermediate scrutiny because there is no showing that the banning of electric arms will promote public safety.  Had New York regulated instead of banned these instruments, that would present a much different question.  Instead, New York has a categorical ban on an entire class of arms despite *Heller*'s admonition "… that the enshrinement of constitutional rights necessarily takes certain policy

15

choices off the table." *District of Columbia v. Heller*, 554 U.S. 570, 636, 128 S. Ct. 2783, 2822 (2008).

One simply has to return to *Caetano* for the proposition that electric arms are good tools for self-defense. Justice Alito's dissent recounts facts from Ms. Caetano's trial:

> After a "bad altercation" with an abusive boyfriend put her in the hospital, Jaime Caetano found herself homeless and "in fear for [her] life." Tr. 31, 38 (July 10, 2013). She obtained multiple restraining orders against her abuser, but they proved futile. So when a friend offered her a stun gun "for self-defense against [her] former boy friend," 470 Mass. 774, 776, 26 N.E.3d 688, 690 (2015), Caetano accepted the weapon.
>
> It is a good thing she did. One night after leaving work, Caetano found her ex-boyfriend "waiting for [her] outside." Tr. 35. He "started screaming" that she was "not gonna [expletive deleted] work at this place" any more because she "should be home with the kids" they had together. *Ibid.* Caetano's abuser towered over her by nearly a foot and outweighed her by close to 100 pounds. But she didn't need physical strength to protect herself. She stood her ground, displayed the stun gun, and announced: "I'm not gonna take this anymore. . . . I don't wanna have to [use the stun gun on] you, but if you don't leave me alone, I'm gonna have to." *Id.*, at 35-36. The gambit worked. The ex-boyfriend "got scared and he left [her] alone." *Id.*, at 36.

*Caetano v. Massachusetts*, 136 S. Ct. 1027, 1028 (2016) (Alito, J. Concurring). Thankfully, Ms. Caetano lived through her ordeal and Massachusetts' ban on stun guns has recently been struck down. New Yorker's deserve the same option to defend themselves.

### VI. Conclusion

Plaintiff respectfully asks this Court to deny Defendant's cross-motion for summary judgment and to grant Plaintiff's motion for summary judgment and permanently enjoin the State of New York's ban on electric arms.

Respectfully submitted, this the 17th day of September, 2018.

*/s/ Stephen D. Stamboulieh*
Stephen D. Stamboulieh

16

## Certificate of Service

     I, Stephen D. Stamboulieh, hereby certify that I have caused to be filed a true and correct copy of the foregoing document or pleading with the Court's ECF system, which generated a Notice and delivered a copy of same to all counsel of record.

Dated: September 17, 2018.

                                                   /s/ *Stephen D. Stamboulieh*
                                                   Counsel for Plaintiff