UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

MATTHEW AVITABILE,

                Plaintiff,

       -v-                            1:16-CV-1447

LT. COL. GEORGE BEACH, in his
official capacity as Superintendent
of the New York State Police,

                Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

APPEARANCES:                        OF COUNSEL:

ALAN A BECK LAW FIRM         ALAN ALEXANDER BECK, ESQ.
Attorneys for Plaintiff
2692 Harcourt Drive, San Diego, CA 92122

STAMBOULIEH LAW, PLLC       STEPHEN D. STAMBOULIEH, ESQ.
Attorneys for Plaintiff
P.O. Box 4008
Madison, MS 39130

HON. LETITIA A. JAMES          MICHAEL G. MCCARTIN, ESQ.
New York State Attorney General    Ass't Attorney General
Attorneys for Defendant
The Capitol
Albany, NY 12224

DAVID N. HURD
United States District Judge

## MEMORANDUM–DECISION and ORDER

## I. INTRODUCTION

     Plaintiff Matthew Avitabile ("Avitabile" or "plaintiff") filed this 42 U.S.C. § 1983

official-capacity action against defendant New York State Police Superintendent George

Beach (the "State" or "defendant") seeking a declaration that New York's total ban on the civilian possession of tasers and stun guns violates the Second Amendment.[1]

The parties have cross-moved for summary judgment under Federal Rule of Civil Procedure ("Rule") 56.  The motions are fully briefed and oral argument was heard on March 5, 2019, in Utica, New York.  Decision was reserved.

## II.  **BACKGROUND**[2]

Avitabile is an adult male resident of Schoharie County, New York who would like to purchase a taser for self-defense in his home, and would consider purchasing a stun gun for that purpose, too.  However, plaintiff has yet to purchase either device because he reasonably fears prosecution under New York Penal Law § 265.01(1), which criminalizes the civilian possession of any "electronic dart gun" or "electronic stun gun."

The penal law defines an "electronic dart gun" as "any device designed primarily as a weapon, the purpose of which is to momentarily stun, knock out or paralyze a person by passing an electrical shock to such person by means of a dart or projectile," § 265.00(15-a), and an "electronic stun gun" as "any device designed primarily as a weapon, the purpose of which is to stun, cause mental disorientation, knock out or paralyze a person by passing a high voltage electrical shock to such person," § 265.00(15-c).

Tasers and stun guns are just two examples of weapons that fall under the umbrella of "conducted electrical weapons" or "electronic control devices."  The sparse legislative history

---

[1]  A September 28, 2017 Memorandum–Decision and Order resolved pre-discovery motions, dismissed extraneous parties, and granted a gun violence prevention organization leave to participate as amicus.  Avitabile v. Beach, 277 F. Supp. 3d 326 (N.D.N.Y. 2017).

[2]  This background is drawn from the parties' statements of material facts, Dkt. Nos. 52-1, 58-18, the corresponding responses, Dkt. Nos. 58-17, 59-3, and a review of other relevant evidence in the record.

associated with New York's ban on these particular electric weapons reveals that each was added to the laundry list of devices criminalized by § 265.01 after their improper use caught the attention of state legislators.[3]

In 1976, state officials amended § 265.01 to prohibit the possession of "electronic dart guns," including the eponymous taser.[4]  Although these were relatively novel devices at the time, lawmakers expressed concern that tasers had "already been used in holdups and robberies."  The bill jacket for the amendment shows that the New York State Police supported the change, positing that "such weapon employed unsuspectingly on a police officer" would pose a dangerous situation.

In 1990, state officials amended the law again to add stun guns to the list.  This time, lawmakers justified the change by noting that these devices "have shown up across the State in a variety of confrontational circumstances."  In particular, though, the written materials repeatedly reference an incident in 1988 in which police arrested a county worker after he "shocked two fellow female co-workers with an electrical stun gun."  As before, various law enforcement organizations threw their support behind the expansion of the law, with at least one group insisting there was "no rational basis for permitting the possession of a stun gun."

Avitabile disagrees.  Plaintiff is a law-abiding citizen who has never been diagnosed with any form of mental illness.  Although he owns three rifles and a shotgun, and would use these firearms to defend himself if it ever became "absolutely necessary," plaintiff thinks that

---

[3]  Section 265.01(1)'s list of banned items includes everything from tasers and stun guns to switchblades, cane swords, brass knuckles, and slingshots.

[4]  "Taser" is actually a proprietary eponym for a brand of "electronic dart gun" popularized by TASER International, Inc. (now Axon).  The Court adopts the parties' use of "taser" as a convenient referent for "electronic dart gun" as that term is defined in the penal law.

lethal force should be a last resort.  Instead, plaintiff would like to arm himself with a

non-lethal weapon, and believes a taser is the most effective choice.  But doing so would be

unlawful under § 265.01(1), even if he just kept the weapon in his own home for self-defense.

## III.  <u>LEGAL STANDARD</u>

The entry of summary judgment is warranted when "the pleadings, depositions,

answers to interrogatories, and admissions on file, together with the affidavits, if any, show

that there is no genuine issue as to any material fact and that the moving party is entitled to a

judgment as a matter of law." <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986) (citing FED.

R. CIV. P. 56(c)).

A fact is "material" for purposes of this inquiry if it "might affect the outcome of the suit

under the governing law." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).  A

material fact is genuinely in dispute "if the evidence is such that a reasonable jury could

return a verdict for the nonmoving party." <u>Id</u>.

The movant bears the initial burden of demonstrating that there is no genuine issue of

material fact to be decided with respect to any essential element of the claim. <u>Jeffreys v. City

of N.Y.</u>, 426 F.3d 549, 553 (2d Cir. 2005).  If this initial burden is met, the opposing party

must show, through affidavits or otherwise, that there is a material issue of fact for

trial.  <u>Anderson</u>, 477 U.S. at 250.

Summary judgment is not appropriate if, after resolving all ambiguities and drawing all

factual inferences in favor of the nonmoving party, a review of the record reveals sufficient

evidence for a rational trier of fact to find in the non-movant's favor.  Treglia v. Town of Manlius, 313 F.3d 713, 719 (2d Cir. 2002).[5]

## IV.  DISCUSSION

Avitabile contends New York's complete ban on the civilian possession of tasers and stun guns must be invalidated because it burdens his Second Amendment right to acquire and possess these weapons for self-defense in his own home.  The State argues that tasers and stun guns are not entitled to protection under the Second Amendment.  Even if they were, defendant argues the blanket ban should nevertheless be upheld because rifles, handguns, shotguns, and even pepper spray are "adequate alternatives" to a taser or stun gun when it comes to civilian self-defense.

The Second Amendment provides:  "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed."  U.S. Const. amend. II.

In District of Columbia v. Heller, the Supreme Court held the Second Amendment "conferred an individual right to keep and bear arms" that "extends, *prima facie*, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding."  554 U.S. 570, 582, 595 (2008).  While "not unlimited," the right secured by the Second Amendment includes those weapons "in common use" that are "typically possessed by law-abiding citizens for lawful purposes."  Id. at 624-26.

---

[5]  Where, as here, the parties have cross-moved for summary judgment, a court "must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration."  Marcano v. City of Schenectady, 38 F. Supp. 3d 238, 246 (N.D.N.Y. 2014) (McAvoy, J.) (citation omitted).  In undertaking this analysis, a district court is not necessarily required to grant summary judgment in favor of either party.  See, e.g., Residential Mgmt. (N.Y.) Inc. v. Fed. Ins. Co., 884 F. Supp. 2d 3, 7 (E.D.N.Y. 2012).

As <u>Heller</u> explained, chief among those lawful purposes is the "the right of law-abiding, responsible citizens to use arms in defense of hearth and home." <u>Heller</u>, 554 U.S. at 635. Referring to a handgun as the "quintessential self-defense weapon," <u>Heller</u> invalidated a District of Columbia law that amounted to a "complete prohibition" on the possession of handguns in the home. <u>Id</u>. at 629.

Two years later, the Supreme Court invalidated a pair of municipal statutes that, like the law challenged in <u>Heller</u>, banned the possession of handguns in the home. <u>McDonald v. City of Chicago</u>, 561 U.S. 742 (2010). Although <u>McDonald</u> broke doctrinal ground by incorporating the Second Amendment against the states, it did not further develop the Second Amendment analysis first set out in <u>Heller</u>.

"Neither <u>Heller</u> nor <u>McDonald</u>, then, delineated the precise scope of the Second Amendment or the standards by which lower courts should assess the constitutionality of firearms restrictions." <u>N. Y. State Rifle & Pistol Ass'n, Inc. v. Cuomo</u>, 804 F.3d 242, 254 (2d Cir. 2015) ("<u>N.Y. State Rifle I</u>"); <u>see also</u> <u>Avitabile</u>, 277 F. Supp. 3d at 333 ("These two Supreme Court decisions managed to upset an entire area of constitutional law without offering much in the way of guidance to the lower courts.").

"Nevertheless, in an attempt to faithfully apply <u>Heller</u> and <u>McDonald</u>'s mandate, the Second Circuit has developed a two-step approach to assessing the constitutionality of firearm restrictions." <u>Avitabile</u>, 277 F. Supp. 3d at 333. "At the first step, a court must determine whether the regulated weapons fall within the protections of the Second Amendment." <u>Id</u>. at 333-34. "If so, it must then decide and apply the appropriate level of constitutional scrutiny." <u>Id</u>. at 334.

### 1. **Whether The Second Amendment Applies**

The Second Amendment applies to "the sorts of weapons" that are (a) "in common use" and (b) "typically possessed by law-abiding citizens for lawful purposes." Avitabile, 277 F. Supp. 3d at 333 (quoting N.Y. State Rifle I, 804 F.3d at 255).[6]  Importantly, though, Heller created "a rebuttable presumption that 'the Second Amendment extends, prima facie, to *all* instruments that constitute bearable arms, 'not just to a small subset.'" Maloney v. Singas, 351 F. Supp. 3d 222, 232 (E.D.N.Y. 2018) (quoting N.Y. State Rifle I, 804 F.3d at 255-56).

### a. **Common Use**

"[W]hat line separates 'common' from 'uncommon' ownership is something the [Supreme] Court did not say." Friedman v. City of Highland Park, Ill., 784 F.3d 406, 409 (7th Cir. 2015) (Easterbrook, J.).  However, the Second Circuit has stated that this "common use" requirement is based on "an objective and largely statistical inquiry." Avitabile, 277 F. Supp. 3d at 334 (quoting N.Y. State Rifle I, 804 F.3d at 255).  Indeed, "[e]very post-Heller case to grapple with whether a weapon is 'popular' enough to be considered 'in common use' has relied on statistical data of some form." Hollis v. Lynch, 827 F.3d 436, 449 (5th Cir. 2016).

For instance, in N.Y. State Rifle I, the plaintiffs challenging statewide bans on the possession of certain semi-automatic "assault weapons" sought to satisfy the "common use" element by showing that at least four million units of a single, particularly popular model of the weapon had been manufactured and sold.  804 F.3d at 255.  The laws' defenders tried to minimize the impact of this raw number by offering up a smaller, percentage-based

---

[6]  Although the latter component of this step requires that the use actually be lawful, that particular limitation need not be considered where, as here, the statute at issue is so broad in scope as to restrict mere possession regardless of purpose.  N.Y. State Rifle I, 804 F.3d at 255 n.52.

calculation, emphasizing that the assault weapons at issue represented only "about two percent of the nation's firearms."  Id.

Faced with these disputed figures, the Second Circuit concluded that, at a minimum, "Americans own millions of the firearms that the challenged legislation prohibits."  N.Y. State Rifle I, 804 F.3d at 255.  Rather than attempt to determine the matter with further precision, the Second Circuit instead "proceed[ed] on the assumption that [the laws at issue] ban weapons protected by the Second Amendment."  Id. at 257.

The Second Circuit has repeated this approach to the "common use" issue in a more recent Second Amendment case, purportedly on the basis that it was going to reject the constitutional challenge to the law anyway.  N. Y. State Rifle & Pistol Ass'n, Inc. v. City of N.Y., 883 F.3d 45, 55 (2d Cir. 2018) ("N.Y. State Rifle II") (skipping the first step in the analytical framework), cert. granted, 2019 WL 271961 (Jan. 22, 2019).

Lacking further guidance, trial courts have expressed frustration about the difficulty of meaningfully evaluating "common use."  For instance, a district court recently lamented that determining common use is a "virtual impossibility" and concluded that the "typical possession" prong must perform the more important gate-keeping function at the first step.  Maloney, 351 F. Supp. 3d at 233 n.25, 237 n.16; cf. Friedman, 784 F.3d at 409 ("[I]t would be absurd to say that the reason why a particular weapon can be banned is that there is a statute banning it, so that it isn't commonly owned.").

Yet despite the difficulty inherent in this task, the parties appear to have done their level best at appropriately developing the "common use" issue in discovery.  Avitabile solicited sales data from several electric arms companies, many of which were unwilling to provide it.  However, based on the limited data available, the parties agree there are at least

300,000 tasers and 4,478,330 stun guns owned by private citizens across the United States.  Plaintiff contends these stipulated figures are more than sufficient to establish that tasers and stun guns are a class of bearable arms that are in "common use" by private citizens across the country.

The State's position on this issue is more muddled.  In its cross-motion and opposition, defendant suggests that only stun guns, and not tasers, are in "common use."  Defendant analogizes the smaller number of tasers (300,000) to the relatively small number of civilian-owned machine guns that were sold prior to the 1986 federal ban on those weapons.  As defendant points out, the Fifth Circuit has suggested that the number of those particular weapons believed to exist (176,000) would probably be insufficient to establish their "common use."  See Hollis, 827 F.3d at 450 (refusing to undertake the analysis given the dearth of record evidence).

Avitabile rejects the premise implicit the State's assertion:  that tasers and stun guns are separable "classes" of arms for purposes of the Second Amendment.  Plaintiff argues that the Supreme Court in Heller did not try to parse out which particular types of handguns (e.g., revolvers or semi-automatics) were entitled to constitutional protection but rather spoke more broadly about handguns as a "class" of bearable arms.

Avitabile argues the same sort of conclusion is appropriate here.  Plaintiff emphasizes that tasers and stun guns have the same basic functionality; that is, both utilize an electric charge to incapacitate an attacker.  In fact, plaintiff argues, a taser operated in "drive-stun" mode is functionally identical to a stun gun.  According to plaintiff, these weapons are better understood as a single class of "electric arms" that, taken together, number in the millions.

In reply to this argument, the State reiterates its assertion that the 300,000 figure for tasers is insufficient to establish "common use" because that number almost certainly represents the entire domestic market.  According to defendant, Axon (formerly TASER) enjoys a virtual monopoly on the domestic sale of tasers.  However, defendant goes on to indicate that it is willing to concede for purposes of this motion practice that tasers *and* stun guns are both in "common use."

Even if the State were to refuse to make such a concession, Avitabile would still have the better of this argument.  Whether or not the parties' agreed-upon figure for tasers is closer to the ceiling or the floor when it comes to the number of electronic dart guns sold in this country, at least one other court has found the "common use" requirement satisfied with a substantially lower figure.  Maloney, 351 F. Supp. 3d at 237-38 (finding same as to metal and wood nunchakus where at least 64,890 were sold to private citizens).

And there has been no meaningful contrary evidentiary showing by the State, which ultimately "bears the burden of rebutting the 'prima facie presumption of Second Amendment protection' that extends to all bearable arms."  Maloney, 351 F. Supp. 3d at 233 (quoting Heller, 554 U.S. at 257 n.73).  Accordingly, both tasers and stun guns ("electric arms") are in "common use."

**b.  Typical Possession**

The next step is to determine whether New York's ban on tasers and stun guns "impinges on upon conduct protected by the Second Amendment."  Maloney, 351 F. Supp. 3d at 234.  Stated another way, the Second Amendment is implicated only if the law or regulation at issue affects a weapon that is "typically possessed by law-abiding citizens for lawful purposes."  N.Y. State Rifle I, 804 F.3d at 255.

Once again, "there is no defined analytical standard" for answering this question.  Maloney, 351 F. Supp. 3d at 234-35; N.Y. State Rifle I, 804 F.3d at 257 (citing approvingly of trial court's observation that "reliable empirical evidence of lawful possession for lawful purposes was elusive").  Instead, the Second Circuit has instructed courts "to look into both broad patterns of use and the subjective motives of [ ] owners."  N.Y. State Rifle I, 804 F.3d at 256.  "Looking solely at a weapon's association with crime, then, is insufficient."  Id.  Rather, a court should "consider more broadly whether the weapon is 'dangerous and unusual' in the hands of law-abiding citizens."  Id.

Avitabile argues that tasers and stun guns satisfy the "typical possession" requirement because unlike firearms, the "only purpose" of these devices is for self-defense.  The State, for its part, appears to focus its briefing at this step solely on the "common use" issue discussed above, and does not engage in any extended discussion about the analytically distinct "typical possession" component of the inquiry.

Upon review, the State has not offered a basis on which to rebut the presumption that tasers and stun guns, which are in common use, are typically possessed by law-abiding citizens for lawful purposes, such as self-defense.  See Maloney, 351 F. Supp. 3d at 235 ("Considering the scant evidence presented, the Court finds that Defendant has not met her burden to exclude nunchaku from the ambit of Second Amendment protection.").

As Avitabile points out, forty-seven states now permit the use and possession of electric arms with or without some form of attendant regulation.  In fairness, a quick survey of state and federal case law reveals that electric arms in these states (and in this state, for that matter) are sometimes used in connection with criminal activity.

But there is no indication that tasers or stun guns have some sort of "special propensity for unlawful use," Maloney, 351 F. Supp. 3d at 236, or that these arms are so "dangerous and unusual" that they fall entirely outside the scope of the Second Amendment.  See, e.g., United States v. Zaleski, 489 F. App'x 474, 475 (2d Cir. 2012) (summary order) (finding machine guns unprotected); United States v. Hatfield, 376 F. App'x 706, 707 (9th Cir. 2010) (memorandum) (finding a sawed-off shotgun to be a "dangerous and unusual weapon" unprotected by the Second Amendment); United States v. Tagg, 572 F.3d 1320 (11th Cir. 2009) (finding "pipe bombs" unprotected by the Second Amendment).

Other courts considering statewide bans on electric arms have reached the same conclusion.  For instance, in People v. Yanna, 824 N.W.2d 241 (Mich. Ct. App. 2012), the Court of Appeals of Michigan struck down the state's complete prohibition on the possession of tasers and stun guns because it infringed on the right of law-abiding private citizens to possess and carry these arms for self-defense.

In Yanna, the state argued stun guns were not suited for lawful defensive purposes because "they can easily be used for torturing someone tied to a chair or incapacitating an unsuspecting victim."  824 N.W.2d at 244.  The court rejected that argument, noting that "[o]ne could easily produce an even lengthier list of criminal cases involving handguns, but the Supreme Court has determined that handguns are within the ambit of the Second Amendment."  Id. at 244-45.

More recently, the Supreme Judicial Court of Massachusetts struck down the commonwealth's complete prohibition on the civilian possession of a stun gun.  Ramirez v. Commonwealth, 94 N.E.3d 809, 810 (Mass. 2018).  In Ramirez, the court recognized that

"stun guns, like handguns, are weapons that can injure or kill and, in the wrong hands, can be used for many unlawful or reckless purposes."  Id. at 816.

Nevertheless, the court in Ramirez determined that stun guns are weapons "typically possessed by law-abiding citizens for lawful purposes," and thus concluded that the current law barring "all civilians from possession or carrying stun guns, even in their home, is inconsistent with the Second Amendment."  94 N.E.3d at 815-16 (emphasis in original).

These and other precedents, viewed in conjunction with Avitabile's own evidentiary showing, are sufficient to demonstrate that tasers and stun guns are in common use and are typically possessed by law-abiding citizens for lawful purposes like self-defense.  Caetano v. Massachusetts, 136 S. Ct. 1027, 1033 (per curiam) (Alito, J., concurring) ("While less popular than handguns, stun guns are widely owned and accepted as a legitimate means of self-defense across the country.").  Accordingly, tasers and stun guns are protected by the Second Amendment.

### 2.  The Level of Constitutional Scrutiny

Having established that New York's ban precludes civilian access to arms protected by the Second Amendment, Avitabile contends the ban should be struck down as categorically unconstitutional, without resort to any level of scrutiny, just as the state courts in Michigan and Massachusetts have done.  If not, plaintiff argues that strict scrutiny should apply because § 265.01(1)'s ban on electric arms places a severe burden on the core of the Second Amendment; that is, the right to possess arms for self-defense in one's own home.

The State argues that no form of heightened scrutiny should apply because a law or regulation restricting access to certain weapons does not burden an individual's Second Amendment right if the challenged law leaves open "adequate alternatives."  According to

defendant, there are "adequate alternatives" for in-home self-defense available in New York, including "handguns, rifles, and shotguns" and even "pepper spray."

This is yet another area of the law left uncertain in the wake of Heller.  Compare, e.g., N.Y. State Rifle II, 883 F.3d at 55 (leaving open the possibility that "rational basis" review of Second Amendment challenge might be appropriate in certain circumstances), and United States v. Lahey, 967 F. Supp. 2d 731, 753 (S.D.N.Y. 2013) (finding statute triggered only rational scrutiny but nevertheless applying intermediate scrutiny), with Heller, 554 U.S. at 628 n.27 (appearing to reject any application of "rational basis" review in the Second Amendment context).

In a recent Second Amendment case, the Circuit explained that "[l]aws that place substantial burdens on core rights are examined using strict scrutiny," while "laws that place either insubstantial burdens on conduct at the core of the Second Amendment or substantial burdens on conduct outside the core of the Second Amendment (but nevertheless implicated by it) can be examined using intermediate scrutiny."  United States v. Jimenez, 895 F.3d 228, 234 (2d Cir. 2018) (collecting cases).

 In other words, in determining whether some form of heightened scrutiny should apply to a challenged regulation, the Second Circuit has instructed lower courts to consider:  (a) "how close the law comes to the core of the Second Amendment right" and (b) "the severity of the law's burden on the right."  N.Y. State Rifle II, 883 F.3d at 56 (quoting N.Y. State Rifle I, 804 F.3d at 258).

### a. The Core of the Right

As an initial matter, § 265.01(1)'s complete ban on the civilian possession and use of tasers and stun guns implicates Avitabile's core constitutional right as a law-abiding citizen to protect himself in his own home with a weapon commonly used for that purpose.

The State does not seriously argue otherwise.  Nor could it.  See, e.g., Jimenez, 895 F.3d at 234 ("It is clear from Heller and our decisions applying it that protecting onself in one's home with a weapon in common use is at the core of the Second Amendment."); N.Y. State Rifle II, 883 F.3d at 56 ("[A] statute can 'implicate the core of the Second Amendment's protections by extending into the home, where the need for defense of self, family and property is most acute.'"); Kachalsky v. Cty. of Westchester, 701 F.3d 81, 89 (2d Cir. 2012) ("Second Amendment guarantees are at their zenith within the home."); Lahey, 967 F. Supp. 2d at 753 ("[T]he home [is] situationally unique for Second Amendment purposes[.]").

Still, though, Avitabile has not established that these devices are "as popularly owned and used for self-defense as the handgun," which Heller called the "quintessential self-defense weapon."  N.Y. State Rifle I, 804 F.3d at 258.  So while the statue implicates Second Amendment rights, it does not do so to *precisely* the same degree as the handgun laws at issue in Heller and McDonald.  See id. (finding same where regulated items numbered in the "millions").

### b. The Severity of the Burden

The severity of the burden on Avitabile's Second Amendment right is the more hotly contested issue.  The State's principal argument is that § 265.01(1) is not a "substantial" or "severe" burden on plaintiff's right to possess electric arms because the law leaves open "adequate alternatives" for purposes of in-home self-defense.

In particular, the State argues Avitabile can use the shotgun and rifles he already owns or, if he finds those inadequate, he is welcome to purchase a handgun. Defendant further argues that if plaintiff has some legitimate objection to using lethal weapons, he can also purchase less-lethal ammunition or other non-lethal weapons, such as pepper spray.

The "adequate alternative" language cited by the State originates from United States v. Decastro, 682 F.3d 160 (2d Cir. 2012), a case in which the Second Circuit rejected a constitutional challenge to 18 U.S.C. § 922(a)(3), a federal criminal statute that made it unlawful for "anyone other than a licensed importer, manufacturer, dealer or collector [to] transport[ ] into his state of residence a firearm purchased or obtained outside the state." Id. at 162.

In Decastro, the defendant originally moved from Florida to New York to help run his step-father's dry cleaning business. 682 F.3d at 161. After a run-in with a customer at the business "escalated into a gang confrontation," a detective recommended that the defendant request a handgun license from the New York Police Department ("NYPD"). Id.

When an NYPD desk officer told him there was "no way" his handgun application would be approved, the defendant paid a visit to Florida, where he was already licensed to own a handgun. Decastro, 682 F.3d at 161. There, the defendant purchased two handguns from a dealer, falsely gave Florida as his state of residence, and then transported the weapons back to New York, where he kept at least one at the dry cleaning business for protection. Id. at 161-62.

On direct appeal from his criminal conviction for transporting the weapons back to New York, the defendant argued § 922(a)(3) ran afoul of the Second Amendment because "it infringes the core . . . right of law-abiding citizens to possess firearms for

self-defense."  Decastro, 682 F.3d at 164.  In rejecting the defendant's challenge, the Second Circuit drew from First Amendment jurisprudence, an area of law "to which Heller adverted repeatedly."  Id. at 167.

As the court explained, "[i]n evaluating the reasonableness of content-neutral time, place or manner regulations under the First Amendment, we ask whether the challenged regulation 'leave[s] open ample alternative channels for communication of the information.'"  Decastro, 682 F.3d at 167 (quoting Clark v. Cmty. for Creative Non–Violence, 468 U.S. 288, 293 (1984)).

Importing this concept into the Second Amendment context, the Decastro court reasoned that a "law that regulates the availability of firearms is not a substantial burden on the right to keep and bear arms if adequate alternatives remain for law-abiding citizens to acquire a firearm for self-defense."  682 F.3d at 168.

Section 922(a)(3) satisfied this "adequate alternative" requirement because it "does nothing to keep someone from purchasing a firearm in her home state."  Decastro, 682 F.3d at 168.  Rather, "[t]he evident purpose of the statue is to stop circumvention of state laws regulating gun possession; it does so by requiring state residents to comply with the conditions of sale and similar requirements in their home state."  Decastro, 682 F.3d at 168.  Thus, the court concluded, there remained "ample alternative means of acquiring firearms for self-defense purposes."  Id.

The State correctly points out that the Second Circuit has repeated this "adequate alternative" language in Second Amendment cases handed down since Decastro.  See, e.g., N.Y. State Rifle II, 883 F.3d at 56 ("The scope of the legislative restriction and the availability

of alternatives factor into our analysis of the degree to which the challenged law burdens the right.").

The State builds on this quoted language to argue that weapons such as handguns, shotguns, and rifles, whether loaded with normal rounds or less lethal ammunition like bean bags or rubber bullets, are all "adequate alternatives" for in-home self-defense.  Defendant also asserts that pepper spray, sometimes called self-defense spray, is an alternative weapon adequate for non-lethal self-defense.  According to defendant, the availability of these and other weapons means that the taser and stun gun ban is not a "substantial burden" on Avitabile's Second Amendment right.

But the State's reading of this "adequate alternative" language is far too broad and, if accepted, would lead to absurd results.  To begin with, the Second Circuit has used this language in the context of regulations imposed on some subset of arms (e.g., assault weapons), some restriction on functionality (e.g., magazine size), or some restriction on use outside the home (e.g., access to firing ranges), not to justify a more sweeping, class-wide ban on possession like the one at issue here.

For instance, in N.Y. State Rifle I, the Second Circuit rejected a constitutional challenge to New York and Connecticut's ban on "semiautomatic assault weapons."  804 F.3d at 260.  There, the court found that the states "have not banned an entire class of arms" but rather "only a limited subset of semiautomatic firearms."  Id.  The court therefore reasoned that "the fact that the statutes at issue do *not* ban 'an entire class of arms' makes the restrictions substantially less burdensome."  Id. (emphasis in original).

The same basic reasoning is present in N.Y. State Rifle II.  There, the Second Circuit rejected a constitutional challenge to a regulation that severely restricted the ability of

handgun owners licensed in New York City to transport those weapons elsewhere, such as to shooting ranges outside the City.  883 F.3d at 57.  The court concluded that the regulation left open "adequate alternatives" because it did not impose an "absolute limitation[ ] on the ability to engage in firearms training."  Id. at 60.  In particular, the court found that evidence in the record established the owners still had "sufficient opportunities to train with their firearms without violating the [regulation]."  Id.

This logic is echoed even more recently in Jimenez.  There, the Second Circuit concluded that a federal criminal statute prohibiting dishonorably discharged persons from possessing firearms or ammunition for any purpose "burdened substantially" the challenger's Second Amendment right.  Jimenez, 895 F.3d at 236.  This was so, the court held, because the law at issue left the defendant "*no* alternative means of doing so, let alone *adequate* alternatives."  Id. (emphasis in original).

The same could be said here.[7]  The statewide ban on civilian possession of tasers and stun guns is a functional ban on the entire class of these arms, not a small subset, and leaves open no permissible avenue for their possession or use.  The ban thus leaves Avitabile no means of possessing these weapons for self-defense, even in his own home.

The fact that other weapons exist in the world, and that those weapons might conceivably be used for self-defense, does not shield the State's blanket ban on these constitutionally protected arms from at least some measure of heightened scrutiny.  Heller, 554 U.S. at 629 ("It is no answer to say, as petitioners do, that it is permissible to ban the

_____

[7]  There is some reason to be skeptical of the State's entire approach.  Friedman v. City of Highland Park, Ill., 136 S. Ct. 447, 449 (2015) (Thomas, J., dissenting from denial of certiorari) ("The question under Heller is not whether citizens have adequate alternatives available for self-defense.  Rather, Heller asks whether the law bans types of firearms commonly used for a lawful purpose—regardless of whether alternatives exist.").

possession of handguns so long as the possession of other firearms (*i.e.*, long guns) is allowed."); Caetano, 136 S. Ct. at 1033 (Alito, J., concurring) ("[T]he right to bear other weapons is 'no answer' to a ban on the possession of protected arms.").

Indeed, the State's analogy to pepper spray as being an "adequate alternative" to a taser or a stun gun is a particularly poor one. The parties have offered competing expert opinions on the safety and efficacy of pepper spray, which is subject to extensive regulation in the State of New York. Among other things, state law dictates the active ingredient (oleoresin capsicum), the strength (no more than 0.7 percent by weight total capsaicinoids), and the total weight (not to exceed 0.75 ounce). N.Y. COMP. CODES R. & REGS. tit. 10, § 54.3.

As Avitabile points out, though, law enforcement enjoys access to a much stronger formulation of pepper spray than civilians do. Thus, the State's argument that pepper spray is an "adequate alternative" for self-defense purposes might make some sense if plaintiff in this case were seeking to possess and use law enforcement-strength pepper spray.

Assuming, arguendo, that self-defense sprays were entitled to Second Amendment protection, the State might convincingly argue that the challenged restrictions left open "adequate alternatives"—the legislature did not ban the whole class of weapons (i.e., self-defense sprays) but rather imposed reasonable restrictions on their civilian use. Cf. Decastro, 682 F.3d at 167-68 (analogizing permissible Second Amendment restrictions to reasonable "time, place and manner restrictions" under the First Amendment).

Of course, that is not the case here. And worse yet, adopting the State's broad reading of the "adequate alternative" language might justify any number of bizarre restrictions. For instance, a state might conceivably ban all (or almost all) firearms but handguns, since the "quintessential self-defense" weapon is surely a constitutionally

"adequate alternative" for that purpose, even for the citizen who would prefer not to use deadly force.  But see Caetano, 136 S. Ct. at 1033 (Alito, J., concurring) ("Countless people may have reservations about using deadly force, whether for moral, religious, or emotional reasons—or simply out of fear of killing the wrong person.").

Or as the State suggests in its reply memorandum, the baseball bat Avitabile already owns certainly counts as the type of thing a determined person could pick up and use for self-defense.  What other self-defense weapons could be banned by pointing to baseball bats as a so-called "adequate alternative"?

In sum, the Court declines to conclude that the "adequate alternative" language sweeps so broadly as to mean that a state can permissibly enact what amounts to a total ban on an entire class of weapons that are in common use for the lawful purpose of self-defense simply because various alternative items that might also be useful for that purpose could still be obtained and kept in the home.  Accordingly, some form of heightened scrutiny must apply to the total ban at issue in this case.

### 3. Application of Scrutiny

On this final step, Avitabile renews his argument that strict scrutiny should apply because § 265.01(1) substantially burdens the core right of a law-abiding citizen to acquire and possess a taser or stun gun for self-defense in his own home.  As plaintiff points out, the State does not appear to have engaged with his strict scrutiny argument at all, instead opting to discuss only intermediate scrutiny, even in its reply memorandum.

This is a difficult question.  The comprehensive reach of the ban certainly suggests that strict scrutiny might be warranted.  After all, "[b]oth Heller and McDonald suggest that broadly prohibitory laws restricting the core Second Amendment right—like the handgun

bans at issue in those cases, which prohibited handgun possession even in the home—are categorically unconstitutional." Ezell v. City of Chicago, 651 F.3d 684, 703 (7th Cir. 2011).  And in Jimenez, the Second Circuit reiterated that "[l]aws that place substantial burdens on core rights are examined using strict scrutiny."  895 F.3d at 234.

Ultimately, the court in Jimenez chose to apply intermediate scrutiny because the defendant, who was dishonorably discharged for felony-equivalent misconduct, was not among those "law-abiding and responsible" persons whose interests in possessing arms "are at the Second Amendment's core."  Id. at 235; see also N.Y. State Rifle II, 883 F.3d at 59 (characterizing the "core right" of the Second Amendment as the right of "self-defense in the home).

But that particular distinction is not available in this case.  Avitabile is precisely the kind of law-abiding citizen whose interest in self-defense, especially in his own home, has been recognized as the "core" of the Second Amendment.

On the other hand, Avitabile has not established that these arms are as popularly owned and used for self-defense as the handgun, which Heller called the "quintessential self-defense weapon."  In N.Y. State Rifle I, the Second Circuit leaned into this particular distinction to conclude the application of intermediate scrutiny was more appropriate.  804 F.3d at 258 (signaling lesser scrutiny is appropriate where regulated weapons were "not nearly as popularly owned and used for self-defense as the handgun").

More recently, a district court applied intermediate scrutiny to invalidate New York's blanket ban on the possession and use of nunchaku, a martial arts weapon.  Maloney, 351 F. Supp. 3d 239.  Notably, the nunchaku ban at issue in Maloney involved § 265.01(1), the very

same penal law at issue in this case.  Id.  Accordingly, out of an abundance of caution, intermediate scrutiny will be applied.

Although "'intermediate scrutiny' may have different connotations in different contexts, here the key question is whether the statute[ ] at issue [is] 'substantially related to the achievement of an important governmental interest.'"  N.Y. State Rifle I, 804 F.3d at 261 (quoting Kachalsky, 701 F.3d at 96).  "In making this determination, [the court] afford[s] 'substantial deference to the predictive judgments of the legislature.'"  Id.

Avitabile does not dispute that New York has a compelling interest in promoting public safety and preventing crime.  The only question that remains is whether § 265.01(1)'s total ban on all civilian possession of tasers and stun guns (even in their own homes) is "substantially related" to the achievement of those asserted interests.

It is not.  "To survive intermediate scrutiny, the 'fit between the challenged regulation [and the government interest] need only be substantial, not perfect."  N.Y. State Rifle I, 804 F.3d at 261 (quoting Kachalsky, 701 F.3d at 97).  Even so, the party seeking to defend the constitutionality of the law or regulation must still produce evidence that "fairly support[s]" its asserted rationale.  Id.

The State leads off with a general argument about the importance of public safety and crime prevention, and supports that argument with citations to state and federal court cases from around the country discussing instances in which a party used a taser or stun gun to inflict harm.

Many of these decisions characterize a taser or stun gun as a "dangerous" weapon.  However, these cases do not support the notion that a law banning the possession

- 23 -

of all electric arms by all civilians in all settings is "substantially related" to the admittedly laudable goals of public safety and crime prevention.

United States v. Agron, 921 F.2d 25 (2d Cir. 1990) (per curiam), is a direct appeal from a criminal conviction in the District of Vermont.  The defendant challenged the application of a provision of the U.S. Sentencing Guidelines that increased a defendant's base offense level if he possessed a "dangerous weapon" during the offense of conviction.  Id. at 26.

The Second Circuit rejected the defendant's claim that a "stun gun" was not a "dangerous weapon" under the relevant Guidelines provision.  Agron, 921 F.2d at 26.  But this case has nothing to do with the legality of the possession of stun guns in New York or even in Vermont, where the crime occurred.  In fact, stun guns appear to be legal to possess and own in the State of Vermont.

The same is true of United States v. Wallace, 800 F.2d 1509, 1513 (9th Cir. 1986), a direct appeal from a criminal conviction in the Central District of California under a federal statute that prohibits a person from boarding a plane with a "concealed dangerous weapon."  800 F.2d at 1512.

The Ninth Circuit concluded that a "stun gun" qualified as the kind of "dangerous weapon" proscribed by the statute.  Wallace, 800 F.2d at 1512.  However, California law also permits the purchase, possession, and use of stun guns in accordance with appropriate regulations.  See, e.g., CAL. PENAL CODE § 22610.

These cases do not hint at a justification for a *total* ban on these arms, in New York or elsewhere.  Nevertheless, the State maintains that this collection of case law broadly reflects the notion that "the Legislature of New York has simply acted within this time-worn historical

tradition in order to protect its citizens from a weapon that it considers to be 'dangerous' to public safety."

That may be true.  But as <u>Heller</u> and its progeny make clear, the fact that a class of arms entitled to Second Amendment protection *might* be dangerous in the wrong hands (e.g., handguns) does not necessarily justify their blanket ban in all settings.

To be sure, the apparent nationwide recognition that tasers and stun guns are not children's toys, and might be dangerous in the wrong hands, would almost certainly justify various limitations on their possession and use, such as the relatively extensive regulations New York has already imposed on pepper spray.[8]

For example, the significant interest in public safety and crime prevention has been properly invoked to uphold federal bans on the possession of *certain* arms by *certain* classes of citizens, such as drug users or those convicted of domestic violence.  <u>See, e.g.</u>, <u>United States v. Chovan</u>, 735 F.3d 1127, 1141 (9th Cir. 2013) (applying intermediate scrutiny to uphold federal statute banning gun possession by domestic violence misdemeanants); <u>United States v. Yancey</u>, 621 F.3d 681, 687 (7th Cir. 2010) (applying something "more than merely" rational basis review to uphold federal statute banning gun possession by drug addicts).

But the State's general appeal to public safety is particularly hard to square with its suggestion, made repeatedly in its briefs and at oral argument, that Avitabile should just go

---

[8]  Courts recognize that the improper use of pepper spray, just like the improper use of tasers and stun guns, can be dangerous.  <u>See, e.g.</u>, <u>United States v. Mosley</u>, 635 F.3d 859 (6th Cir. 2011) (Sutton, J.) (holding that unjustified use of pepper spray qualifies as a "crime of violence"); <u>United States v. Maiden</u>, 606 F.3d 337 (7th Cir. 2010) (affirming sentencing enhancement based on ill effects from defendant's use of pepper spray during a robbery).

out and buy a handgun, or perhaps a few more shotguns or rifles, if he wants to better protect himself.

As the dissent noted in Heller, then-available data on firearm-related deaths showed there were 180,533 such deaths between 1993 and 1997, or an average of 36,000 per year.  Heller, 554 U.S. at 696 (Breyer, J., dissenting).  Over that same period of time, there were 411,800 nonfatal firearm-related injuries, averaging out to 82,000 per year.  Id.

And in New York alone, recent data from the Centers for Disease Control and Prevention show there were 900 deaths (in 2016), 849 deaths (in 2015), and 875 deaths (in 2014) from firearms, to say nothing of firearm-related injuries, intentional or otherwise.[9]

Yet despite the wide availability of this kind of year-over-year data confirming the prevalence and relative dangerousness of firearms, New York recognizes that a blanket ban on the civilian possession and use of firearms would be overly broad and totally inconsistent with the Second Amendment.

In fact, although New York requires a license to own and carry a handgun, N.Y. PENAL LAW § 400.00 et seq., and regulates the possession of a certain subset of dangerous firearms such as machine guns and sawed-off shotguns, §§ 265.00(1), (3), outside of New York City the State does not even require a permit to purchase, or a license to possess, a rifle or a shotgun.

As a practical matter, an argument could be made that the present New York law banning tasers and stun guns actually increases the danger of death and injury, particularly in the home.  A law-abiding citizen like Avitabile, if prevented from buying a taser or stun gun,

---

[9] Stats of the State of New York, https://www.cdc.gov/nchs/pressroom/states/newyork/newyork.htm

would buy a handgun for protection in the home.  This would result in more handguns in the home.  A handgun in the home would be much more likely to result in injury or death than a taser or a stun gun.  Fewer handguns in the home would result in fewer injuries or deaths.  More handguns in circulation increase the likelihood of criminal activity causing injury or death, both in the home and out of it.  Therefore, the complete ban on tasers and stun guns actually undermines public safety and crime prevention because it results in more crimes, injuries, and deaths.

In short, a mere generalized appeal to public safety and crime prevention as the justification for a total and complete ban on a whole class of arms is precisely the kind of "shoddy reasoning" that even intermediate scrutiny forbids.  Kachalsky, 701 F.3d at 97 ("[O]n intermediate scrutiny review, the state cannot get away with shoddy data or reasoning.").

Instead, "[t]o survive intermediate scrutiny, the defendant[ ] must show '*reasonable* inferences based on *substantial* evidence' that the statute[ ] [is] substantially related to the governmental interest."  Maloney, 351 F. Supp. 3d at 239 (quoting N.Y. State Rifle I, 804 F.3d at 264).

The State offers as relevant evidence the two bill jackets for the amendments to § 265.01 that added tasers and stun guns to the list of prohibited items and the expert opinion of New York State Trooper Philip Shappy, a "Senior Defensive Tactics instructor" at the State Police Academy.

However, a careful review of this legislative history confirms that the complete ban on tasers and stun guns was not reasonably based on any substantial evidence considered by the state legislature.  And while Trooper Shappy's affidavit lends support to the proposition that pepper spray is a viable alternative for civilian self-defense, there is no indication that the

legislature considered that kind of possibility or drew that kind of conclusion in settling on a *complete* ban, either in 1976 or in 1990.

The State has not introduced substantial evidence from which it could be reasonably inferred that *complete* bans on tasers and stun guns, even ones kept in the home of a law-abiding citizen like Avitabile, are "substantially related" to the admittedly compelling interests in public safety and crime prevention.  Maloney, 351 F. Supp. 3d at 239 (rejecting State's public safety rationale for substantially similar reasons).  Accordingly, § 265.01(1), as applied to "electronic dart guns" and "electronic stun guns," must be invalidated as unconstitutional.

## V. CONCLUSION

New York's sweeping prohibition on the possession and use of tasers and stun guns by all citizens for all purposes, even for self-defense in one's own home, must be declared unconstitutional in light of Heller.  To be clear, this conclusion does not foreclose the possibility that some restriction(s) on the possession and/or use of tasers and stun guns would be permissible under the Second Amendment.  Other states have already done this.  See, e.g., WIS. STAT. § 941.295(2g)(b) (permitting possession of "electric weapon" in home or place of business).  New York might consider doing so as well.

Therefore, it is

ORDERED that

1.  Plaintiff's motion for summary judgment is GRANTED;

2.  Defendant's cross-motion for summary judgment is DENIED;

3.  New York Penal Law § 265.01(1), as applied to "electronic dart guns" and "electronic stun guns," is an unconstitutional restriction on the right to bear arms; and

4.  Defendant, his officers, agents, servants, employees, and all persons in active concert or participation with the New York State Police are hereby ENJOINED from enforcing New York Penal Law § 265.01(1) as applied to "electronic dart guns" and "electronic stun guns."

The Clerk of the Court is directed to enter a judgment accordingly and close the file.

IT IS SO ORDERED.

Dated:  March 22, 2019
      Utica, New York.

United States District Judge